# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Case No.: _____

## JOSEPH RIAD
## AND
## RIAD HOLDINGS, INC.

*Plaintiffs,*

– v. –

## WELLS FARGO BANK, N.A.,

*Defendant.*

---

## COMPLAINT AND JURY DEMAND, 12 JURORS

MICKALA RECTOR, ESQ.
ID No. 315082
RECTOR LAW
509 Schoolhouse Road
Kennett Square, Pennsylvania 19348
(484) 748-1423
mickala.rector@gmail.com

*Attorney for Plaintiffs*

## TABLE OF CONTENTS

COMPLAINT ................................................................................................. 3

INTRODUCTION ......................................................................................... 3

THE PARTIES ............................................................................................. 6

JURISDICTION AND VENUE .................................................................... 8

BACKGROUND FACTS.............................................................................. 10

  A.  FACTS RELEVANT TO CERTAIN CASHIER'S CHECKS PURCHASED
      BY PLAINTIFF RIAD AND/OR PLAINTIFF RIAD  HOLDINGS........................... 10

  B.  FACTS RELEVANT TO CERTAIN UNAUTHORIZED WIRES
      FROM PLAINTIFF RIAD'S AND/OR PLAINTIFF RIAD HOLDINGS' ACCOUNTS
      WITH DEFENDANT WELLS FARGO.................................................................... 41

  C.  FACTS RELEVANT TO CONSUMER FRAUD BY DEFENDANT WELLS FARGO
      IN RELATION TO PLAINTIFF RIAD AND PLAINTIFF RIAD HOLDINGS .......... 72

      COUNT 1 ............................................................................................... 86
      BREACH OF CONTRACT ..................................................................... 86

      COUNT 2 ............................................................................................... 97
      UNJUST ENRICHMENT (ALTERNATIVE TO COUNT 1)..................... 97

      COUNT 3 ............................................................................................... 104
      CONVERSION (ALTERNATIVE TO COUNT 1)................................... 104

      COUNT 4 ............................................................................................... 109
      NEGLIGENCE BY DEFENDANT WELLS FARGO
      UNDER RESPONDEAT
      SUPERIOR………………………………………………………………..109

      COUNT 5 ............................................................................................... 125
      NEGLIGENT HIRING/SUPERVISION ................................................. 125

      COUNT 6 ............................................................................................... 133
      CONSUMER FRAUD BY DEFENDANT WELLS FARGO…………………………133

      APPENDIX 1...................................................................................... 142
      *First Version of the First Fraudulent Wire Transfer Request Form*

      APPENDIX 2...................................................................................... 143
      *Second Version of the First Fraudulent Wire Transfer Request Form*

      APPENDIX 3...................................................................................... 144

*Third Version of the First Fraudulent Wire Transfer Request Form*

**APPENDIX 4** ................................................................................................ 145
*Second Fraudulent Wire Transfer Request Form*

**APPENDIX 5** ................................................................................................ 146
*Third Fraudulent Wire Transfer Request Form*

**APPENDIX 6** ................................................................................................ 147
*First Version of the Fifth Fraudulent Wire Transfer Request Form*

**APPENDIX 7** ................................................................................................ 148
*Second Version of the Fifth Fraudulent Wire Transfer Request Form*

**APPENDIX 8** ................................................................................................ 149
*Sixth Fraudulent Wire Transfer Request Form*

**APPENDIX 9** ................................................................................................ 150
*Table 1.1, The Fraudulent Churn Accounts, Redacted Account Numbers*

## COMPLAINT

The Plaintiffs, Joseph Edward Riad ("**Riad**") and Riad Holdings (doing business as Riad Holdings, Riad Trust & Holdings and/or Riad Holdings Inc. ("**Riad Holdings**"), by and through their attorneys, Rector Law, hereby file this Complaint and in support thereof aver as follows:

## INTRODUCTION

1.     This is an action against Defendant Wells Fargo Bank, N.A. ("**Wells Fargo**") seeking damages and such other relief the Court deems just or proper.

2.     Plaintiff Riad and Plaintiff Riad Holdings each allege, as set forth herein or that may otherwise be proved by evidence at trial:

(a)     Breach of contract by Defendant Wells Fargo;

(b)     Unjust Enrichment by Defendant Wells Fargo (as an alternative to breach of contract);

(c)     Conversion by Defendant Wells Fargo (as an alternative to breach of contract and/or unjust enrichment);

(d)     Negligence of Defendant Wells Fargo under Respondeat Superior;

(e)     Negligent Hiring and/or Supervision by Defendant Wells Fargo; and

(f)     Consumer Fraud by Defendant Wells Fargo,

in connection with the following:

2.1     Defendant Wells Fargo's failure to credit an account held by Defendant Wells Fargo in the joint names of Plaintiff Riad and Plaintiff Riad Holdings (the "**Joint Account**") and/or an account held by Defendant Wells Fargo in the joint names of Plaintiff Riad and Michelle Schepperd ("**Schepperd**"), the

former common law partner and mother of a daughter of Plaintiff Riad (the "**Riad Schepperd Account**") and/or such other accounts opened and/or closed and/or held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings, directly or indirectly, with funds deposited and used to purchase five (5) cashier's checks identified herein and representing the funds comprising the four (4) Dollar amounts set forth in the Original Complaint.

2.2     Defendant Wells Fargo's dealing in funds from the Joint Account and/or the Riad Schepperd Account and/or such other accounts opened and/or closed and/or held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings, directly or indirectly:

    (a)     Without Riad's knowledge, consent or bona fide signature on any of the respective Wire Transfer of Funds Request forms; and/or

    (b)     Pursuant to improper conduct associated therewith conducted by Defendant Wells Fargo, by and/or through an employee or employees thereof acting as authorized agents of Defendant Wells Fargo at the time.

2.3     Defendant Wells Fargo's failure to return fees incorrectly and/or improperly deducted from accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings, directly or indirectly, arising from Defendant Wells Fargo's improper withdrawal, transfer and/or other incorrect, improper or fraudulent dealing in such funds.

2.4     Defendant Wells Fargo's failure to credit interest otherwise due and payable by Defendant Wells Fargo to Plaintiff Riad and/or Plaintiff Riad Holdings in respect of funds in accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings, directly or indirectly, due to Defendant Wells Fargo's improper withdrawal, transfer and/or other incorrect, improper or fraudulent dealing in such funds.

2.5     Defendant Wells Fargo's opening and closing of accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings without the knowledge, consent or authority of Plaintiff Riad and/or Riad Holdings and concurrent improper withholding, withdrawal, transfer and/or other incorrect, improper or fraudulent dealing in funds of Plaintiff Riad and/or Plaintiff Riad Holdings associated therewith to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

2.6     Such other conduct by Defendant Wells Fargo, by and/or through an employee or employees thereof, involving incorrect and/or improper and/or fraudulent dealing in respect of:

(a)     Accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings; and

(b)     Funds held by Defendant Wells Fargo  for the benefit of Plaintiff Riad and/or Riad Holdings; and/or

(c)     Instruments issued and/or held by Defendant Wells Fargo related to funds held by Defendant Wells Fargo  for the benefit of Plaintiff Riad and/or Riad Holdings,

without the knowledge, consent or authority of Plaintiff Riad and/or Riad Holdings.

3.     Plaintiff Riad and Plaintiff Riad Holdings request a judgment against Defendant Wells Fargo Bank for Counts 1 through 6 for those damages alleged in Counts 1 through 6 as set forth herein as well as treble and punitive damages if available under applicable law and any and all other relief as this Honorable Court may deem appropriate.

## THE PARTIES

4.      Plaintiff Riad is an adult individual with a residence in Chester County, Pennsylvania.

5.      At all relevant times to this Complaint:

5.1         Plaintiff Riad Holdings was a sole proprietorship wholly owned by Plaintiff Riad.

5.2         Plaintiff Riad Holdings, Inc. was incorporated in 2012 as a Delaware corporation solely owned by Plaintiff Riad.

6.      At all times mentioned in this Complaint, each Plaintiff was a customer of Defendant Wells Fargo and maintained bank account(s) with Defendant Wells Fargo.

7.      Defendant Wells Fargo is, and at all relevant times was:

7.1         A national banking association established in the State of South Dakota, having its principal place of business in the City and County of San Francisco and in the State of California.

7.2         Defendant Wells Fargo is a citizen of the State of South Dakota.

8.      Defendant Wells Fargo is a subsidiary of Wells Fargo & Company ("**WFC**").

8.1         WFC is a public company listed on the New York Stock Exchange ("**NYSE**" under the ticker symbol 'WFC').

8.2         On 31 December 2008, Wachovia Corporation ("**Wachovia**") merged with WFC ("**Wells Fargo-Wachovia Merger**") with WFC as the continuing entity.

8.3         Prior to the Wachovia-Wells Fargo Merger, Defendant Wells Fargo's Kennett Square Branch was a Wachovia branch.

8.4      Starting in 2009, the Wachovia brand was absorbed into Defendant Wells Fargo's brand in a process that lasted approximately three (3) years.

8.5      Defendant Wells Fargo continued to use the Wachovia brand until the Wachovia brand was retired by Defendant Wells Fargo and/or WFC on or about 15 October 2011.

9.       Since all relevant acts occurred after the Wells Fargo-Wachovia Merger, any action taken under the Wachovia brand name was action taken by Wells Fargo.[1]

10.      Unless otherwise specifically stated, all acts of the employees of Defendant Wells Fargo occurred at Defendant Wells Fargo's branch located at 400 Scarlet Road, Kennett Square, Pennsylvania (the "**Kennett Square Branch**" or the "**Branch**").

11.      At all times mentioned in this Complaint, Defendant Wells Fargo offered, for good and valuable consideration, community banking products and services.

12.      Defendant Wells Fargo's employees routinely provided the following services to customers of Defendant Wells Fargo as part of their customary scope of employment with Defendant Wells Fargo and in furtherance of Defendant Wells Fargo's provision of products and services to customers (for good and valuable consideration) as part of its community banking and other business segments:

(a)      Handled customer funds, including deposits, transfers and/or withdrawals of such funds;

(b)      Opened, closed and managed deposits, withdrawals and/or transfers of funds from accounts held by Defendant Wells Fargo on behalf of customers;

(c)      Issued cashier's checks, received unused cashier's checks and credited bank accounts, including purchasers' bank accounts (or such other accounts) and otherwise dealt with the issuance and disposition of cashier's

---

[1]      Documents or other factual allegations identifying or otherwise referring to the Kennett Square Branch or Branch as "Wachovia" do not refer to a separate banking entity or to the pre-merger entity.

checks issued by Defendant Wells Fargo; and

(d)    Undertook electronic transfers of funds between customers and other parties within and beyond the United States of America ("**Wire Transfers**").

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this case based on diversity of citizenship pursuant to *28 U.S.C. §1332* because the parties are diverse and the amount in controversy exceeds $75,000.00:

13.1    Plaintiff Riad, resides in the county of Chester in the state of Pennsylvania.

13.2    Plaintiff Riad Holdings, Inc. is a Delaware corporation with an address located in New Castle County, Delaware.

13.3    Defendant Wells Fargo, for the purposes of diversity jurisdiction, is solely a citizen of the state of South Dakota pursuant to *28 U.S.C. §1348*:

(a)    Defendant Wells Fargo is a national bank; and

(b)    Defendant Wells Fargo, for purposes of diversity jurisdiction, is a citizen only of South Dakota because its "main office" is 'located' in the state of South Dakota. *Wachovia Bank v. Schmid,* 546 U.S. 303, 309 (2006); *Rouse v. Wachovia Mortgage, FSB, a division of Wells Fargo Bank, N.A.*, *No. 12-55278* (9th Cir. 2014).

14.    This Court has personal jurisdiction over Defendant Wells Fargo because the alleged controversy arises out of the Defendant's forum related activities.

14.1    Defendant Wells Fargo purposely availed itself of conducting ongoing business within the Commonwealth of Pennsylvania:

(a)    Defendant Wells Fargo continuously offers community banking services within the Commonwealth of Pennsylvania including, but not limited to, at the Kennett Square Branch; and

(b)     Plaintiff Riad and Plaintiff Riad Holdings incorporate Paragraphs 6-12 by reference as if stated fully herein.

14.2     A substantial portion of the transactions and/or occurrences and/or a majority of the tortious actions which give rise to this Complaint occurred within this judicial district and in the Commonwealth of Pennsylvania.

14.3     Plaintiff Riad and Plaintiff Riad Holdings suffered harm within the Commonwealth of Pennsylvania and within this judicial district.

15.     Venue is proper under *12 U.S.C. § 94* in this judicial district because:

(a)     Venue exists under *12 U.S.C. § 94*, in the judicial district where the "association…is 'located'". An association is 'located' in all districts in which the bank operates a branch. *Citizens & Southern National Bank v. Bougas*, 434 U.A. 35 (1977); and

(b)     A substantial portion of the transactions and/or occurrences which give rise to the causes of action set forth in this Complaint arose within this judicial district, to wit, in the Kennett Square Branch.

*(Background Facts Commences on Following Page)*

## BACKGROUND FACTS

**A.    FACTS RELEVANT TO CERTAIN CASHIER'S CHECKS PURCHASED BY PLAINTIFF RIAD AND/OR PLAINTIFF RIAD  HOLDINGS**

16.    At all times and places mentioned herein, Plaintiff Riad and/or Plaintiff Riad Holdings were and/or are a customer of Defendant Wells Fargo.

17.    At all times and places mentioned herein, Triandos Randolph ("**Randolph**") was a Store Manager III and/or an Assistant Vice President of Defendant Wells Fargo at the Kennett Square Branch.

17.1        Randolph was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo;

17.2        As part of his employment duties with Defendant Wells Fargo, Randolph was responsible for the supervision and/or management of employees at the Branch in the ordinary course of his employment;

17.3        Randolph had access to and/or the ability to input and/or manipulate data within Defendant Wells Fargo's management information systems;

17.4        Randolph as issued with and used at least one (1) email address and one (1) email account owned, operated and maintained by Defendant Wells Fargo, including but not limited to triandos.randolphjr@wellsfargo.com; and

17.5        Randolph was acting within the scope of his employment with Defendant Wells Fargo.

18.    Upon information and belief, at a time after all times and places mentioned herein, the employment of Randolph with Defendant Wells Fargo was terminated for cause by Defendant Wells Fargo.

19.    At all times mentioned herein, Defendant Wells Fargo had a duty to exercise

reasonable care to its customers and ensure that its employees exercised a duty of reasonable care to its customers in relation to:

(a)    The issue and cashing of cashier's checks purchased by any customer;

(b)    The return, receipt and disposition of unused cashier's checks purchased by any customer;

(c)    The acceptance for deposit of cashier's checks, including the deposit of such cashier's checks;

(d)    Maintaining bank account records that accurately reflect the balance of funds in every customer's account with Defendant Wells Fargo;

(e)    Correctly debiting and crediting funds deposited into and withdrawn from every customer's account with Defendant Wells Fargo including, without limitation, cashier's checks; and

(f)    The detection, prevention and remedy of fraud and/or other criminal conduct related to any cashier's checks and/or accounts held for the benefit of customers by Defendant Wells Fargo including, but not limited to, fraud and/or other criminal conduct committed by any employee or employees of Defendant Wells Fargo,

in accordance with established procedures and/or customary banking best practices reasonably expected of a large financial institution in the United States of America.

19.1    In *Nat'l Bank v. Graham,* the United States Supreme Court held:

(a)    A national bank owes its customers a duty of reasonable care in connection with the banking activities it performs, including accepting, safekeeping and returning deposits. *Nat'l Bank v. Graham, 100 U.S. 699, 701-702 (1889).*

(b)     A national bank breaches its duty of reasonable care whereby it fails and/or refuses to return the deposit or its value to the customer.  "The only way of escape from liability to the [plaintiff] would have been to return the property to the owner…" *Id.*

20.     Within all times mentioned herein, Randolph introduced Plaintiff Riad and Plaintiff Riad Holdings to at least four (4) business entities located and/or representing parties located in Burkina Faso and/or other countries in Africa and/or with the capability to supply gold from Burkina Faso and/or other countries in Africa (the "**Burkina Faso Companies**").

20.1     One party was called Von Atlas Consultants LLC ("**Von Atlas**").

20.2     One party was called Sant Jude Mining Corp. ("**Saint Jude**").

20.3     One party was called Elevation Consultants & Investments, LLC ("**Elevation**").

20.4     One of party was called Panasoft Strategic Solutions (**Panasoft**").

21.     Randolph orally encouraged Plaintiff Riad and Plaintiff Riad Holdings to enter into business with such entities.

21.1     Randolph explicitly represented to Plaintiff Riad that Defendant Wells Fargo was a bank founded upon "stage coaches and the transport of gold" and was a sophisticated party in this area of commerce.

21.2     Randolph explicitly represented to Plaintiff Riad that Defendant Wells Fargo was aware of Randolph's provision of introductory services in respect of the business proposed with the Burkina Faso Companies.

21.3     Randolph explicitly represented to Plaintiff Riad that the provision of introductory services to the Burkina Faso Companies was within the scope of his employment with Defendant Wells Fargo.

21.4    Randolph wrote several letters on Defendant Wells Fargo letterhead and stamped with Defendant Wells Fargo's Branch stamp to third parties which represented that:

    (a)    Plaintiff Riad was and had been a customer of Defendant Wells Fargo for twenty (20) years;

    (b)    Plaintiff Riad had substantial funds and assets on deposit with Defendant Wells Fargo; and

    (c)    Plaintiff Riad's funds on deposit with Defendant Wells Fargo were sufficient to undertake transactions of the nature contemplated by the business anticipated with such entities.

21.5    Randolph made his representations to Plaintiff Riad at the Branch and elsewhere and through communication channels owned, operated and maintained by Defendant Wells Fargo and used by Randolph in the ordinary course of his employment by Defendant Wells Fargo.

21.6    Randolph represented that the Burkina Faso Companies were bona fide companies capable of selling the commodity of gold to the Plaintiff Riad and Plaintiff Riad Holdings on attractive terms.

22.    Randolph suggested that if Plaintiff Riad and/or Plaintiff Riad Holdings purchased cashier's checks issued by Defendant Wells Fargo, the he would send scanned images of such cashier's checks to the Burkina Faso Companies to evidence that the Plaintiffs were qualified buyers with sufficient funds to make certain purchases.

22.1    Defendant Randolph represented to the Plaintiffs that they would not actually need to pay the Burkina Faso Companies until the Plaintiffs received the gold in the United States of America and completed the smelting and assaying of the same.

22.2    Randolph represented that, after images of the cashier's checks were sent to the Burkina Faso Companies, such checks would be marked as "not used

for the intended purpose" and returned to the Plaintiffs bank accounts held with Defendant Wells Fargo.

23. As such representations were made by Randolph, in part, at the Branch or through Defendant Wells Fargo communications channels including, but not limited to, letters written on Defendant Wells Fargo letterhead, Plaintiff Riad and Plaintiff Riad Holdings reasonably believed and relied upon such reasonable belief that:

(a)    Randolph made such introductions as part of the services offered to premium customers of Defendant Wells Fargo (such as Plaintiff Riad) by Defendant Wells Fargo;

(b)    Randolph's representations were made in his capacity as an employee and/or authorized agent of Defendant Wells Fargo and within the permitted scope of his employment with Defendant Wells Fargo;

(c)    Randolph would not be authorized to make such introductions unless such introductory services were authorized by Defendant Wells Fargo;

(d)    Randolph would not be authorized to make such introductions unless the Burkina Faso Companies were known to Defendant Wells Fargo;

(e)    Randolph would not be authorized to make such introductions unless Defendant Wells Fargo, as a regulated financial institution, had completed at least a cursory due diligence regarding the bona fides of the Burkina Faso Companies; and

(f)    Randolph would not be authorized to make such introductions unless Defendant Wells Fargo, given stringent regulatory requirements governing Defendant Wells Fargo and the conduct of its business as a regulated financial institution, regarded the Burkina Faso Companies as reputable companies in good standing with Defendant Wells Fargo.

24. Based on and reasonably relying upon representations made by Randolph, Plaintiff Riad and Plaintiff Riad Holdings made contact with the Burkina Faso

Companies.

25. Based on and reasonably relying upon representations made by Randolph, Plaintiff Riad and Plaintiff Riad Holdings subsequently agreed to further explore the opportunities raised by Randolph with the Burkina Faso Companies.

26. Facilitated and guided by Randolph and reasonably relying upon the representations of Randolph at all times, Plaintiff Riad transferred funds on three (3) occasions from other accounts held with Defendant Fargo into the Joint Account with a total value of $3,500,000.00.

26.1    On or about 2 December 2011, Plaintiff Riad visited the Branch and transferred $1,200,000.00 from another account held with Defendant Wells Fargo to the Joint Account (the "**First Deposit**").

26.2    On or about 8 December 2011, Plaintiff Riad visited the Branch and transferred $1,200,000.00 from another account held with Defendant Wells Fargo to the Joint Account (the "**Second Deposit**").

26.3    On or about 22 December 2011, Plaintiff Riad visited the Branch and transferred $1,100,000.00 from another account held with Defendant Wells Fargo to the Joint Account (the "**Third Deposit**").

(collectively the "**Three Deposits**").

27. Facilitated and guided by Randolph and reasonably relying upon the representations of Randolph at all times, Plaintiff Riad and/or Plaintiff Riad Holdings made four (4) withdrawals from the Joint Account with a total value of $4,600,000.00.

27.1    On or about 2 December 2011, a withdrawal of $1,200,000.00 was made by Plaintiff Riad from the Joint Account with Defendant Wells Fargo. The withdrawal ticket record made by Defendant Wells Fargo noted that such withdrawal was for "Elevation Consultants & Investments LLC." (the "**First Withdrawal"**).

27.2    On or about 8 December 2011, a withdrawal of $1,200,000.00 was made by Plaintiff Riad from the Joint Account with Defendant Wells Fargo.  The withdrawal ticket made by Defendant Wells Fargo noted that such withdrawal was for "Saint Jude Mining Corp." (the "**Second Withdrawal"**).

27.3    On or about 22 December 2011, a withdrawal of $1,100,010.00 was made by Plaintiff Riad from the Joint Account with Defendant Wells Fargo.  The withdrawal ticket made by Defendant Wells Fargo noted that such withdrawal was for "Von Atlas Consultants LLC" (the "**Third Withdrawal"**).

27.4    On or about 23 December 2011, a withdrawal of $1,100,010.00 was made by Plaintiff Riad from the Joint Account with Defendant Wells Fargo.  The withdrawal ticket made by Defendant Wells Fargo noted that such withdrawal was for "Von Atlas Consultants LLC" (the "**Fourth Withdrawal"**).

(collectively the "**Four Withdrawals**").

28.    Facilitated and guided by Randolph and reasonably relying upon the representations of Randolph at all times, Plaintiff Riad and/or Plaintiff Riad Holdings used proceeds of the Four Withdrawals to purchased four (4) cashier's checks issued by Defendant Wells Fargo with a total value of $4,600,000.00 to conduct business with the Burkina Faso Companies.

28.1    On or about 2 December 2011, Plaintiff Riad used proceeds from the First Withdrawal to purchase a cashier's check in or about in the amount of $1,200,000.00 payable to "Elevation Consultants & Investments LLC." (the "**First Cashier's Check"**).

28.2    On or about 8 December 2011, Plaintiff Riad used proceeds from the Second Withdrawal to purchase a cashier's check in or about in the amount of $1,200,000.00 payable to "Saint Jude Mining Corp." (the "**Second Cashier's Check"**).

28.3    On or about 22 December 2011, Plaintiff Riad used proceeds from the Third

Withdrawal to purchase a cashier's check in or about in the amount of $1,100,000.00 payable to "Von Atlas Consultants LLC" (the "**Third Cashier's Check**").

28.4     On or about 23 December 2011, Plaintiff Riad used proceeds from the Fourth Withdrawal to purchase a cashier's check in or about in the amount of $1,100,000.00 payable to "Von Atlas Consultants LLC" (the "**Fourth Cashier's Check**").

(collectively the "**Four Cashier's Checks**").

29.     Plaintiff Riad made the Three Deposits to collectively fund the First Withdrawal, the Second Withdrawal and the Third Withdrawal as Plaintiff Riad wanted a distinct record of each deposit to correspond with each cashier's check.  Plaintiff Riad did make any further deposit to fund the Fourth Withdrawal as sufficient funds existed in the Joint Account to cover the Fourth Withdrawal and purchase of the Fourth Cashier's Check.

30.     Plaintiff Riad made the Three Deposits that funded the Four Withdrawals prior to purchase of any of the Four Cashier's Checks.  It appears that Defendant Wells Fargo did not use correct routing numbers in relation to the Three Deposits and/or such other deposits related to the Four Cashier's Checks.

31.     Following purchase and receipt of each of the Four Cashier's Checks at the Branch, Plaintiff Riad handed over each of the Four Cashier's Checks to Randolph at the Branch.

32.     Upon receipt of each of the Four Cashier's Checks from Plaintiff Riad at the Branch, Randolph left Plaintiff Riad's presence and went to his office or elsewhere within the Branch with, in each instance, one of the Four Cashier's Checks in one of his hands.

32.1     In each instance, Plaintiff Riad waited for Randolph in the Branch.

32.2     Upon Plaintiff Riad's information and belief, Randolph made a photocopy or

otherwise scanned an image of each of the Four Cashier's Checks using Defendant Wells Fargo's facilities within the Branch.

32.3    Upon Plaintiff Riad's information and belief, Randolph send an image of each of the Four Cashier's Checks to some or all of the Burkina Faso Companies.

32.4    Following his receipt of each of the Four Cashier's Checks and disappearance into another part of the Branch for a brief time, Randolph came back and, in each instance, returned each of the Four Cashier's Checks to Plaintiff Riad.

33.    In each instance, upon receipt of each of the Four Cashier's Checks from Randolph, Plaintiff Riad turned around and walked back to a teller or such other employee of Defendant Wells Fargo at the Branch and presented the applicable Cashier's Check to such teller or other employee of Defendant Wells Fargo at the Branch to deposit the applicable cashier's check into the Joint Bank Account.

33.1    On or about 2 December 2011, Plaintiff Riad presented the First Cashier's Check to a teller or other employee of Defendant Wells Fargo at the Branch to deposit into the Joint Bank Account.

33.2    On or about 8 December 2011, Plaintiff Riad presented the Second Cashier's Check to a teller or other employee of Defendant Wells Fargo at the Branch to deposit into the Joint Bank Account.

33.3    On or about 22 December 2011, Plaintiff Riad presented the Third Cashier's Check to a teller or other employee of Defendant Wells Fargo at the Branch to deposit into the Joint Bank Account.

33.4    On or about 23 December 2011, Plaintiff Riad presented the Fourth Cashier's Check to a teller or other employee of Defendant Wells Fargo at the Branch to deposit into the Joint Bank Account.

34.    In respect of each of the Four Cashier's Checks presented by Plaintiff Riad to the

applicable teller or other employee of Defendant Wells Fargo to deposit into the Joint Bank Account:

(a) Plaintiff Riad marked each of the Four Cashier's Checks as "for deposit only, not used for purposes intended" and/or marked each of the Four Cashier's Checks with part or all the same or similar language above his endorsement in accordance with the instructions of Randolph; and

(b) Plaintiff Riad explicitly orally instructed the teller or other employee of Defendant Wells Fargo at the Branch to deposit each of the Four Cashier Check's into the Joint Bank Account.

35. Within all relevant times herein, each of the Four Cashier's Checks did not leave the care, custody and possession of Plaintiff Riad other than during the time that each of the Four Cashier's Checks were in the care, custody and possession of Randolph.

35.1 Elevation did not receive or cash the First Cashier's Check.

35.2 Saint Jude did not receive or cash the Second Cashier's Check.

35.3 Von Atlas did not receive or cash the Third Cashier's Check.

35.4 Von Atlas did not receive or cash the Fourth Cashier's Check.

36. Given the business and standing of Defendant Wells Fargo and the routine and customary nature of the transactions, Plaintiff Riad and Plaintiff Riad Holdings reasonably believed that the Four Cashier Checks had been deposited and credited to the Joint Bank by a teller or other employee of Defendant Wells Fargo at the Branch in accordance with the instructions given by Plaintiff Riad to such teller or other employee of Defendant Wells Fargo at the Branch.

37. On or about 23 December 2010, the amount of $1,100,000.00 was deposited into the Riad Schepperd Account by a teller or other employee of Defendant Wells Fargo at the Branch (the "**Incorrect Deposit**").

38.   The Incorrect Deposit was made without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/ or Schepperd.

39.   On or about 9 January 2012, the amount of $1,100,000.00 was withdrawn from the Riad Schepperd Account by a teller or other employee of Defendant Wells Fargo at the Branch (the "**Fraudulent Withdrawal**").

40.   The Fraudulent Withdrawal was made without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd.

41.   On or about 9 January 2012, proceeds of the Fraudulent Withdrawal were used by a teller or other employee of Defendant Wells Fargo at the Branch to purchase and issue a cashier's check in or about in the amount of $1,100,000.00 payable to "Panasoft Strategic Solutions" (the "**Fraudulent Fifth Cashier's Check**").

42.   The Fraudulent Fifth Cashier's Check was purchased and issued without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd.

43.   Schepperd confirms that the Incorrect Deposit credited to the Riad Schepperd Account were funds entirely owned by Plaintiff Riad and disavows any claim to the Incorrect Deposit.

44.   Schepperd confirms that, if any court of law deems that she has any right to the Incorrect Deposit, she assigns the same to Plaintiff Riad on an unconditional basis.

45.   On or about 9 January 2012, an employee or employees of Defendant Wells Fargo closed  and/or otherwise concealed the existence of and/or deprived Plaintiff Riad and/or Plaintiff Riad Holdings of knowledge of and/or access to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and Plaintiff Riad Holdings, including the Joint Account, as well as the Riad Schepperd Account (the "**Unauthorized Account Closures**").

46.   The Unauthorized Account Closures were conducted without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or

Schepperd.

47.     Upon discovering that Defendant Wells Fargo had not deposited the proceeds of the Four Cashier's Checks into the Joint Bank Account, Plaintiff Riad informed Defendant Wells Fargo in person, via telephonic conversations and via written correspondence that the amount of the Four Cashier's Checks had been returned for deposit as unfit for intended purposes with instructions to deposit the same into the Joint Account but the funds associated with the Four Cashier's Checks had not been deposited or credited to the Joint Account as requested during his presentation of the Four Cashier Checks.

48.     Since about 2016, Plaintiff Riad repeatedly engaged with Defendant Wells Fargo through personal visits to the Branch, via telephonic conversations and via email correspondence to:

(a)     Ascertain what happened to the proceeds of the Four Cashier's Checks with a collective value of $4,600,000.00;

(b)     Request copies of relevant records; and

(c)     Request that any account held by Defendant Wells Fargo for the benefit of Plaintiff Raid and/or Plaintiff Riad Holdings be credited for the amount of $4,600,000.00 representing the proceeds of the Four Cashier's Checks returned for deposit by the Plaintiff Riad to a bank teller or other employee of Defendant Wells Fargo at the Branch during December 2011.

49.     Between about 9 January 2012 and until about September 2016, Defendant Wells Fargo. by and/or through an employee or employees thereof:

(a)     Did not provide any information about what happened to the proceeds of the Four Cashier's Checks;

(b)     Did not provide any copies of any relevant records;

(c)     Did not credit the amount of $4,600,000.00 representing the proceeds of

the Four Cashier's Checks returned by Plaintiff Riad to a teller or other employee of Defendant Wells Fargo at the Branch during December 2011 for deposit into the Joint Account despite explicit instructions given by Plaintiff Riad to such teller or other employee of Defendant Wells Fargo to effect the same; and

(d)     Denied and frustrated Plaintiff Riad and/or Plaintiff Riad Holdings in their efforts to ascertain the location of $4,600,000.00 representing the proceeds of the Four Cashier's Checks between 2012 and 2016.

50.     On or about between September 2016 and about May 2018, after repeated requests by Plaintiff Riad and/or Plaintiff Riad in person, via telephone calls and via email correspondence, Defendant Wells Fargo provided Plaintiff Riad with copies of a limited scope of bank statements (the "**Limited Bank Statements**").

50.1    The Limited Bank Statements are not complete statements and/or records of those accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings.

50.2    The Limited Bank Statements do contain material statements and/or records for the majority of accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings.

50.3    The Limited Bank Statements provided on or about September 2016 bear a cover note that instructs employees of Wells Fargo not to provide any documents to Plaintiff Riad and/or Plaintiff Riad Holdings.

51.     The Limited Bank Statements contain numerous material inconsistencies including, but not limited to:

(a)     Missing time stamps;

(b)     Different account numbers on withdrawal slips;

(c)     Unknown handwriting; and

(d)    Misspelling of the name of Michelle Schepperd on deposit slips.

52.    Based on information discovered in the Limited Bank Statements provided on or about May 2018, Plaintiff Riad and Plaintiff Riad Holdings ascertained that a teller or other employee of Defendant Wells Fargo:

(a)    Conducted the Incorrect Deposit of the Fourth Cashier's Check into the Riad Schepperd Account;

(b)    Conducted the Fraudulent Withdrawal of proceeds of the Incorrect Deposit out of the Riad Schepperd Account;

(c)    Conducted the purchase and issue of the Fraudulent Fifth Cashier's Check using proceeds of the Fraudulent Withdrawal; and

(d)    Conducted the closure of the Riad Schepperd Account as part of the Unauthorized Account Closures,

each without the consent, knowledge or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd.

53.    From 23 December 2011 until present time, Defendant Wells Fargo has:

(a)    Failed to provide and/or refused to provide information about what happened to the $4,600,000.00 representing:

(i)    The proceeds of the First Cashier's Check, Second Cashier's Check and Third Cashier's Check originally funded by the Three Deposits; and

(ii)    The proceeds of the Fraudulent Fifth Cashier's Check funded by the Incorrect Deposit.

(b)    Failed to provide and/or refused to provide copies of complete records other than the Limited Bank Statements;

(c)    Failed to and/or refused to credit the amount of $3,500,000.00 representing the proceeds of the First Cashier's Check, Second Cashier's Check and Third Cashier's Checks returned by Plaintiff Riad to a bank teller or other employee of Defendant Wells Fargo at the Branch for deposit into the Joint Account during December 2011 into any account maintained by Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd (with any credit to the Joint Account or Riad Schepperd Account made impossible due to the Defendant Wells Fargo's unilateral closure of such accounts as part of the Unauthorized Account Closures without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd);

(d)    Failed to and/or refused to credit the amount of $1,100,000.00 representing proceeds of the Unauthorized Withdrawal and Fraudulent Fifth Cashier's Check into any account maintained by Wells Fargo for the benefit of the Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd (with any credit to the Joint Account or Riad Schepperd Account made impossible due to the Defendant Wells Fargo's unilateral closure of such accounts as part of the Unauthorized Account Closures without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd); and

(e)    Continued to deny and frustrate Plaintiff Riad and/or Plaintiff Riad Holdings in their efforts to ascertain the location of the proceeds of the First Cashier's Check, Second Cashier's Check, Third Cashier's Check and Fraudulent Fifth Cashier's Check.

54.    The Limited Bank Statements do not reflect any credit for deposit of the First Cashier's Check, Second Cashier's Check or Third Cashier's Check into any account maintained by Defendant Wells Fargo for Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd on any date following the withdrawal date and issue date of said cashier's checks despite return by Plaintiff Riad to a bank teller

or other employee of Defendant Wells Fargo at the Branch of the same for deposit into the Joint Account during December 2011.

54.1    The Limited Bank Statements do not show any credit to any account held by Defendant Wells Fargo on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd for the amount of $1,200,000,00 representing proceeds of the First Cashier's Check on any date following the withdrawal date and issue date of said cashier's check despite said check being returned for deposit into the Joint Account by the Plaintiff Riad to a bank teller or other employee of Defendant Wells Fargo at the Branch on 2 December 2011.

54.2    The Limited Bank Statements do not show any credit to any account held by Defendant Wells Fargo on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd for the amount of $1,200,000.00 representing proceeds of the Second Cashier's Check on any date following the withdrawal date and issue date of said cashier's check despite said check being returned for deposit into the Joint Account by the Plaintiff Riad to a bank teller or other employee of Defendant Wells Fargo on 8 December 2011.

54.3    The Limited Bank Statements do not show any credit to any account held by Defendant Wells Fargo on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings or Schepperd for the amount of $1,100,000.00 representing proceeds of the Third Cashier's Check on any date following the withdrawal date and issue date of said cashier's check despite said check being returned for deposit into the Joint Account by the Plaintiff Riad to a bank teller or other employee of Defendant Wells on 22 December 2011.

54.4    The Limited Bank Statements do not reflect any credit to any account held by Defendant Wells Fargo on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd for the amount of $1,100,000.00 representing the amount of the Unauthorized Withdrawal and/or Fraudulent Fifth

Cashier's Check on any date following the withdrawal date and issue date of said cashier's check.

55.     On or about 27 December 2011, an employee or employees of Defendant Wells Fargo transferred approximately $147,754.76 from the Joint Account into the Riad Schepperd Account without the knowledge, consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings ("**Original Unauthorized Transfer"**) which resulted in a balance in the Riad Schepperd Account at the time of the Unauthorized Account Closures of $168,562.00 (the **"Riad Schepperd Balance**").

55.1    On or about 9 January 2012, an employee or employees of Defendant Wells withdrew approximately $20,000 of the Riad Schepperd Balance from the Riad Schepperd Account (the "**Accepted Transfer**") and deposited such funds into a new account opened with Defendant Wells Fargo for Schepperd with her knowledge, consent and authority (the "**Accepted Schepperd Account**").

55.2    On or about 9 January 2012, an employee or employees of Defendant Wells withdrew approximately $143,462.00 of the Riad Schepperd Balance from the Riad Schepperd Account (the "**Unauthorized Transfer**") and deposited such funds into another new account opened with Defendant Wells Fargo for Schepperd without her knowledge, consent or authority (the "**Unauthorized Schepperd Account**").

56.     Accounting for the Accepted Transfer and the Unauthorized Transfer, the Riad Schepperd Account held a balance of $5,100 (the "**Residual Balance")** at the time of its closure and/or other maladministration of such account as part of the Unauthorized Account Closures.

56.1    The Limited Bank Statements do not show what happened to the Residual Balance.  It just disappears as part of the Unauthorized Account Closures.

56.2    Plaintiff Riad and/or Schepperd did not receive at the time of the Unauthorized Account Closures and have not received at any time

subsequent to the Unauthorized Account Closures the Residual Balance despite repeated demands to Defendant Wells Fargo for the same.

57. On or about 27 February 2012, an employee or employees of Defendant Wells Fargo withdrew the amount of $143,525.29 representing $143,462.00 of original funds and the benefit of two interest payments from the Unauthorized Schepperd Account (the "**Unauthorized Withdrawal of the Unauthorized Transfer**").

57.1 The Unauthorized Withdrawal of the Unauthorized Transfer was done without the knowledge, consent or authority of Schepperd.

57.2 Plaintiff Riad and/or Schepperd did not receive and have not received at any time proceeds of the Unauthorized Withdrawal of the Unauthorized Transfer despite repeated demands to Defendant Wells Fargo for the same.

57.3 Schepperd confirms that the funds which comprise the Unauthorized Withdrawal of the Unauthorized Transfer are entirely owned by Plaintiff Riad and disavows any claim to the same and, if any court of law deems that she has any right to the funds which comprise the Unauthorized Withdrawal of the Unauthorized Transfer, she assigns the same to Plaintiff Riad on an unconditional basis.

58. On or about 27 February 2012, an employee or employees of Defendant Wells Fargo closed the Unauthorized Schepperd Account (the "**Unauthorized Closure of the Unauthorized Schepperd Account**").

59. The Unauthorized Closure of the Unauthorized Schepperd Account was done without the knowledge, consent or authority of Schepperd.

60. It was known to Defendant Wells Fargo, by and/or through Randolph and/or an employee and/or employees of Defendant Wells Fargo at the Branch that Schepperd:

(a) Was a former employee of Wachovia;

(b)     Had suffered from brain tumor;

(c)     Had undergone brain surgery in connection with the brain tumor; and

(d)     Due to her illness and subsequent effects therefrom, had limited neuropsychological capacity to conduct her own affairs.

61.     Medical records and reports which confirmed Schepperd's limited neuropsychological capacity and her inability to manage money formed part of her employment records with Defendant Wells Fargo.

61.1     The following excerpts form part of the medical records and reports provided to Defendant Wells Fargo in connection with the craniotomy and brain tumor:

PREOPERATIVE DIAGNOSIS: Left hypothalamic brain tumor

POSTOPERATIVE DIAGNOSIS: Left hypothalamic brain tumor

"A pearly white tumor was noted to be herniating up from the floor of the lateral ventricle."

(Operative Note, University of Pennsylvania, Department of Neurology).

61.2     The following excerpts form part of the medical records and reports provided to Defendant Wells Fargo:

[Ms. Schepperd is] "a lovely woman who underwent resection of a pilocytic astrocytoma in the region of the thalamus. . . [She] has remained at home caring for her infant daughter."

(Department of Neurology, University of Pennsylvania Medical Center Reexamination Report issued by Dr. Gula Glosser, Ph.D., ABPP to Dr. Sean Grady, M.D., Chairman, Department of Neurology, pg. 1 (the "**Neurology Report**").

"Based on the neuropsychological findings I continue to be very concerned about [Ms. Schepperd's] return to work in a position where she must handle large sums of money. I do not believe that at this time she can be expected to perform her previous duties reliably and independently. Since it has been more than a year since her surgery and the onset of the cognitive problems, it is unlikely that there will be much further spontaneous recovery of neurological function." (Neurology Report, pg. 3)

62.  Plaintiff Riad avers that Defendant Wells Fargo and/or an employee or employees of Defendant Wells Fargo:

(a)  Took advantage of their knowledge of Schepperd's limited capacity and inability to manage money and money-related affairs to prejudice Plaintiff Riad in dealings with funds jointly held by Plaintiff Riad and Schepperd with Defendant Wells Fargo; and/or

(b)  Should reasonably have known about Schepperd's limited capacity and inability to manage money and money-related affairs and, notwithstanding the same, conducted bank transactions on behalf of Schepperd or involving accounts held jointly by Plaintiff Riad and Schepperd with Defendant Wells Fargo to prejudice Plaintiff Riad.

63.  Between 9 January 2012 when the Unauthorized Schepperd Account was opened by an employee or employees of Defendant Wells Fargo and 27 February 2012 when the Unauthorized Schepperd Account was closed by an employee or employees of Defendant Wells Fargo, the only transactions in the Unauthorized Schepperd Account comprised of:

(a)  Automatic interest payments made by Defendant Wells Fargo based on the balance of the account; and

(b)  The Unauthorized Withdrawal of the Unauthorized Transfer made by an

employee or employees of Defendant Wells Fargo on the day that Defendant Wells Fargo closed the account.

64.     Between about 2010 and about 2016, Defendant Wells Fargo, by and/or through an employee or employees thereof, opened and/or closed and/or transacted (and may continue to open and/or close and/or transact) in at least twenty-five (25) accounts in the name of Plaintiff Riad and/or Plaintiff Riad Holdings and/or other accounts in which Plaintiff Riad and/or Plaintiff Riad Holdings held a beneficial interest (the "**Fraudulent Churn Accounts**").

64.1     Defendant Wells Fargo, by and/or through an employee or employees thereof, opened and/or closed and/or conducted deposits, withdrawals and/or transfers of funds into, out of and between the Fraudulent Churn Accounts (and may continue to open and/or close and/or transact in such Fraudulent Churn Accounts) (the "**Fraudulent Activities**").

64.2     Defendant Wells Fargo, by and/or through an employee or employees thereof, charged Plaintiff Riad and/or Plaintiff Riad Holdings fees related to the Fraudulent Activities (the "**Fraudulent Fees**").

64.3     Defendant Wells Fargo, by and/or through an employee or employees thereof, opened and/or closed online banking facilities (the "**Fraudulent Online Banking Facilities")** related to the Fraudulent Churn Accounts.

64.4     Defendant Wells Fargo, by and/or through an employee or employees thereof, conducted transactions (and may continue to conduct transactions) using the Fraudulent Online Banking Facilities (the "**Fraudulent Online Banking Transactions**").

64.5     Defendant Wells Fargo, by and/or through an employee or employees thereof, may have charged Plaintiff Riad and/or Plaintiff Riad Holdings fees related to the Fraudulent Online Banking Facilities (the "**Fraudulent Online Fees**").

(collectively the "**Fraudulent Churn Activities**").

65.    Defendant Wells Fargo, by and/or through an employee or employees thereof:

(a)    Directed, operated and undertook activities in the Fraudulent Churn Accounts and/or Fraudulent Online Banking Facilities;

(b)    Directed, operated and undertook the Fraudulent Activities and/or Fraudulent Online Banking Transactions; and/or

(c)    Directed, operated and charged the Fraudulent Fees and/or Fraudulent Online Fees,

without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings.

66.    Plaintiff Riad and/or Plaintiff Riad Holdings did not have access to a land-based internet connection between about 2011 and about 2013.

67.    Between about 2010 and until about 2018, Defendant Wells Fargo, by and/or through an employee or employees thereof:

(a)    Did not disclose the existence of the Fraudulent Churn Activities;

(b)    Did not provide copies of complete records;

(c)    Misled Plaintiff Riad and/or Plaintiff Riad Holdings about the nature of their accounts with Defendant Wells Fargo; and/or

(d)    Denied and frustrated Plaintiff Riad and/or Plaintiff Riad Holdings in their efforts to ascertain copies of relevant records,

despite repeated requests by Plaintiff Riad and/or Plaintiff Riad Holdings to an employee and/or employees of Defendant Wells Fargo for the same.

68.    Between about 2010 and about 2018, Defendant Wells Fargo, by and/or through an employee or employees thereof, benefitted from the Fraudulent Churn Activities

to the prejudice and loss of Plaintiff Riad and/or Riad Holdings.

68.1    Defendant Wells Fargo, by and/or through an employee or employees thereof, charged and collected the Fraudulent Fees and/or Fraudulent Online Fees to the prejudice and loss of Plaintiff Riad and/or Riad Holdings.

68.2    Defendant Wells Fargo, by and/or through an employee or employees thereof, lost, misplaced or misappropriated funds in the Fraudulent Churn Accounts and/or Fraudulent Online Banking Facilities to the prejudice and loss of Plaintiff Riad and/or Riad Holdings.

68.3    Defendant Wells Fargo, by and/or through an employee or employees thereof, lost, misplaced or misappropriated funds related to the Fraudulent Activities and/or Fraudulent Online Banking Transactions to the prejudice and loss of Plaintiff Riad and/or Riad Holdings.

69.    Defendant Wells Fargo has:

(a)    Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully derived by Defendant Wells Fargo of the Fraudulent Fees;

(b)    Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully derived by Defendant Wells Fargo of the Fraudulent Online Fees;

(c)    Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully deprived to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo of funds lost, misplaced or misappropriated through the Fraudulent Churn Accounts to the prejudice and loss of Plaintiff Riad and/or Riad Holdings;

(d)    Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully deprived to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo of funds lost, misplaced

or misappropriated through the Fraudulent Online Banking Facilities to the prejudice and loss of Plaintiff Riad and/or Riad Holdings;

(e)     Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully deprived to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo of funds lost, misplaced or misappropriated through the Fraudulent Churn Activities to the prejudice and loss of Plaintiff Riad and/or Riad Holdings;

(f)     Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully deprived to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo of funds lost, misplaced and/or misappropriated through the Fraudulent Online Banking Transactions to the prejudice and loss of Plaintiff Riad and/or Riad Holdings; and/or

(g)     Failed to provide and/or otherwise return to Plaintiff Riad Holdings and/or Plaintiff Riad Holdings the benefit unlawfully deprived to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo of interest lost on funds that Plaintiff Riad and/or Riad Holdings had deposited with Defendant Wells Fargo due to the Fraudulent Churn Activities to the prejudice and loss of Plaintiff Riad and/or Riad Holdings,

despite repeated requests by Plaintiff Riad and/or Plaintiff Riad Holdings to an employee and/or employees of Defendant Wells Fargo for the same.

70.     Upon information and belief, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof:

(a)     Failed to maintain adequate policies and/or procedures;

(b)     Failed to ensure that adequate policies and/or procedures and/or customary banking best practices were followed by an employee or employees of Defendant Wells Fargo; and/or

(c)     Permitted an employee or employees of Defendant Wells Fargo or, alternatively, failed to permit an employee or employees of Defendant Wells Fargo, from engaging in conduct contrary to established policies and/or procedures and/or customary banking best practices,

which resulted in the Defendant Wells Fargo, by and through an employee and and/or employees thereof, causing prejudice and loss of Plaintiff Riad and/or Riad Holdings and the unjust benefit and/or enrichment of Defendant Wells Fargo and/or an employee or employees thereof and/or persons unknown other than Plaintiff Riad and/or Riad Holdings.

70.1    By and/or through an employee or employees thereof, Defendant Wells Fargo Opened and closed accounts in the name of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd with Defendant Wells Fargo including, but not limited to, the Joint Account, Riad Schepperd Account, Unauthorized Schepperd Account and/or other such accounts, without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd, to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

70.2    By and/or through an employee or employees thereof, Defendant Wells Fargo incorrectly and/or improperly made deposits and/or withdrawals and/or transfers of funds into, out of and between accounts in the name of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd with Defendant Wells Fargo including, but not limited to, the Joint Account, Riad Schepperd Account, Unauthorized Schepperd Account and/or other such accounts, without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd, to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

70.3    By and/or through an employee or employees thereof, Defendant Wells Fargo lost safe custody and/or proper administrative control over accounts in the name of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd with Defendant Wells Fargo including, but not limited to, the Joint Account, Riad

Schepperd Account, Unauthorized Schepperd Account and/or other such accounts, without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad and/or Schepperd, to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

71.    As a result of the Defendant Wells Fargo's action or failure to act, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to correctly and/or properly deposit and/or credit the amount of $4,600,000.00 to any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to, the loss of $4,600,000.00.

71.1    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of $1,200,000.00 into any bank account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings representing proceeds of the First Cashier's Check returned for deposit into the Joint Account by Plaintiff Riad to a teller or other employee of Defendant Wells Fargo at the Branch on 2 December 2011 despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

71.2    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of $1,200,000.00 into any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings representing proceeds of the Second Cashier's Check returned for deposit into the Joint Account by the Plaintiff Riad to a teller or other employee of Defendant Wells Fargo at the Branch on 8 December 2011 despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

71.3    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of $1,100,000.00 into any account held by Defendant

Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings representing proceeds of the Third Cashier's Check returned for deposit into the Joint Account by Plaintiff Riad to a teller or other employee of Defendant Wells Fargo at the Branch on 22 December 2011 despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

71.4    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of $1,100,010.00 into any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd representing the amount of the Fraudulent Withdrawal and/or proceeds of the Fraudulent Fifth Cashier's Check despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

72.     In addition or alternative to any other averment herein, as a result of the Defendant Wells Fargo's action or failure to act, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to correctly and/or properly deposit and/or credit the amount of $148,562.00 to any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to, the loss of $148,562.00

72.1    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of the $143,462.00 into any bank account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings representing the Unauthorized Withdrawal of the Unauthorized Transfer.

72.2    Defendant Wells Fargo failed to correctly and/or properly deposit and/or credit the amount of the $5,100.00 into any bank account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings representing the Residual Balance of the Riad Schepperd Account

stemming from the Unauthorized Withdrawal of the Unauthorized Transfer from the Riad Schepperd Account.

73.     In addition or alternative to any other averment herein, as a result of the Defendant Wells Fargo's action or failure to act, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to correctly and/or properly deposit and/or credit the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings with such amounts due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings arising from fees incorrectly and/or improperly charged by Defendant Wells Fargo, by and/or through an employee or employees thereof, in respect of every unauthorized and/or fraudulent dealing by Defendant Wells Fargo, by and/or through an employee or employees thereof, in respect of the following instruments and/or transactions and/or accounts:

(a)     The Joint Account;

(b)     The Riad Schepperd Account;

(c)     The Unauthorized Riad Schepperd Account:

(d)     The Four Cashier's Checks;

(e)     The Three Deposits;

(f)     The Incorrect Deposit;

(g)     The Fraudulent Withdrawal;

(h)     The Fraudulent Fifth Cashier's Check;

(i)      The Unauthorized Withdrawal;

(j)     The Fraudulent Churn Accounts;

(k)     The Fraudulent Online Banking Facilities; and/or

(l)     Every other instrument related to and/or transaction undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

74.    In addition or alternative to any other averment herein, as a result of the Defendant Wells Fargo's action or failure to act, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to correctly and/or properly credit the Joint Account, Riad Schepperd Account, Unauthorized Riad Schepperd Account and/or any other account held by Defendant Wells Fargo with interest that would have otherwise accrued to such accounts if it were not for the incorrect and/or improper withdrawal and/or transfer of funds and/or charging of fees and/or other unauthorized and/or fraudulent dealing by Defendant Wells Fargo, by and/or through an employee or employees thereof, in respect of the following instruments and/or transactions and/or accounts:

(a)     The Four Cashier's Checks;

(b)     The Three Deposits;

(c)     The Incorrect Deposit;

(d)     The Fraudulent Withdrawal;

(e)     The Fraudulent Fifth Cashier's Check;

(f)     The Unauthorized Withdrawal;

(g)     The Fraudulent Churn Accounts;

(h)     The Fraudulent Online Banking Facilities; and/or

(i)     Every other instrument related to and/or transactions undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

75.     In addition or alternative to any other averment herein, as a result of the Defendant Wells Fargo's action or failure to act, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof, lost, misplaced and/or misappropriated funds owned by Plaintiff Riad Holdings and/or Plaintiff Riad Holdings as a result of incorrect and/or improper deposit and/or withdrawal and/or transfer of funds and/or charging of fees and/or other unauthorized and/or fraudulent dealing by Defendant Wells Fargo, by and/or through an employee or employees thereof, in respect of the following instruments and/or transactions and/or accounts:

(a)     The Four Cashier's Checks;

(b)     The Three Deposits;

(c)     The Incorrect Deposit;

(d)     The Fraudulent Withdrawal;

(e)     The Fraudulent Fifth Cashier's Check;

(f)     The Unauthorized Withdrawal;

(g)     The Fraudulent Churn Accounts;

(h)     The Fraudulent Online Banking Facilities; and/or

(i)     Every other instrument related to and/or transactions undertaken by

Defendant Wells Fargo, by and/or through an employee or employees thereof, in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

76.   Defendant Wells Fargo, by and/or through an employee or employee thereof, has repeatedly frustrated Plaintiff Riad and/or Plaintiff Riad's reasonable efforts to obtain records related every account held by Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo to substantiate the quantum of loss and damages suffered by Plaintiff Riad and/or Plaintiff Riad in respect of the same despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings for Defendant Wells Fargo for the same.

77.   Defendant Wells Fargo, by and/or through an employee or employees thereof, has failed to remedy the prejudice and loss caused to Plaintiff Riad and/or Plaintiff Riad Holdings by the actions or failure to act of Defendant Wells Fargo, by and/or through an employee or employees thereof, despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings (and Schepperd, as applicable) for Defendant Wells Fargo to remedy the same.

*(Section B Commences on Following Page)*

**B.**     **FACTS RELEVANT TO CERTAIN UNAUTHORIZED WIRES FROM PLAINTIFF RIAD AND/OR PLAINTIFF RIAD HOLDINGS ACCOUNTS WITH DEFENDANT WELLS FARGO**

78.     At all times mentioned herein, Defendant Wells Fargo had a duty to exercise reasonable care to its customers and ensure that its employees exercised a duty of reasonable care to its customers in relation to:

    (a)     Providing products and/or services related to Wire Transfers;

    (b)     Maintaining bank account records that accurately reflect the balance of funds in every customer's bank account with Defendant Wells Fargo;

    (c)     Correctly debiting and/or crediting funds deposited into and withdrawn out of every customer's bank account with Defendant Wells Fargo including, without limitation, fund deposited and/or withdrawn through Wire Transfers; and/or

    (d)     Detecting, preventing and/or remedying acts of fraud and/or other criminal conduct related to any Wire Transfers and/or bank accounts held for the benefit of customers by Defendant Wells Fargo including, but not limited to, acts of fraud and/or other criminal conduct committed by an employee or employees of Defendant Wells Fargo,

in accordance with established policies and/or procedures and/or customary banking best practices reasonably expected of a large financial institution in the United States of America.

79.     At all times mentioned herein, it was established procedure at Defendant Wells Fargo in accordance with customary banking best practices to only permit the debit of an account and the transmission of a Wire Transfer using proceeds from such debit under the express authority of the customer duly registered with Defendant Wells Fargo as the authorized signatory for such account.

80.    As part of the authorization process for Wire Transfers at Defendant Wells Fargo, it was established procedure in accordance with customary banking best practices to require any customer seeking to make a Wire Transfer to complete a Write Transfer of Funds Request form (a "**Wire Transfer Request Form**") which required, inter alia:

(a)    The date of such request;

(b)    A control number;

(c)    A description of the type of Wire Transfer (domestic or international);

(d)    The currency amount of the Wire Transfer;

(e)    The value date of the Wire Transfer;

(f)    Particulars of the originator of the Wire Transfer, including an account number;

(g)    Particulars of the receiving bank for the Wire Transfer;

(h)    Particulars of the beneficiary of the Wire Transfer, including an account number;

(i)    Particulars of how the customer initiated the Wire Transfer request (phone or walk-in);

(j)    The signature of the customer requesting the Wire Transfer (the "**Customer Signature**") who, by signature thereof, agrees to the terms and conditions of the Wire Transfer request;

(k)    The date of the request completed by the customer requesting the Wire Transfer;

(l)    The employee number of such other identifying number of the employee of Defendant Wells Fargo that prepares such Wire Transfer Request Form;

(m)   The signature of the employee of Defendant Wells Fargo that initiates such Wire Transfer Request Form (the "**Initiator's Signature**");

(n)   The signature of the employee of Defendant Wells Fargo that prepares such Wire Transfer Request Form (the "**Preparer's Signature**");

(o)   The signature of the employee of Defendant Wells Fargo that verifies such Wire Transfer Request Form (the "**Verifier's Signature**"); and

(p)   The signature of the employee of Defendant Wells Fargo that authorizes such Wire Transfer Request (the "**Authorized Signature**").

81.   The Wire Transfer Request Form includes a contract (the "**Customer Contract**") at the bottom of the Wire Transfer Request Form which stipulates:

> *"All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account.  The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request.  My signature below evidences that I have received a complete copy of this Request, and that I have received the Deposit Agreement."*

82.   The second (back) page of every Wire Transfer Request Form contains the terms and conditions ("**Terms & Conditions**") reference in the Customer Contract on each Wire Transfer Request Form.

83.   Between 23 November 2010 and 18 January 2011, Defendant Wells Fargo, by and/or through an employee or employees thereof, made six (6) fraudulent withdrawals of funds from the Joint Bank Account with a total value of $1,068,735.00 and used proceeds of such fraudulent debits to undertake six (6) fraudulent wire transfers with a total value of $1,068,735.00.

83.1    On or about 23 November 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $53,000.00 from the Joint Bank Account (the "**First Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount to a Tapsoba Emmanuel through Coris Bank International in Burkina Faso via Societe General du Banque in Paris as correspondent bank (the "**First Fraudulent Wire Transfer**").

83.2    On or about 30 November 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $53,000.00 from the Joint Bank Account (the "**Second Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount to a Dipama Issaka through Societe Générale Bank in New York for the further credit of Banque Commercial du Burkina in Burkina Faso (the "**Second Fraudulent Wire Transfer**").

83.3    On or about 9 December 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $21,000.00 from the Joint Bank Account (the "**Third Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount to a Dipama Issaka through Societe Générale Bank in New York for the further credit of Banque Commercial du Burkina in Burkina Faso (the "**Third Fraudulent Wire Transfer**").

83.4    On or about 15 December 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $100.00 from the Joint Bank Account (the "**Fourth Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount (the "**Fourth Fraudulent Wire Transfer**").

83.5    On or about 20 December 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $670,000.00 from the Joint Bank Account (the "**Fifth Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount to Plaintiff Riad in Burkina Faso

through Eco Bank in Burkina Faso (the "**Fifth Fraudulent Wire Transfer**").

83.6    On or about 18 January 2011, Defendant Wells Fargo, by and/or through an employee or employees thereof, debited the amount of $271,635.00 from the Joint Bank Account (the "**Sixth Fraudulent Debit**") and undertook a Wire Transfer in a corresponding amount to OBS Imports/Exports in Burkina Faso through Eco Bank in Burkina Faso (the "**Sixth Fraudulent Wire Transfer**").

(collectively the "**Six Fraudulent Debits**" and "**Six Fraudulent Wire Transfers**").

84.    Each of the Six Fraudulent Debits and each of the Six Fraudulent Wire Transfers were undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, without the knowledge, consent or authority of Plaintiff Riad and Plaintiff Riad Holdings.

85.    Despite repeated requests by Plaintiff Riad and/or Plaintiff Raid Holdings, Defendant Wells Fargo has been unable or unwilling to produce any SWIFT message related to any of the Six Fraudulent Wire Transfers to confirm the dispatch and/or receipt of funds related thereto.

86.    Because Defendant Wells Fargo, by and/or through an employee or employees thereof, has failed to produce any SWIFT messages related to any of the Six Fraudulent Wire Transfers, Plaintiff Riad and/or Plaintiff Riad Holdings is unable to ascertain whether or not:

(a)    The First Fraudulent Wire Transfer reached its intended beneficiary;

(b)    The Second Fraudulent Wire Transfer reached its intended beneficiary;

(c)    The Third Wire Transfer reached its intended beneficiary;

(d)    The Fourth Wire Transfer reached its intended beneficiary;

(e)    The Fifth Wire Transfer reached its intended beneficiary; and

(f)     The Sixth Wire Transfer reached its intended beneficiary.

87.     Plaintiff Riad and Plaintiff Riad Holdings aver that Plaintiff Riad did not receive the Fraudulent Fifth Wire Transfer.

88.     Defendant Wells Fargo has produced three (3) versions of a Wire Transfer Request Form related to the First Fraudulent Wire Transfer (the "**Three Versions of the First Fraudulent Wire Transfer Request Form").**

88.1        The First Version of the First Fraudulent Wire Transfer Request Form was provided to Plaintiff Riad by an employee of Defendant Wells Fargo on or about September 2016.

88.2        The Second Version of the First Fraudulent Wire Transfer Request Form was provided to Plaintiff Riad by Defendant Wells Fargo on or about May 2018 as part of a Request for Admissions.

88.3        The Third Version of the First Fraudulent Wire Transfer Request Form was provided to Plaintiff Riad by Defendant Wells Fargo on or about May 2018 as part of a Request for Admissions.

89.     Defendant Wells Fargo relies upon a Wire Transfer Request Form provided to Plaintiff Riad on or about September 2016 that purports to relate to the First Fraudulent Wire Transfer (the "**First Version of the First Fraudulent Wire Transfer Request Form").**  A true and correct copy of the First Version of the First Fraudulent Wire Transfer Request Form is annexed as **Appendix 1**.

90.     The First Fraudulent Wire Transfer Request Form in incomplete in at least eight (8) material respects.

90.1        It does not have a Customer Signature.

90.2        It has been dated but in the handwriting of Leesa Wyatt ("**Wyatt**"), an employee of Defendant Wells Fargo and initiator of the First Fraudulent Wire Transfer Request Form.

90.3      It does not have a Preparer's Signature.

90.4      It does not have an Authorized Signature.

90.5      It does not have a Verifier's Signature.

90.6      It does not have an address for the Receiving Bank.

90.7      It does not have an address for the Beneficiary.

90.8      The Customer Contract, an integral term of every Wire Transfer Request Form, has not been signed any party, including Plaintiff Riad or Plaintiff Riad Holdings.

91.   The incompleteness of material provisions of the First Fraudulent Wire Transfer Request Form, including but not limited to the absence of any Preparer's Signature, Authorized Signature, Verifier's Signature and Customer Signature, demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

92.   The absence of a Customer Signature on the Customer Contract voids the Terms & Conditions of the First Fraudulent Wire Transfer Request Form and demonstrates prima face disregard by Defendant Wells Fargo, by and/or through its employees, for following established policies and/or procedures and/or customary banking best practices.

93.   The First Version of the First Fraudulent Wire Transfer Request Form contains the signature of Wyatt as the Initiator's Signature.  It is the only signature on this Form.

94.   The First Version of the First Fraudulent Wire Transfer Request Form contains:

(a)      Handwritten annotations in the upper right hand corner of the document (the "**First Handwritten Notes**"); and

(b)      A handwritten scratch over the words "Paris" towards the lower left hand

corner of the document (the "**Paris Scratch**").

95.    Defendant Wells Fargo produced another Wire Transfer Request Form to Plaintiff Riad on or about May 2018 that purports to relate to the First Fraudulent Wire Transfer (the "**Second Version of the First Fraudulent Wire Transfer Request Form**").  A true and correct copy of the Second Version of the First Fraudulent Wire Transfer Request Form is annexed as **Appendix 2**.

96.    The Second Version of the First Fraudulent Wire Transfer Request Form is identical to the First Version of the First Fraudulent Wire Transfer Request Form except in seven (7) material respects.

96.1    A Customer Signature has been added to the Second Version of the First Fraudulent Wire Transfer Request Form not found in the First Version of the First Fraudulent Wire Transfer Request Form.

96.2    The handwritten date in the lower right hand corner of the Second Version of the First Fraudulent Wire Transfer Request Form is written in a different form and in different handwriting than the form and handwriting found on the First Version of the First Fraudulent Wire Transfer Request Form.

96.3    The Paris Scratch found in the First Version of the First Fraudulent Wire Transfer Request Form is not found on the Second the Second Version of the First Fraudulent Wire Transfer Request Form.

96.4    A "X" mark indicating that the wire transfer request was generated on a "Customer Initiated" basis not found on the First Version of the First Fraudulent Wire Transfer Request Form has been added to the Second Version of the First Fraudulent Wire Transfer Request Form.

96.5    The Second Version of the First Fraudulent Wire Transfer Request Form contains handwritten annotations in the upper right hand corner of the document (the "**Second Handwritten Notes**") which have the same information but written in a different color pen in different handwriting and in

different positions than the **First Handwritten Notes** found on the First Version of the First Fraudulent Wire Transfer Request Form.

96.6    The Second Version of the First Fraudulent Wire Transfer Request Form contains a handwritten reference to a debit card number written in a different color pen (the "**Handwritten Debit Card Information**") which is not found on the First Version of the First Fraudulent Wire Transfer Request Form.

96.7    The Second Version of the First Fraudulent Wire Transfer Request Form contains the signature of Wyatt as the Initiator's Signature:

(a)    It is the only signature on the Form; and

(b)    The Initiator's Signature is similar but different to the Initiator's Signature found on the First Version of the First Fraudulent Wire Transfer Request Form.

97.    Defendant Wells Fargo produced another Wire Transfer Request Form to Plaintiff Riad on or about May 2018 that purports to relate to the First Fraudulent Wire Transfer (the "**Third Version of the First Fraudulent Wire Transfer Request Form**").  A true and correct copy of the Third Version of the First Fraudulent Wire Transfer Request Form is annexed as **Appendix 3**.

98.    The Third Version of the First Fraudulent Wire Transfer Request Form is identical to the First Version of the First Fraudulent Wire Transfer Request Form and the Second Version of the First Fraudulent Wire Transfer Request Form except in eleven (11) material respects:

98.1    A Verifier's Signature has been added to the Third Version of the First Fraudulent Wire Transfer Request Form which is:

(a)    Not found in the First Version of the First Fraudulent Wire Transfer Request Form or the Second Version of the First Fraudulent Wire Transfer Request Form;

(b)    Illegible; and

(c)    Not known to represent the signature of any employee of Defendant Wells Fargo at the Branch known to Plaintiff Riad and/or Plaintiff Riad Holdings.

98.2    The Customer Signature on the Third Version of the First Fraudulent Wire Transfer Request Form is similar but not the same as the Customer Signature found on the Second Version of the First Fraudulent Wire Transfer Request Form.

98.3    The "X" mark indicating that the wire transfer request was generated on a "Customer Initiated" basis found on the Third Version of the First Fraudulent Wire Transfer Request Form is different to the "X" mark found on the Second Version of the First Fraudulent Wire Transfer Request Form.

98.4    A "X" mark indicating that the wire transfer request was generated on an "Internal" basis has been added to the Third Version of the First Fraudulent Wire Transfer Request Form and then scratched out by hand.  Neither of these marks are found in the First Version of the First Fraudulent Wire Transfer Request Form or the Second Version of the First Fraudulent Wire Transfer Request Form.

98.5    The First Handwritten Notes found on the First Version of the First Fraudulent Wire Transfer Request Form and the Second Handwritten Notes found on the Second Version of the First Fraudulent Wire Transfer Request Form are not found on the Third Version of the First Fraudulent Wire Transfer Request Form.

98.6    The Handwritten Debit Card Information found on the Second Version of the First Fraudulent Wire Transfer Request Form is not found on the Third Version of the First Fraudulent Wire Transfer Request Form.

98.7     The Paris Scratch found on the First Version of the First Fraudulent Wire Transfer Request Form is not found on the Third Version of the First Fraudulent Wire Transfer Request Form.

98.8     The Third Version of the First Fraudulent Wire Transfer Request Form contains the signature of Wyatt as the Initiator's Signature.  The Initiator's Signature found on the Third Version of the First Fraudulent Wire Transfer Request Form is similar but not the same as the Initiator's Signature found on the First Version of the First Fraudulent Wire Transfer Request Form or Second Version of the First Fraudulent Wire Transfer Request Form.

98.9     The Third Version of the First Fraudulent Wire Transfer Request Form contains a date and time markings in the upper left hand corner and a page notation in upper right hand corner of the form that are not present in the First Version of the First Fraudulent Wire Transfer Request Form or Second Version of the First Fraudulent Wire Transfer Request Form.

98.10    The Third Version of the First Fraudulent Wire Transfer Request Form contains markings in the lower right hand corner and lower left hand corner of the form that are not present in the First Version of the First Fraudulent Wire Transfer Request Form or Second Version of the First Fraudulent Wire Transfer Request Form.

99.     Upon review of the Three Versions of the First Fraudulent Wire Transfer Request Form, Plaintiff Riad and Plaintiff Riad Holdings aver that each of the Three Versions of the First Fraudulent Wire Transfer Request Form are distinct and separate forms and not the same form and/or iterations of the same form.

100.    The Second Version of the First Fraudulent Wire Transfer Request Form and the Third Version of the First Fraudulent Wire Transfer Request Form each contain a Customer Signature purportedly to be that of Plaintiff Riad.

100.1    Plaintiff Riad denies that he signed the Second Version of the First Fraudulent Wire Transfer Request Form.

100.2    Plaintiff Riad denies that he signed the Third Version of the First Fraudulent Wire Transfer Request Form.

100.3    Plaintiff Riad avers that the Customer Signature on the Second Version of the First Fraudulent Wire Transfer Form is an unauthorized signature, forgery and fraudulent signature and in violation of Title 18, Pa. C.S.A. Crimes and Offenses § 4201 et seq. (forgery).

100.4    Plaintiff Riad avers that the Customer Signature on the Third Version of the First Fraudulent Wire Transfer Form is an unauthorized signature, forgery and fraudulent signature and in violation of Title 18, Pa. C.S.A. Crimes and Offenses § 4201 et seq. (forgery).

101.    Plaintiff Riad and Plaintiff Riad Holdings deny any knowledge of the First Fraudulent Debit and First Fraudulent Wire Transfer prior to their undertaking.

102.    Plaintiff Riad and Plaintiff Riad Holdings did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the First Fraudulent Debit and/or First Fraudulent Wire Transfer.

103.    On or about 26 November 2010, Plaintiff Riad came to possess a copy of the First Version of the First Fraudulent Wire Transfer Form which was the first instance of his knowledge of the First Fraudulent Wire Transfer.

103.1    Plaintiff Riad immediately notified Defendant Wells Fargo that he did not authorize the First Fraudulent Wire Transfer.

103.2    Plaintiff Riad immediately demanded that Defendant Wells Fargo cancel the First Fraudulent Debit and First Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

104.    On or about 26 November 2010, Defendant Wells Fargo, through Randolph and/or another employee or employees of Defendant Wells Fargo, completed a reverse wire of approximately $53,000 into the Joint Account (the "**Reverse Wire of the First Fraudulent Wire Transfer**").

104.1     Defendant Wells Fargo debited fees from the Joint Account for performing the Reverse Wire of the First Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

104.2     Defendant Wells Fargo has refused to repay Plaintiff Riad and/or Riad Holdings the amount of fees deducted from the Joint Account in respect of the Reverse Wire of the First Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings for the same.

105.    On or about 30 November 2010, Defendant Wells Fargo, by and/or through an employee or employees thereof, undertook the Second Fraudulent Wire Transfer for $53,000.00, the exact same amount as the First Fraudulent Wire Transfer.

105.1     Defendant Wells Fargo, by and/or through an employee or employees thereof, undertook the Second Fraudulent Wire Transfer despite knowledge that Plaintiff Riad and/or Plaintiff Riad Holdings had not authorized the First Fraudulent Wire Transfer only seven (7) days beforehand.

105.2     Defendant Wells Fargo, by and/or through an employee or employees thereof, undertook the Second Fraudulent Wire Transfer despite knowledge and that Defendant Wells Fargo had undertaken a Reverse Wire of the First Fraudulent Wire Transfer only four (4) days beforehand because the First Fraudulent Wire Transfer was not authorized by Plaintiff Riad and/or Plaintiff Riad Holdings.

106.    Defendant Wells Fargo relies upon a Wire Transfer Request Form that it provided to Plaintiff Riad on or about May 2018 that purports to relate to the Second Fraudulent Wire Transfer (the "**Second Fraudulent Wire Transfer Request Form**").  A true and correct copy of the Second Fraudulent Wire Transfer Request Form is annexed as **Appendix 4**.

107.    The Second Fraudulent Wire Transfer Request Form contains:

(a)     The signature of Randolph as the Initiator's Signature; and

(b)     The signature of Wyatt as the Verifier's Signature.

108.    The Second Fraudulent Wire Transfer Request Form is incomplete in at least four (4) material respects.

108.1        It does not have a Preparer's Signature.

108.2        It does not have an Authorized Signature.

108.3        It does not have an address for the Receiving Bank.

108.4        It does not have an address for the Beneficiary.

109.    The incompleteness of material provisions of the Second Fraudulent Wire Transfer Request Form including, but not limited to, the absence of any Preparer's Signature and Authorized Signature, demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

110.    The Second Fraudulent Wire Transfer Request Form contains a Customer Signature purportedly to be that of Plaintiff Riad.

111.    Plaintiff Riad:

(a)     Denies that he signed the Second Fraudulent Wire Transfer Request Form; and

(b)     Avers that the Customer Signature on the Second Fraudulent Wire Transfer Form is an unauthorized signature, forgery and fraudulent signature and in violation of Title 18, Pa. C.S.A. Crimes and Offenses § 4201 et seq. (forgery).

112.    On or about between September 2016 and 2018, Plaintiff Riad and/or Plaintiff Riad Holdings discovered the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer and/or the Second Fraudulent Wire Request Form when Plaintiff Riad

was provided with the Limited Bank Statements by an employee of Defendant Wells Fargo.

112.1    Plaintiff Riad immediately notified Defendant Wells Fargo, by and/or through an employee or employees thereof, that he did not authorize the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer.

112.2    Plaintiff Riad immediately demanded that Defendant Wells Fargo, by and/or through an employee or employees thereof, cancel the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

113.    Plaintiff Riad and/or Plaintiff Riad Holdings deny any knowledge of the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer prior to their undertaking.

114.    Plaintiff Riad and/or Plaintiff Riad Holdings did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer.

115.    Defendant Wells Fargo has refused to credit the Joint Account or any other account held by Plaintiff Riad and/or Plaintiff Riad Holdings for the amount of the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings to Defendant Wells Fargo for the same.

116.    Defendant Wells Fargo relies upon a Wire Transfer Request Form that it purports to relate to the Third Fraudulent Wire Transfer (the "**Third Fraudulent Wire Transfer Request Form**").  A true and correct copy of the Third Fraudulent Wire Transfer Request Form is annexed as **Appendix 5**.

117.    The Third Fraudulent Wire Transfer Request Form is incomplete in at least seven (7) material respects.

117.1        It does not have a Customer Signature.

117.2        It does not have a Preparer's Signature.

117.3        It does not have a Verifier's Signature.

117.4        It does not have an Authorized Signature.

117.5        It does not have an address for the Receiving Bank.

117.6        It does not have an address for the Beneficiary.

117.7        The Customer Contract, an integral term of every Wire Transfer Request Form, has not been signed any party, including Plaintiff Riad or Plaintiff Riad Holdings.

118.    The incompleteness of material provisions of the Third Fraudulent Wire Transfer Request Form including, but not limited to, the absence of any Customer Signature, Preparer's Signature, Verifier's Signature and Authorized Signature, demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

119.    The absence of a Customer Signature on the Customer Contract voids the Terms & Conditions of the Third Fraudulent Wire Transfer Request Form and demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

120.    The Third Fraudulent Wire Transfer Request Form contains the signature of Wyatt as the Initiator's Signature.  It is the only signature on this Form.

121.    On or about September 2016, Plaintiff Riad and/or Plaintiff Riad Holdings discovered the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer when Plaintiff Riad was provided with the Limited Bank Statements by an employee of

Defendant Wells Fargo.

121.1    Plaintiff Riad immediately notified Defendant Wells Fargo, by and/or through an employee or employees thereof, that he did not authorize the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer.

121.2    Plaintiff Riad immediately demanded that Defendant Wells Fargo, by and/or through an employee or employees thereof, cancel the Third Fraudulent Debit and/or reverse the Third Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

122.    Plaintiff Riad and/or Plaintiff Riad Holdings:

(a)    Deny any knowledge of the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer prior to their undertaking; and

(b)    Did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer.

123.    Defendant Wells Fargo has refused to credit the Joint Account or any other account held by Plaintiff Riad and/or Plaintiff Riad Holdings for the amount of the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings to Defendant Wells Fargo for the same.

124.    Defendant Wells Fargo has been unable to produce any Wire Transfer Request Form that relates to the Fourth Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and Plaintiff Riad Holdings for Defendant Wells Fargo to produce the same.

125.    On or about between September 2016 and 2018, Plaintiff Riad and/or Plaintiff Riad Holdings discovered the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer when Plaintiff Riad was provided with the Limited Bank Statements by an employee of Defendant Wells Fargo which reflected charges levied against the

Joint Bank Account by Defendant Wells Fargo, by and/or through an employee or employees thereof, in relation to the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer.

125.1     Plaintiff Riad immediately notified Defendant Wells Fargo, by and/or through an employee or employees thereof, that he did not authorize the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer.

125.2     Plaintiff Riad immediately demanded that Defendant Wells Fargo, by and/or through an employee or employees thereof, cancel the Fourth Fraudulent Debit and/or reverse the Fourth Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

126.   Plaintiff Riad and/or Plaintiff Riad Holdings deny any knowledge of the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer prior to their undertaking.

127.   Plaintiff Riad and/or Plaintiff Riad Holdings did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer.

128.   Plaintiff Riad was out of the country on the date of the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer.

129.   Defendant Wells Fargo has refused to credit the Joint Account or any other account held by Plaintiff Riad and/or Plaintiff Riad Holdings for the amount of the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings to Defendant Wells Fargo for the same.

130.   Defendant Wells Fargo has produced two (2) versions of a Wire Transfer Request Form related to the Fifth Fraudulent Wire Transfer (the "**Two Versions of the Fifth Fraudulent Wire Transfer Request Form"**).

130.1     The First Version of the Fifth Fraudulent Wire Transfer Request Form was provided to Plaintiff Riad by an employee of Defendant Wells Fargo on or

about December 2018.

130.2    The Second Version of the First Fraudulent Wire Transfer Request Form was provided to Plaintiff Riad by Defendant Wells Fargo on or about May 2018.

131.    Defendant Wells Fargo relies upon a Wire Transfer Request Form that it provided to Plaintiff Riad on or about December 2018 that purports to relate to the Fifth Fraudulent Wire Transfer (the "**First Version of the Fifth Fraudulent Wire Transfer Request Form**").  A true and correct copy of the First Version of the Fifth Fraudulent Wire Transfer Request Form is annexed as **Appendix 6**.

132.    The First Version of the Fifth Fraudulent Wire Transfer Request Form is incomplete in at least eight (8) material respects.

132.1    It does not have a Customer Signature.

132.2    It does not have an Authorized Signature.

132.3    It does not have an Initiator's Signature.

132.4    It does not have a Verifier's Signature.

132.5    It does not have a Preparer's Signature.

132.6    It does not specify if the request was "Internal" or "Customer Initiated".

132.7    It is not dated by the purported customer thereof.

132.8    It does not have an address for the Beneficiary.

133.    The incompleteness of material provisions of the Fist Version of the Fifth Fraudulent Wire Transfer Request Form including, but not limited to, the absence of any signature at all (including the Customer Signature, Authorized Signature, Initiator's Signature, Verifier's Signature and Preparer's Signature), demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee

or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

134.   The absence of a Customer Signature on the Customer Contract voids the Terms & Conditions of the Third Fraudulent Wire Transfer Request Form and demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

135.   Defendant Wells Fargo relies upon a Wire Transfer Request Form that it provided to Plaintiff Riad on or about May 2018 that purports to relate to the Fifth Fraudulent Wire Transfer (the "**Second Version of the Fifth Fraudulent Wire Transfer Request Form**").   A true and correct copy of the Second Version of the Fifth Fraudulent Wire Transfer Request Form is annexed as **Appendix 7**.

136.   The Second Version of the Fifth Fraudulent Wire Transfer Request Form is incomplete in at least four (4) material respects.

136.1        It does not have an Authorized Signature.

136.2        It does not have a Preparer's Signature.

136.3        It is not dated by the purported customer thereof.

136.4        It does not have an address for the Beneficiary.

137.   The incompleteness of material provisions of the Second Version of the Fifth Fraudulent Wire Transfer Request Form including, but not limited to, the absence of any Preparer's Signature and Authorized Signature, demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

138.   The Second Version of the Fifth Fraudulent Wire Transfer Request Form contains a Customer Signature purportedly to be that of Plaintiff Riad.

138.1     Plaintiff Riad denies that he signed the Second Version of the Fifth Fraudulent Wire Transfer Request Form.

138.2     Plaintiff Riad avers that the Customer Signature on the Second Version of the Fifth Fraudulent Wire Transfer Form is an unauthorized signature, forgery and fraudulent signature and in violation of Title 18, Pa. C.S.A. Crimes and Offenses § 4201 et seq. (forgery).

138.3     Plaintiff Riad was out of the country on the date of each of the Two Versions of the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer.

139.   The Second Version of the Fifth Fraudulent Wire Transfer Request Form contains:

(a)     The signature of Randolph as the Initiator's Signature.

(b)     The signature of Wyatt as the Verifier's Signature.

140.   On or about between September 2016 and 2018, Plaintiff Riad and/or Plaintiff Riad Holdings discovered the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer and/or the First Version of the Fifth Fraudulent Wire Transfer Request Form and/or the Second Version of the Fifth Fraudulent Wire Transfer Request Form when Plaintiff Riad was provided with the Limited Bank Statements by counsel for Defendant Wells Fargo.

140.1     Plaintiff Riad immediately notified Defendant Wells Fargo, by and/or through an employee or employees thereof, that he did not authorize the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer.

140.2     Plaintiff Riad immediately demanded that Defendant Wells Fargo, by and/or through an employee or employees thereof, cancel the Fifth Fraudulent Debit and/or reverse the Fifth Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

141.   Plaintiff Riad and/or Plaintiff Riad Holdings deny any knowledge of the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer prior to their undertaking.

142.   Plaintiff Riad and/or Plaintiff Riad Holdings did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer.

143.   Defendant Wells Fargo has refused to credit the Joint Account or any other account held by Plaintiff Riad and/or Plaintiff Riad Holdings for the amount of the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings to Defendant Wells Fargo for the same.

144.   Defendant Wells Fargo relies upon a Wire Transfer Request Form that it purports to relate to the Sixth Fraudulent Wire Transfer (the "**Sixth Fraudulent Wire Transfer Request Form**").   A true and correct copy of the Sixth Fraudulent Wire Transfer Request Form is annexed as **<u>Appendix 8</u>**.

145.   The Sixth Fraudulent Wire Transfer Request Form is incomplete in at least eight (8) material respects.

145.1      It does not have a Customer Signature.

145.2      It does not have an Authorized Signature.

145.3      It does not have an Initiator's Signature.

145.4      It does not have any Preparer's Signature.

145.5      It does not have a Verifier's Signature.

145.6      It is not dated by the purported customer thereof.

145.7      It does not have an address for the Beneficiary.

145.8      The Customer Contract, an integral term of every Wire Transfer Request Form, has not been signed any party, including Plaintiff Riad or Plaintiff Riad Holdings.

146.    The incompleteness of material provisions of the Sixth Fraudulent Wire Transfer Request Form including, but not limited to, the absence of any signature at all (including the Customer Signature, Preparer's Signature, Initiator's Signature, Verifier's Signature and Authorized Signature), demonstrates prima face disregard by Defendant Wells Fargo, by and/or through an employee or employees thereof, for following established policies and/or procedures and/or customary banking best practices.

147.    The absence of a Customer Signature on the Customer Contract voids the Terms & Conditions of the Sixth Fraudulent Wire Transfer Request Form and demonstrates prima face disregard by Defendant Wells Fargo, by and/or through its employees, for following established policies and/or procedures and/or customary banking best practices.

148.    Plaintiff Riad was out of the country on the date of the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer.

149.    On or about between 2016 and about 2018, Plaintiff Riad and/or Plaintiff Riad Holdings discovered the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer and/or the Sixth Fraudulent Wire Transfer Request Form when Plaintiff Riad was provided with the Limited Bank Statements by an employee of Defendant Wells Fargo.

149.1    Plaintiff Riad immediately notified Defendant Wells Fargo, by and/or through an employee or employees thereof, that he did not authorize the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer.

149.2    Plaintiff Riad immediately demanded that Defendant Wells Fargo, by and/or through an employee or employees thereof, cancel the Sixth Fraudulent Debit and/or reverse the Sixth Fraudulent Wire Transfer and return all funds related thereto to the Joint Account.

150.    Plaintiff Riad and/or Plaintiff Riad Holdings deny any knowledge of the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer prior to their undertaking.

151.    Plaintiff Riad and/or Plaintiff Riad Holdings did not provide any consent or authority for Defendant Wells Fargo, by and/or through an employee or employees thereof, to undertake the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer.

152.    Defendant Wells Fargo has refused to credit the Joint Account or any other account held by Plaintiff Riad and/or Plaintiff Riad Holdings for the amount of the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer (the "**Fraudulent Eco Bank Wire Transfers**") despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings to Defendant Wells Fargo for the same.

153.    Randolph asserted via email correspondence to Plaintiff Riad that, inter alia:

153.1    Plaintiff Riad had requested that each of the Fraudulent Eco Bank Wire Transfers be reversed and Randolph had notified the Wire Operations Team of Defendant Wells Fargo (the "**Wire Operations Team**") of the same.

153.2    Defendant Wells Fargo had initiated an investigation and assigned case workers to investigate the matter.

153.3    A claims investigation number had been assigned to each of the Six Fraudulent Wires; to wit:

(a)    'XQR0302100429' had been assigned to the investigation and/or purported investigation related to the First Fraudulent Debit and/or First Fraudulent Wire;

(b)    'XQR0302100528' had been assigned to the investigation and/or purported investigation related to the Second Fraudulent Debit and/or Second Fraudulent Wire;

(c)    'XQR0302100219' had been assigned to the investigation and/or purported investigation related to the Third Fraudulent Debit and/or Third Fraudulent Wire;

    (d)    '<u>XQR0302100629</u>' had been assigned to the investigation and/or purported investigation related to the Forth Fraudulent Debit and/or Forth Fraudulent Wire;

    (e)    '<u>XQR0302100729</u>' had been assigned to the investigation and/or purported investigation related to the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire; and

    (f)    '<u>XQR0302100834</u>' had been assigned to the investigation and/or purported investigation related to the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire.

153.3    The Wire Operations Team would provide feedback of the investigation to Randolph within two (2) days of the correspondence

153.4    Randolph would provide feedback to Plaintiff Riad once he had feedback from the Wire Operations Team.

154.    Neither Randolph nor any other employee of Defendant Wells Fargo has provided feedback to Plaintiff Riad and/or Plaintiff Riad Holdings despite repeated promises demands for the same from Plaintiff Riad and/or Plaintiff Riad Holdings.

155.    Plaintiff Riad avers as follows:

155.1    Plaintiff Riad denies that he initiated the Fraudulent Eco Bank Transfers, particularly since Plaintiff Riad was out of the country at the time of the Fraudulent Eco Bank Transfers.

155.2    Plaintiff Riad demanded the reversal of the Fraudulent Eco Bank Transfers on the ground of breach of contract by Defendant Wells Fargo, by and/or through an employee or employees thereof.

156.    Defendant Wells Fargo benefitted from the Three Deposits, the Six Fraudulent Debits, the Six Fraudulent Wire Transfers, the Reverse Wire of the First Fraudulent Wire Transfer and the Wire Investigation Fees to the prejudice and loss of Plaintiff

Riad and/or Plaintiff Riad Holdings.

156.1    Defendant Wells Fargo charged Plaintiff Riad and/or Plaintiff Riad Holdings fees for completing the Three Deposits, the Six Fraudulent Debits, the Six Fraudulent Wire Transfers and/or the Reverse Wire of the First Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

156.2    Defendant Wells Fargo charged Plaintiff Riad and/or Plaintiff Riad Holdings fees for its promise to investigate the Fraudulent Eco Bank Wire Transfers and/or in connection with and/or in relation to its promise and/or duty to credit the Joint Account in the amount of the Fraudulent Eco Bank Wire Transfers (the "**Wire Investigation Fees**").

156.3    Defendant Wells Fargo paid Plaintiff Riad and/or Plaintiff Riad Holdings less interest on the balance of funds held in the Joint Account than otherwise due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings without the absence of funds and fees associated with the Six Fraudulent Debits, the Six Fraudulent Wire Transfers and the Reverse Wire of the First Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.    Upon information and belief, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof:

(a)    Failed to maintain adequate policies and/or procedures;

(b)    Failed to ensure that adequate policies and/or procedures and/or customary banking best practices were followed by an employee or employees of Defendant Wells Fargo; and/or

(c)    Permitted an employee or employees of Defendant Wells Fargo or, alternatively, failed to permit an employee or employees of Defendant Wells Fargo, from engaging in conduct contrary to established policies and/or

procedures and/or customary banking best practices,

which enabled an employee or employees of Defendant Wells Fargo to incorrectly and/or improperly undertake the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and/or charge fees and/or withhold interest otherwise due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings to the prejudice of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to, the loss of $1,015,725.00 representing the amount debited from the Joint Account through the Second Fraudulent Debit to the Sixth Fraudulent Debit and/or Second Fraudulent Wire Transfer through Sixth Fraudulent Wire Transfer.

157.1    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the amount of $53,000.00 representing proceeds of the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.2    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the amount of $21,000.00 representing proceeds of the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.3    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the amount of $100.00 representing proceeds of the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.4    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the amount of $670,000.00 representing proceeds of the Fifth Fraudulent Debit and/or Fifth Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.5    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the amount of $271,635.00 representing proceeds of the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

157.6    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad the amount of those fees and/or other charges deducted from the Joint Account by Defendant Wells Fargo in respect of the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and/or Reverse Wire of the First Fraudulent Wire Transfer.

157.7    Defendant Wells Fargo did not credit and has not credited the Joint Account or any other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad the amount of the loss of interest that would have otherwise accrued to Plaintiff Riad and/or Riad Holdings in respect of the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and/or Reverse Wire of the First Fraudulent Wire Transfer and/or fees and/or other charges deducted from the Joint Account in respect of the same except for the absence of funds associated with the same.

158.    In addition and/or alternative to every other averment herein, Plaintiff Riad and Plaintiff Riad Holdings aver that Defendant Wells Fargo, by and/or through an employee or employees thereof:

(a) Failed to maintain adequate policies and/or procedures;

(b) Failed to ensure that adequate policies and/or procedures and/or customary banking best practices were followed by an employee or employees of Defendant Wells Fargo; and/or

(c) Permitted an employee or employees of Defendant Wells Fargo or, alternatively, failed to permit any employee or employees of Defendant Wells Fargo, from engaging in conduct contrary to established policies and/or procedures and/or customary banking best practices,

which compromised Defendant Wells Fargo's safe custody and/or proper administrative control over the Joint Account and/or other accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings and caused prejudice and loss to Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited, to the loss of $1,015,725.00.

158.1    Defendant Wells Fargo has failed to deliver the benefit of $53,000.00 representing proceeds of the Second Fraudulent Debit and/or Second Fraudulent Wire Transfer despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

158.2    Defendant Wells Fargo has failed to deliver the benefit of $21,000.00 representing proceeds of the Third Fraudulent Debit and/or Third Fraudulent Wire Transfer despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

158.3    Defendant Wells Fargo has failed to deliver the benefit of $100.00 representing proceeds of the Fourth Fraudulent Debit and/or Fourth Fraudulent Wire Transfer despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

158.4    Defendant Wells Fargo has failed to deliver the benefit of $670,000.00 representing proceeds of the Fifth Fraudulent Debit and/or Fifth Fraudulent

Wire Transfer despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

158.5   Defendant Wells Fargo has failed to deliver the benefit of $271,635.00 representing proceeds of the Sixth Fraudulent Debit and/or Sixth Fraudulent Wire Transfer despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds for the same.

158.6   Defendant Wells Fargo has failed to deliver the benefit of the amount of fees improperly charged to Plaintiff Riad and/or Plaintiff Riad by Defendant Wells Fargo in respect of the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings for the same.

158.7   Defendant Wells Fargo has failed to deliver the benefit of the amount of interest incorrectly and/or improperly and/or erroneously not paid to Plaintiff Riad and/or Plaintiff Riad by Defendant Wells Fargo due to the lower balance in the Joint Account arising from the incorrect and/or improper withdrawal of funds associated the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and/or fees and/or other charges incorrectly and/or improperly and/or erroneously deducted from the Joint Account in relation to the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, despite repeated demands from Plaintiff Riad and/or Plaintiff Riad Holdings for the same.

159.   Defendant Wells Fargo, by and/or through an employee or employee thereof, has repeated frustrated Plaintiff Riad and/or Plaintiff Riad's reasonable efforts to obtain records related every account held by Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo to substantiate the quantum of loss and damages suffered by Plaintiff Riad and/or Plaintiff Riad in respect of the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and fees and loss of interest

associated therewith, despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings for Defendant Wells Fargo for the same.

160.    Defendant Wells Fargo, by and/or through an employee or employees thereof, has failed to remedy the prejudice and loss caused to Plaintiff Riad and/or Plaintiff Riad Holdings by the actions or failure to act of Defendant Wells Fargo, by and/or through an employee or employees thereof, in respect of the Six Fraudulent Debits and/or Six Fraudulent Wire Transfers and fees and loss of interest associated therewith, despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings for Defendant Wells Fargo to remedy the same.

*(Section C Commences on the Following Page)*

**C.      FACTS RELEVANT TO CONSUMER FRAUD BY DEFENDANT WELLS FARGO IN RELATION TO PLAINTIFF RIAD AND PLAINTIFF RIAD HOLDINGS**

161.    Between 1 May 2002 and 20 April 2017, Defendant Wells Fargo offered consumer financial banking products and services including, but not limited to, consumer and small business checking and savings accounts, credit cards, unsecured lines of credit, and/or online bill payment services (the "**Defendant's Products and Services**") to its customers including, but not limited to, Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd.

162.    Between 1 May 2002 and 20 April 2017, Defendant Wells Fargo published a brochure entitled 'The Vision & Values of Wells Fargo' which established a quota for employees to sell at least eight of the Defendant's Products and Services to each customer (the "**Quota**"):

> "Going for gr-eight. Our average retail banking household has about six products with us.  We want to get to eight…and beyond.  One of every four already has eight or more. . . "

163.    To encourage and incentivize employees of Defendant Wells Fargo to achieve the 'Going for gr-eight' Quota, Defendant Wells Fargo established and implemented an incentive compensation program whereby, until at least 30 September 2016, employees of Defendant Wells Fargo were materially rewarded through various means by Defendant Wells Fargo for selling the Defendant's Products and Services to its customers (the "**Cross-Selling of Defendant's Products and Services**").[3]

164.    Employees of Defendant Wells Fargo engaged in alternative means to meet the Quota including, without limitation, opening unauthorized accounts and funding said accounts from existing and/or authorized accounts.

---

[3]    https://www.attorneygeneral.gov/wp-content/uploads/2018/12/Wells-Fargo-Multistate-Settlement-Agreement-12-28-18.pdf.

164.1        Defendant Wells Fargo, by and/or through an employee or employees thereof, opened in excess of 3.5 million unauthorized bank accounts and funded these accounts through the unauthorized transfer of funds from authorized and/or existing accounts.[4]

164.2        Defendant Wells Fargo, by and/or through an employee or employees thereof, "built and refined an incentive-based program and implemented sales goals to boost the cross-selling of products, but did so in a way that made it possible for employees to pursue unfair and abusive sales practices. . . ."[5]

164.3        Defendant Wells Fargo, by and/or through an employee or employees thereof, "[r]ather than putting its customers first . . . built and sustained a program where the bank and many of its employees served themselves instead, violating the basic ethics of a banking institution, including the key norm of trust."[6]

164.4        "The gravity of the fraud that has occurred at [Defendant] Wells Fargo cannot be pushed aside as the stray misconduct of just a few bad apples. As one former federal prosecutor aptly noted, the stunning nature and scale of these practices reflects instead the consequences of a diseased orchard."[7]

165.    Governmental entities, including the Office of the Comptroller of the Currency (the "**OCC**"), the Consumer Finance Protection Bureau ("**CFPB**") and every Attorney General in every state of the United States of America (the "**State AGs**") have launched investigations into Defendant Wells Fargo's sales practices.

---

[4]    Yahoo Finance, "**Every Wells Fargo Consumer Scandal Since 2015: A timeline**", (8 August 2018).

[5]    Testimony of Richard Cordray, Director of the CFPB, before the United States Senate Committee on Banking, Housing and Urban Affairs (20 September 2016).

[6]    Ibid.

[7]    Ibid.

165.1    In each of the above cited instances, every investigation concluded with determinations that Defendant Wells Fargo engaged in systematic and widespread fraudulent and deceptive practices to the detriment of consumers.

165.2    In each of the above cited instances, each investigation resulted in the payment of hundreds of millions of dollars in civil penalties or fines by Defendant Wells Fargo.

166.    From 2012 through 2016, the OCC examined Defendant Wells Fargo's sales practices including, but not limited to, the unauthorized opening of deposit and/or credit card accounts and the transfer of funds from authorized and/or existing accounts to unauthorized accounts.

167.    The OCC commenced its investigation as a result of complaints from consumers and Defendant Wells Fargo employees alleging improper sales practices at Defendant Wells Fargo.

168.    From February 2015 to June 2015, the OCC examined Defendant Wells Fargo's Community Bank Operational Risk Management:

168.1    In February 2015, the OCC concluded that Defendant Wells Fargo lacked a formalized governance framework to oversee sales practices and issued a supervisory letter that included a Matter Requiring Attention ("**MRA**").

168.2    In June 2015, the OCC issued a second supervisory letter that identified, inter alia, the following material failures of Defendant Wells Fargo:

(a)    Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to have an appropriate control or oversight structure given the corporate emphasis on product sales and cross-selling;

(b)    Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to have an enterprise-wide sales practices

program; and

(c)   Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to have an effective enterprise-wide customer complaint process.

169.   In 2016, the OCC issued a Report of Examination (the "**OCC Report**") which included the following findings and conclusions:

169.1      The sales practices engaged by Defendant Wells Fargo, by and/or through an employee or employees thereof, were unethical.

169.2      The sales practices engaged by Defendant Wells Fargo, by and/or through an employee or employees thereof, harmed consumers.

169.3      Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to promptly respond to these issues.

170.   The OCC approved the issuance of a consent order (the "**Consent Order**") and assessment of civil monetary penalties against Defendant Wells Fargo due to Defendant Wells Fargo's "reckless unsafe or unsound sales practices and [Defendant Wells Fargo's] risk management and oversight of those practices."

171.   The OCC issued the Consent Order on 8 September 2016.[8] The unsafe or unsound sales practices identified by the OCC included:

171.1      Defendant Wells Fargo, by and/or through an employee or employees thereof, sold unwanted deposit or credit accounts.

171.2      Defendant Wells Fargo, by and/or through an employee or employees thereof, opened unauthorized deposit or credit card accounts.

171.3      Defendant Wells Fargo, by and/or through an employee or employees thereof, funded the unauthorized accounts through the unauthorized

---

[8]      https://occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106a.pdf.

transfers of funds from authorized or existing consumer accounts.

171.4   Defendant Wells Fargo, by and/or through an employee or employees thereof, conducted unauthorized credit inquiries for the purpose of opening unauthorized accounts.

172.   The OCC assessed a $35 million civil penalty against Defendant Wells Fargo as part of such Consent Order.

173.   The CFPB investigation determined that Defendant Wells Fargo violated sections 1031 and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 ("**CFPA**"), *12 US.C. 5531* and *5536(a)(1)(B)*. This determination was based on the CFPB's conclusion that Defendant Wells Fargo engaged in at least the following unlawful and deceptive acts and practices:

173.1   Defendant Wells Fargo, by and/or through an employee or employees thereof, opened unauthorized deposit accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without the customers' knowledge or consent.

173.2   Defendant Wells Fargo, by and/or through an employee or employees thereof, submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent.

173.3   Defendant Wells Fargo, by and/or through an employee or employees thereof, enrolled consumers in online-banking services that they did not request.

173.4   Defendant Wells Fargo, by and/or through an employee or employees thereof, ordered and activated debit cards using consumers' information without their knowledge or consent.

174.   The CFPB fined Defendant "Wells Fargo $100 million for the widespread illegal practice of secretly opening unauthorized deposit accounts and credit card accounts."

175.   The State AGs, including the Attorney General of the Commonwealth of Pennsylvania, conducted investigations into certain sales practices of Defendant Wells Fargo including, but not limited to, the opening of unauthorized accounts through the funding of funds in existing accounts.[9]

176.   The State AGs, including the Attorney General of the Commonwealth of Pennsylvania, determined that Defendant "Wells Fargo's sales goals and incentive compensation program created an incentive for employees to engage in improper sales practices to satisfy sales goals and earn financial rewards." [10]

177.   The State AGs found that the sales goals and incentive compensation program requirements imposed on Wells Fargo Community Bank employees contributed to improper sales practices that Defendant Wells Fargo failed to promptly recognize and adequately prevent including, but not limited to, the following improper practices:

   a.   Defendant Wells Fargo, by and/or through an employee or employees thereof, opened accounts without Customer's knowledge or consent.[11].

   b.   Defendant Wells Fargo, by and/or through an employee or employees thereof, transferred funds between Customers' accounts without Customers' knowledge or consent.

   c.   Defendant Wells Fargo, by and/or through an employee or employees thereof, applied for credit cards without Customers' knowledge or consent.

   d.   Defendant Wells Fargo, by and/or through an employee or employees

---

[9]    https://www.attorneygeneral.gov/wp-content/uploads/2018/12/Wells-Fargo-Multistate-Settlement-Agreement-12-28-18.pdf \

[10]   Ibid.

[11]   The Attorney Generals defined "Customer" to mean any individual or small business that owns or holds or previously owned or held an account with Wells Fargo Community Bank and/or was sold, offered, referred, or enrolled in an insurance referral product by Wells Fargo Community Bank and/or Wells Fargo Insurance, Inc.

thereof, issued debit cards without Customers' knowledge or consent.

e. Defendant Wells Fargo, by and/or through an employee or employees thereof, enrolled Customers into online banking services, including online bill pay services, without Customers' knowledge or consent.

f. Defendant Wells Fargo, by and/or through an employee or employees thereof, engaged in misrepresentations and/or omissions to Customers regarding accounts.

178. State AGs, including the Attorney General of the Commonwealth of Pennsylvania, determined that Defendant "Wells Fargo has violated the consumer protection laws of the states of the respective Attorneys General based on the Attorneys General's Investigations." This determination was based on the conduct set forth in the CFPB investigation and otherwise recorded in the Settlement Agreement.[12]

179. On 2 February 2018, the Board of Governors of the Federal Reserve System ("**Federal Reserve**") issued a Consent Cease and Desist Order (the "**Federal Reserve Order**") against Defendant Wells Fargo and restricted its growth based on the same failures, deficiencies and fraudulent and deceptive practices identified above.

180. In 2018, Defendant Wells Fargo's systematic and widespread practice of harming fraud victims by closing customer bank accounts came to light through an action brought by a whistle-blower.[13]  In *Matthew Valles v. Wells Fargo Bank, N.A. and Kimberly Thrush*, (Case No. 18-cv-07181), the plaintiff, a former fraud investigator for Defendant Wells Fargo, described "an illegal and systematic scheme to

---

[12]  https://www.attorneygeneral.gov/wp-content/uploads/2018/12/Wells-Fargo-Multistate-Settlement-Agreement-12-28-18.pdf

[13]  New York Times Article, "**Wells Fargo Accused of Harming Fraud Victims by Closing Accounts**" (28 February 2019); *Matthew Valles v. Wells Fargo Bank, N.A. and Kimberly Thrush*, (Case No. 18-cv-07181).

prematurely close certain customer accounts"[14] that included the following illegal practices:

180.1    "[T]he apparent directive of the Loss Prevention Line of Business Referrals unit - as indicated by [Defendant] Wells Fargo management - was to meet [Defendant] Wells Fargo's metrics at all costs, even if it meant failing to adequately investigate instances of fraud on accounts belonging to [Defendant] Wells Fargo's customers."[15]

180.2    "Rather than conduct thorough investigations into claims of fraud, Mr. Valles began to notice that [Defendant] Wells Fargo would instead save money by simply closing accounts under the pretext of a 'business decision to close'."[16]

180.3    "Improperly closing customer accounts in this manner ensured that customers, not [Defendant] Wells Fargo, were left to absorb the costs of fraudulent and unauthorized [activities] from their checking and savings accounts."[17]

180.4    The decision by [Defendant] Wells Fargo's Loss Prevention Line of Business Referrals unit to prematurely close accounts also unfairly harmed customers' credit in cases where fraud had caused an account to become overdrawn."[18]

181.    Defendant Wells Fargo has fired over 5,300 employees for "inappropriate sales conduct" associated with its consumer fraud activities.[19]

---

[14]   *Id.*, Complaint, at pg. 2.

[15]   *Id.*, at ¶11.

[16]   *Id.*, at ¶11.

[17]   *Id.*, at ¶11.

[18]   *Id.*, at ¶11.

[19]   https://hbr.org/2016/09/wells-fargo-and-the-slippery-slope-of-sales-incentives

182.     In toto, Defendant Wells Fargo has entered into consent orders with federal authorities related to its fraudulent conduct which include, inter alia, the payment or commitment to pay by Defendant Wells Fargo of restitution to consumers in excess of $600 million in relation to those orders and settlement of a related consumer class action lawsuit as well as payment of more than $1 billion in civil penalties to the federal government.[20]

183.     Defendant Wells Fargo, by and/or through its CEO at the pertinent time, Timothy J. Sloan ("**Sloan**"), has testified under oath before the United States Senate, Committee on Banking, Housing and Urban Affairs ("**U.S. Senate, Banking Committee**") and before the United States House of Representatives, Committee on Financial Serves ("**U.S. House, Banking Committee**").

183.1    Sloan's statements during the course of his testimony are representations and promises by and/or on behalf of Defendant Wells Fargo. Customers and investors are entitled to reasonably rely on same.[21]

183.2    On or about 3 October 2017, Defendant Wells Fargo, by and/or through Sloan, testified before the U.S. Senate, Banking Committee, and stated under oath that:

         (a)     "We are compensating every customer who has suffered because [Defendant] Wells Fargo made mistakes."[22]

         (b)     [Defendant] Wells Fargo will remedy all harm suffered by consumers back through 2009, the year that Wachovia merged with [Defendant]

---

[20]    https://www.news-sentinel.com/news/local-news/2018/12/28/wells-fargos-575-million-settlement-with-states-will-net-indiana-5-2m/

[21]    Testimony of Timothy J. Sloan, before the United States House of Representatives, Committee on Financial Serves (March 12, 2019).

[22]    Testimony of Timothy J. Sloan, then CEO of Defendant Wells Fargo, before the United States Senate Committee on Banking, Housing and Urban Affairs (Oct. 3, 2017) available at https://www.govinfo.gov/content/pkg/CHRG-115shrg28111/html/CHRG-115shrg28111.htm

Wells Fargo.[23]

183.3    On or about 12 March 2019, Defendant Wells Fargo, by and/or through Sloan, testified before the U.S. House, Banking Committee, and stated under oath that:

(a)    Defendant Wells Fargo's information technology management systems permit Defendant Wells Fargo to identify suspicious account transactions indicating identity theft and/or imposter fraud:

(i)    The biggest risk American consumers face today is one of imposter fraud[24]; and

(ii)    The following transaction would be suspicious and indicate a customer was the victim of theft and/or imposter fraud:

"If we see some sort of transaction that looks odd for the customer, like maybe [sic] sending a million dollars to a bank account in a country you have never had a relationship with, we would try to surface that for the customer";[25]

(c)    Defendant Wells Fargo is "dedicated to compensating every customer who suffered harm because of [its] mistakes…Above all, [Defendant] Wells Fargo is committed to making things right for our customers and earning back the public's trust";[26]

(d)    Defendant Wells Fargo will remedy all harm suffered by customers

---

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    *Id.*

back through 2009.[27]

184.   Plaintiff Riad and/or Plaintiff Riad Holdings are victims of Defendant Wells Fargo's consumer fraud and deceptive practices as perpetrated by and/or through an employee or employees thereof.  Defendant Wells Fargo's consumer fraud and deceptive practices against Plaintiff Riad and/or Plaintiff Riad include, but are not limited to, the Fraudulent Churn Activities.

185.   At all material times and places herein, Plaintiffs Riad and/or Riad Holdings and/or Schepperd were and continue to be customers of Defendant Wells Fargo and/or its predecessors-in-interest.

186.   Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd (accessing funds in the Riad Schepperd Account benefitting Plaintiff Riad) used the Riad Schepperd Account to pay household expenses.

187.   The Riad Schepperd Account was maintained with a low positive balance of between several hundred dollars and several thousand dollars.

188.   Along with the Riad Schepperd Account, Plaintiff Riad maintained personal accounts with Defendant Wells Fargo to pay his household expenses.

189.   Plaintiff Riad and/or Plaintiff Riad Holdings repeatedly requested that all funds held in the Joint Account, Riad Schepperd Account and all other accounts by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings, and all statements related thereto, be regularly sent to Plaintiff Riad as evidenced, inter alia, by the following correspondence from Plaintiff Riad to Defendant Wells Fargo:

189.1      "I am writing to you because I understand that I have multiple accounts that have been opened using the same account name that I have and I am finding it confusing to keep up with all these accounts and I don't know which one has my money in it.  I have spoken to the Branch manager Triandos

---

[27]   *Id.*

Randolph at 400 Scarlet Rd, New Garden PA branch."

189.2    "I am not happy with this and I cannot keep track of all these accounts. Please close all these accounts and keep my money in the two accounts that I opened for myself.  I went to the branch to inquire where my money is and I can see it on the screen at the office of Triandos, yet I cannot get a statement showing me the money in the account.  I am told my money is in a different account under my name. . . . I complained several times about this and I need to have a bank statement showing me where my money is.  It makes no sense for the bank to open multiple accounts under my name.  This is confusing and complicated."

189.3    "I am tired of calling your customer service line and being put on a hold for a long time to hear at the end that there is nothing they can do, and to go to the branch.  I go to the branch and they tell me the money is there.  I want to be able to get a bank statement and see it on the ATM receipt."

190.    Following further repeated attempts by Plaintiff Riad and/or Plaintiff Riad Holdings to obtain account statements and identify which accounts held their funds and quantify the amounts of such funds held in such accounts, Defendant Wells Fargo, by and/or through an employee or employees thereof, closed and/or purported to close all of Plaintiff Riad and Plaintiff Riad Holdings accounts held for their benefit by Defendant Wells Fargo (the "**Second Unauthorized Account Closures**").

190.1    Defendant Wells Fargo, by and/or through an employee or employees thereof, undertook the Second Unauthorized Account Closures without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings.

190.2    Defendant Wells Fargo, by and/or through an employee or employees thereof, represented to Plaintiff Riad and/or Plaintiff Riad Holdings that Defendant Wells Fargo was closing such accounts for "business reasons".

190.3    Defendant Wells Fargo, by and/or through an employee or employees thereof, sent Plaintiff Riad and Plaintiff Riad Holdings several checks purported to reflect the balance of funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings in the Joint Account, Joint Riad Schepperd Account and/or the Fraudulent Churn Accounts (the "**Unauthorized Closing Balance Checks**").

190.4    The Unauthorized Closing Balance Checks did not reflect the funds that Plaintiff Riad and/or Plaintiff Riad Holdings had on deposit with Defendant Wells Fargo and were materially deficient in an amount greater than that the amount of all funds stated in this Complaint.

190.5    Defendant Wells Fargo's information technology management systems permit Defendant Wells Fargo to keep open and/or re-open customer's 'closed' bank accounts without the knowledge, consent or authority of customers (the "**Hidden Account Management Capabilities**").

190.6    Defendant Wells Fargo's Hidden Account Management Capabilities constitute a confusing and deceptive practice that, along with Defendant Wells Fargo's refusal to provide complete records of accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings, frustrated the ability of Plaintiff Riad and/or Plaintiff Riad Holdings to access and ascertain the status of such accounts including, but not limited to, whether or not such accounts were open or closed and/or accurately track, trace and/or determine the balances of funds held in such accounts for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo.

191.    On or about 2019, Plaintiff Riad and Plaintiff Riad Holdings discovered that Defendant Wells Fargo, by and/or through an employee or employees thereof, undertook the Fraudulent Churn Activities in relation to at least 25 Fraudulent Churn Accounts. The redacted bank account numbers of the Fraudulent Churn Accounts are set forth in Table 1 attached hereto as **Appendix 9**.

192.    On or about August or September 2014, Plaintiff Riad visited the Oxford, Pennsylvania branch of Defendant Wells Fargo to re-assert his earlier requests for records related to his accounts from the branch manager thereof (the "**Oxford Branch Manager**").

192.1    The Oxford Branch Manager invited Plaintiff Riad inside his office to wait for the bank statements to print.

192.2    On or about the same time that Plaintiff Riad was waiting inside the Branch Manager's office and the Oxford Branch Manager was attempting to print out the statements of accounts for Plaintiff Riad and/or Plaintiff Riad Holdings, the Oxford Branch Manager received and answered a phone call in the presence of Plaintiff Riad.

192.3    Upon concluding such phone call, the Oxford Branch Manager represented to Plaintiff Riad that the phone call had been from Defendant Wells Fargo's Loss Prevention Unit who had directed him not to print any documents for Plaintiff Riad and to further order him to leave the bank branch.

*(Count 1 Commences on Following Page)*

## COUNT 1

## BREACH OF CONTRACT

1.     Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.     Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

3.     Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.     Plaintiff Riad and/or Plaintiff Riad Holdings, jointly and/or severally, and Defendant Wells Fargo, and/or its predecessor(s)-in-interest, entered into various agreements during the course of their commercial relationship (the "**Agreements**").

5.     The Agreements included, inter alia, the following terms and conditions:

5.1     Plaintiff Riad and Plaintiff Riad Holdings agreed to deposit funds with Defendant Wells Fargo from time to time.

5.2     Defendant Wells Fargo agreed to hold funds deposited with Defendant Well Fargo by Plaintiff Riad and/or Plaintiff Riad Holdings in safe custody and under its proper administrative control for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings for good and valuable consideration.

5.3     Defendant Wells Fargo agreed to pay Plaintiff Riad and/or Plaintiff Riad Holdings the benefit of interest on any positive balance of funds held by Defendant Wells Fargo on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings in accordance with an interest schedule and such other terms and

conditions established by Defendant Wells Fargo in relation thereto from time to time.

5.4     Defendant Wells Fargo agreed to make such funds available to Plaintiff Riad and/or Plaintiff Riad Holdings for their use from time to time in accordance with policies and/or procedures established by Defendant Wells Fargo in relation thereto from time to time.

5.5     Defendant Wells Fargo agreed not to deal in any funds deposited with Defendant Well Fargo by Plaintiff Riad and/or Plaintiff Riad Holding for any purpose without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings given in accordance with policies and/or procedures established by Defendant Wells Fargo in relation thereto from time to time.

5.6     Defendant Wells Fargo agreed to offer its products and services to Plaintiff Riad and/or Plaintiff Riad Holdings, for good and valuable consideration, in accordance with a fee schedule and such other terms and conditions established by Defendant Wells Fargo in relation thereto from time to time.

5.7     Plaintiff Riad and Plaintiff Riad Holdings agreed that, if they made use of any product and/or service offered by Defendant Wells Fargo from time to time, that they would pay such fees and other charges and comply with such terms and conditions established by Defendant Wells Fargo in respect of such products and/or services from time to time.

5.8     Defendant Wells Fargo agreed to provide Plaintiff Riad and/or Plaintiff Riad Holdings with statements regarding funds deposited by Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo including, but not limited to, records related to the amount, nature and movement of such funds and fees and other charges associated with such funds and Defendant Wells Fargo's provision of products and/or services related to such funds, on a regular basis and/or upon reasonable demand by Plaintiff Riad and/or

Plaintiff Riad Holdings given in accordance with policies and/or procedures established by Defendant Wells Fargo in relation thereto from time to time.

6.    In addition to the terms and conditions of the Agreements, the Agreements were subject to applicable law.

7.    An obligation for Defendant Wells Fargo to exercise a duty of reasonable care in the discharge of its rights and obligations under the Agreements was an implied term of such Agreements pursuant to established applicable and/or common law.

8.    Plaintiff Riad and/or Plaintiff Riad performed every obligation owed to Defendant Wells Fargo under the Agreements at all times relevant herein.

9.    Defendant Wells Fargo, by and/or through an employee or employees thereof, failed to perform the following material obligations incumbent upon Defendant Wells Fargo under the Agreements:

9.1    Defendant Wells Fargo failed to deposit into and/or credit the Joint Account in the amount of $1,200,000.00 representing proceeds of the First Cashier's Check.

9.2    Defendant Wells Fargo failed to deposit into and/or credit the Joint Account in the amount of $1,200,000.00 representing proceeds of the Second Cashier's Check.

9.3    Defendant Wells Fargo failed to deposit into and/or credit the Joint Account in the amount of $1,100,000.00 representing proceeds of the Third Cashier's Check.

9.4    Defendant Wells Fargo failed to deposit into and/or credit the Joint Account in the amount of $1,100,000.00 representing proceeds of the Fourth Cashier's Check and subsequently undertook the Incorrect Deposit, Unauthorized Withdrawal and issue of the Fraudulent Fifth Cashier's Check and failed to return the benefit of the $1,100,000.00 to Plaintiff Riad and/or Plaintiff Riad Holdings as owners of such funds.

9.5     Defendant Wells Fargo made six (6) fraudulent withdrawals of funds from the Joint Bank Account with a total value of $1,068,735.00 and used proceeds of such fraudulent debits to undertake six (6) fraudulent wire transfers with a total value of $1,068,735.00 without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings.

(a)     Defendant Wells Fargo undertook the Second Fraudulent Debit in the amount of $53,000.00 from the Joint Bank Account and undertook the Second Fraudulent Wire Transfer in a corresponding amount without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings;

(b)     Defendant Wells Fargo undertook the Third Fraudulent Debit in the amount of $21,000.00 from the Joint Bank Account and undertook the Third Fraudulent Wire Transfer in a corresponding amount without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings;

(c)     Defendant Wells Fargo undertook the Fourth Fraudulent Debit in the amount of $100.00 from the Joint Bank Account and undertook the Fourth Fraudulent Wire Transfer in a corresponding amount without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings;

(d)     Defendant Wells Fargo undertook the Fifth Fraudulent Debit in the amount of $670,000.00 from the Joint Bank Account and undertook the Fifth Fraudulent Wire Transfer in a corresponding amount without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

(e)     Defendant Wells Fargo undertook the Sixth Fraudulent Debit in the amount of $271,635.00 from the Joint Bank Account and undertook the Sixth Fraudulent Wire Transfer in a corresponding amount

without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.6      Defendant Wells Fargo lost, misallocated, misappropriated and/or misplaced funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad Holdings and/or Plaintiff Riad Holdings as a result of incorrect and/or improper withdrawal and/or transfer of funds (by wire transfer or otherwise) and/or charging of fees and/or other unauthorized and/or fraudulent dealing by Defendant Wells Fargo in respect of the following instruments and/or transactions and/or accounts:

(a)      The Residual Balance of $5,100; and

(b)      The Unauthorized Withdrawal of the Unauthorized Transfer of $143,462.00.

9.7      Defendant Wells Fargo lost, misallocated, misappropriated and/or misplaced funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad Holdings and/or Plaintiff Riad Holdings as a result of incorrect and/or improper withdrawal and/or transfer of funds (by wire transfer or otherwise) and/or charging of fees and/or other unauthorized and/or fraudulent dealing by Defendant Wells Fargo in respect of the following instruments and/or transactions and/or accounts:

(a)      The Three Deposits;

(b)      The Four Cashier's Checks;

(c)      The Incorrect Deposit;

(d)      The Fraudulent Withdrawal;

(e)      The Fraudulent Fifth Cashier's Check;

(f)      The Fraudulent Churn Accounts;

(g)     The Fraudulent Online Banking Facilities;

(h)     The Second Fraudulent Debit;

(i)     The Second Fraudulent Wire Transfer;

(j)     The Third Fraudulent Debit;

(k)     The Third Fraudulent Wire Transfer;

(l)     The Fourth Fraudulent Debit;

(m)     The Fourth Fraudulent Wire Transfer;

(n)     The Fifth Fraudulent Debit;

(o)     The Fifth Fraudulent Wire Transfer;

(p)     The Sixth Fraudulent Debit;

(q)     The Sixth Fraudulent Wire Transfer; and/or

(r)     Every other instrument related to and/or transaction undertaken by Defendant Wells Fargo, by and/or through an employee or employees thereof, in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.8     Defendant Wells Fargo unilaterally opened and closed all accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings without the expressed prior consent and authority of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to:

(a)     The Unauthorized Account Closures;

(b)      The Fraudulent Churn Accounts; and/or

(c)      The Fraudulent Online Banking Facilities.

9.9      Defendant Wells Fargo incorrectly and/or improperly charged fees to Plaintiff Riad and/or Plaintiff Riad by Defendant Wells Fargo in respect of transactions undertaken and/or instruments issued by Defendant Wells Fargo in and/or related to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which were not undertaken with the knowledge, consent or authority of the same including, but not limited to, the Fraudulent Fees, the Fraudulent Online Fees and such other fees related to the following accounts, transactions and/or instruments:

(a)      The Joint Account;

(b)      The Riad Schepperd Account;

(c)      The Unauthorized Riad Schepperd Account:

(d)      The Four Cashier's Checks;

(e)      The Incorrect Deposit;

(f)      The Fraudulent Withdrawal;

(g)      The Fraudulent Fifth Cashier's Check;

(h)      The Unauthorized Withdrawal;

(i)      The Fraudulent Churn Accounts;

(j)      The Fraudulent Online Banking Facilities;

(k)      The Six Fraudulent Debits;

(l)      The Six Fraudulent Wire Transfers;

(m)     The Reverse Wire of the First Fraudulent Wire Transfer; and/or

(n)     Every other transaction undertaken and/or instrument issued by Defendant Wells Fargo in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.10     Defendant Wells Fargo incorrectly and/or improperly and/or erroneously failed to pay over to Plaintiff Riad and/or Plaintiff Riad such interest otherwise due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Well Fargo absent lower balances in accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Raid Holdings due to the incorrect and/or improper withdrawal and/or transfer of funds and/or charging of fees and/or other unauthorized and/or fraudulent dealing by Defendant Wells Fargo in respect of the following instruments and/or transactions and/or accounts:

(a)     The Joint Account;

(b)     The Riad Schepperd Account;

(c)     The Unauthorized Riad Schepperd Account:

(d)     The Three Deposits;

(e)     The Four Cashier's Checks;

(f)     The Incorrect Deposit;

(g)     The Fraudulent Withdrawal;

(h)     The Fraudulent Fifth Cashier's Check;

(i)     The Unauthorized Withdrawal;

(j)     The Fraudulent Churn Accounts;

(k)     The Fraudulent Online Banking Facilities;

(l)     The Six Fraudulent Debits;

(m)     The Six Fraudulent Wire Transfers;

(n)     The Reverse Wire of the First Fraudulent Wire Transfer;

(o)     The Fraudulent Fees;

(p)     The Fraudulent Online Fees; and/or

(q)     Every other transaction undertaken and/or instrument issued by Defendant Wells Fargo in any account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and/or Schepperd which was not undertaken with the knowledge, consent or authority of the same to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.11     Defendant Wells Fargo failed to provide and/or refused to provide and/or failed to provide and/or refused to provide in a timely manner:

(a)     Complete records related to accounts opened and/or closed and/or all dealings in funds related to such accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings;

(b)     Accurate records related to accounts opened and/or closed and/or all dealings in funds related to such accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings;

(c)     Any and/or all SWIFT messages related to any of the Six Fraudulent Wire Transfers;

(d)     Any Wire Transfer Request Form related to the Fourth Fraudulent

Wire Transfer;

(e)  Incomplete and/or incorrect and/or fraudulent Wire Transfer Request Forms including, but not limited to, the Three Versions of the First Fraudulent Wire Transfer Request Form, the Second Fraudulent Wire Transfer Request Form, the Third Fraudulent Wire Transfer Request Form, the Two Versions of the Fifth Fraudulent Wire Transfer Request Form and the Sixth Fraudulent Wire Transfer Request Form; and/or

(f)  Incomplete and/or inaccurate Limited Bank Statements.

10.  Defendant Wells Fargo's failure to comply with such obligations each constitute a breach of the Agreements and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law.

11.  As a direct and proximate result of Defendant Wells Fargo's breach of the Agreements and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law, Plaintiff Raid and/or Plaintiff Riad Holdings have suffered the loss of the benefit of their funds and other losses, damages and prejudice in the following amounts:

(a)  $4,600,000 representing proceeds of the Four Cashier's Checks;

(b)  $1,068,735 representing proceeds of the Six Fraudulent Withdrawals and/or Six Fraudulent Wire Transfers;

(c)  $5,100 representing the amount of the Residual Balance;

(d)  $143,462 representing the amount of the Unauthorized Withdrawal of the Unauthorized Transfer;

(e)  The amount of all fees charged by Defendant Wells Fargo to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings as a result of Defendant Wells Fargo's breach of contract

and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law, the exact amount to be determined at trial;

(f)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings as a result of Defendant Wells Fargo's breach of contract and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law, the exact amount to be determined at trial; and/or

(g)     The amount of such other relief as sought herein related hereto.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)     Actual damages and/or compensatory damages and/or restitutionary damages in the following amounts:

(i)     $4,600,000.00; and

(ii)     $1,068,735.00; and

(iii)     $5,100.00; and

(iv)     $143,462.00;

(b)     The amount of all fees charged by Defendant Wells Fargo to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings as a result of Defendant Wells Fargo's breach of contract and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law, the exact amount to be determined at trial;

(c)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff

Riad and/or Plaintiff Riad Holdings as a result of Defendant Wells Fargo's breach of contract and/or obligations imposed on Defendant Wells Fargo by the Agreements and/or applicable law and/or common law, the exact amount to be determined at trial;

(d)   All attorney's fees and litigation costs on a full indemnity basis;

(e)   All costs;

(f)   Interest; and

(g)   Such other such relief as this Honorable Court may deem appropriate.

## COUNT 2

## UNJUST ENRICHMENT (ALTERNATIVE TO COUNT 1)

1.   Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.   Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

3.   Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.   Plaintiff Riad and Plaintiff Riad Holdings deposited funds into accounts held for their benefit with Defendant Wells Fargo.

5.   It was a condition of the Agreements between Plaintiff Riad and Plaintiff Riad Holdings with Defendant Wells Fargo, whether express or implied, that:

(a)   Defendant Wells Fargo would keep safe custody and/or proper administrative control over all funds deposited with Defendant Wells Fargo

by Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

(b)     Defendant Wells Fargo would return all funds deposited with Defendant Wells Fargo by Plaintiff Riad and/or Plaintiff Riad Holdings upon reasonable demand for the same by the same.

6.     In addition or alternative to any condition of the Agreements (or in the event that it is found that no Agreements, express or implied, existed between Plaintiff Riad and/or Plaintiff Riad and Defendant Wells Fargo), it was an implied promise by Defendant Wells Fargo to Plaintiff Riad and/or Plaintiff Riad Holdings that:

(a)     Defendant Wells Fargo would keep safe custody and/or proper administrative control over all funds deposited with Defendant Wells Fargo by Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

(b)     Defendant Wells Fargo would return all funds deposited with Defendant Wells Fargo by Plaintiff Riad and/or Plaintiff Riad Holdings upon reasonable demand for the same by the same.

7.     Whether under the Agreements or upon reliance on Defendant Wells Fargo's implied promise, or both, Plaintiff Riad and/or Riad Holdings entrusted and provided Defendant Wells Fargo with money through the deposit of such funds into accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings, for good and valuable consideration exchanged between them.

8.     By and/or through an employee or employees thereof, Defendant Wells Fargo acknowledged, accepted and benefitted from Plaintiff Riad and/or Plaintiff Riad's deposit of money into accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to, charging fees to Plaintiff Riad and/or Plaintiff Riad Holdings and otherwise using such funds for its benefit as permitted by laws applicable to a regulated financial institution in the United States of America.

9.    Despite repeated demands by Plaintiff Riad and/or Plaintiff Riad Holdings, Defendant Wells Fargo, by and/or through an employee or employees thereof, has refused to:

   (a)    Return funds deposited by Plaintiff Riad and/or Plaintiff Riad Holdings into accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings;

   (b)    Return the amount of fees and/or other charges incorrectly and/or improperly debited by Defendant Wells Fargo against funds deposited by Plaintiff Riad and/or Plaintiff Riad Holdings into accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

   (c)    Credit the amount of interest due and payable by Defendant Wells Fargo to Plaintiff Riad and/or Plaintiff Riad Holdings for its use of funds deposited by Plaintiff Riad and/or Plaintiff Riad Holdings into accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings.

10.    Defendant Wells Fargo has been unjustly enriched by its refusal to return such funds, return such fees and credit interest to Plaintiff Riad and/or Plaintiff Riad Holdings and further unjustly enriched by its continued benefit of such funds, amount of such fees and amount of such interest.

11.    Plaintiff Riad and/or Riad Holdings purchased from Defendant Wells Fargo, by and/or through an employee or employees thereof, five (5) cashier's checks with a collective value of $4,600,000 as follows:

   (a)    The First Cashier's Check in the amount of $1,200,000.00 payable to "Elevation Consultants & Investments LLC";

   (b)    The Second Cashier's Check in the amount of $1,200,000.00 payable to "Saint Jude Mining Corp.";

   (c)    The Third Cashier's Check in the amount of $1,100,000.00 payable to "Saint

Jude Mining Corp.";

(d)     The Fourth Cashier's Check in the amount of $1,100,000.00 payable to "Von Atlas Consultants LLC"; and

(e)     The Fifth Cashier's Check in the amount of $1,100,000.00 payable to "Panasoft Strategic Solutions".

12.     Defendant Wells Fargo debited accounts held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings for $4,600,000 to issue these five cashier's checks and, pursuant to applicable law and/or policies and/or procedures of Defendant Wells Fargo and/or customary banking best practices, transferred the same into an account and/or accounts owned and/or controlled and/or operated for the benefit of Defendant Wells Fargo to guarantee that it could pay the amount of each of the five cashier's checks upon presentation for payment or return for deposit of the same.

13.     Paragraphs 30, 53 and 156 are incorporated, mutatis mutandis, by reference as if stated in full herein.

14.     No beneficiary of each of these five (5) cashier's checks has cashed the checks.

14.1    Plaintiff Raid returned the First Cashier's Check, the Second Cashier's Check, and the Third Cashier's Check to Defendant Wells Fargo for deposit into the Joint Account.

14.2    The whereabouts of the Fifth Cashier's Check are not known to Plaintiff Riad and/or Plaintiff Riad Holdings as Defendant Wells Fargo has not provided any records to indicate the whereabouts of the Fifth Cashier's Check.

15.     Defendant Wells Fargo's policy and/or procedures for cashing cashier's checks for non-account holders requires the presentation of:

(a)     Government issued photo identification in the name of the beneficiary of the

cashier's check;

(b)     An option to require presentation of a second form of identification in the name of the beneficiary of the cashier's check;

(c)     Where cashier's checks are drawn in favor of corporate entities (as in the case at hand), presentation of appropriate corporate documents for such corporate entities; and

(d)     Where cashier's checks are drawn in favor of corporate entities (as in the case at hand), presentation of a resolution or other similarly suitable corporate document in the name of the applicable corporate entity that evidences the power and authority of the person presenting such identification to present and cash such cashier's check for the benefit of such corporate entity.

16.     To the knowledge of Plaintiff Riad and/or Plaintiff Riad Holdings, none of the beneficiaries of the five cashier's checks reside in or have visited the United States of America.

17.     Defendant Wells Fargo has not produced any records to indicate that the First Cashier's Check, Second Cashier's Check, Third Cashier's Check or Fifth Cashier's Check have been cashed and/or attempted to be cashed by any party.

18.     In accordance with Defendant Wells Fargo's policies and/or procedures, the validity period for cashing each of the Four Cashier's Checks has passed.

18.1     Pursuant to policies and/or procedures of Defendant Wells Fargo, cashier's checks are only valid for a specified period of time.

18.2     In 2013, Defendant Wells Fargo claimed a five year statute of limitations on cashing cashier's checks which is beyond the period at hand.

18.3     Defendant Wells Fargo has failed to report the unclaimed proceeds of the applicable cashier's checks to the Pennsylvania Treasury Department as

required by applicable law.

19.   As none of the Four Cashier's Checks were cashed by any beneficiary thereof and Defendant Wells Fargo has not turned over proceeds of the Four Cashier's Checks to the Pennsylvania Treasury Department, Defendant Wells Fargo continues to hold the amount of $4,600,000 in an account and/or accounts owned and/or controlled and/or operated for the benefit of Defendant Wells Fargo.

20.   By virtue of its conduct and in alternative to Count 4, Defendant Wells Fargo has been unjustly enriched by its refusal to return the amount of $4,600,000 and return fees and credit interest to Plaintiff Riad and/or Plaintiff Riad Holdings in respect thereof and further unjustly enriched by its continued benefit of such funds, amount of such fees and amount of such interest.

21.   Defendant Wells Fargo, by and/or through an employee or employees thereof, closed all accounts held at Defendant Wells Fargo for the benefit of Plaintiff Riad and Plaintiff Riad Holdings including, but not limited to, the Joint Account and the Riad Schepperd Account, without the knowledge, consent or authority of Plaintiff Riad and/or Plaintiff Riad Holdings.

22.   At the time of relevant account closures, the accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings contains funds including, but not limited to:

(a)   The Residual Balance of $5,100; and

(b)   The Unauthorized Withdrawal of the Unauthorized Transfer of $143,462,

which were the property of Plaintiff Riad and/or Plaintiff Riad Holdings.

23.   By virtue of its conduct and in alternative to Count 4, Defendant Wells Fargo has been unjustly enriched by its refusal to return the amount of $5,100 and $143,462 and return fees and credit interest charged to Plaintiff Riad and/or Plaintiff Riad Holdings in respect of all accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings and further unjustly enriched by its continued

benefit of such funds, amount of such fees and amount of such interest.

24.    It is inequitable, unconscionable and/or unlawful for Defendant Wells Fargo to:

(a)    Retain the $5,100 representing the Residual Balance;

(b)    Retain the $143,462 representing the Unauthorized Withdrawal of the Unauthorized Transfer;

(c)    Retain all other funds that were in accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings at the time of the relevant account closures by Defendant Wells Fargo;

(d)    Retain the benefit of the amount of fees improperly charged to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings; and

(e)    Retain the benefit of interest that should have been paid by Defendant Wells Fargo to Plaintiff Riad and/or Plaintiff Riad Holdings in respect of the $5,100 Residual Balance and $143,462 Unauthorized Withdrawal of the Unauthorized Transfer.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)    Actual and/or compensatory damages and/or restitutionary damages in the following amounts:

(i)    $4,600,000.00; and

(ii)    $1,068,735.00; and

(iii)    $5,100.00; and

(iv)    $143,462.00;

(b)     The amount of all fees charged by Defendant Wells Fargo to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings related to the Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized Transfer, the exact amount to be determined at trial;

(c)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings related to the Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized Transfer, the exact amount to be determined at trial;

(d)     All attorney's fees and litigation costs on a full indemnity basis;

(e)     All costs;

(f)     Interest; and

(g)     Such other such relief as this Honorable Court may deem appropriate.

## COUNT 3

## CONVERSION (ALTERNATIVE TO COUNT 1)

1.      Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.      Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

3.      Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.      Paragraph 9 of Count 1 is incorporated, mutatis mutandis, by reference as if stated

in full herein.

5.      Paragraphs 4 through 9, 11 through 17 and 19 and 20 of Count 2 are incorporated, mutatis mutandis, by reference as if stated in full herein.

6.      As referenced by Paragraphs 4 and 5 herein, Defendant Wells Fargo has:

   (a)      Taken and continues to possess the property of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

   (b)      Mistakenly delivered the property of Plaintiff Riad and/or Plaintiff Riad Holding to a third party; and/or

   (c)      Used the property of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

   (d)      Misused the property of Plaintiff Riad and/or Plaintiff Riad Holdings,

without the authorization of Plaintiff Riad and/or Plaintiff Riad Holdings.

7.      Funds are tangible property and chattels that can be the subject of a conversion of property claim under Pennsylvania law.

8.      Plaintiff Riad and/or Plaintiff Riad Holdings have a right of possession to that property of Plaintiff Riad and/or Plaintiff Riad Holding which:

   (a)      Defendant Wells Fargo has taken and continues to possess; and/or

   (b)      Defendant Wells Fargo has mistakenly delivered to a third party; and/or

   (c)      Defendant Wells Fargo has used; and/or

   (d)      Defendant Wells Fargo has misused,

without the authorization of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.      Plaintiff Riad and/or Plaintiff Riad Holdings have repeatedly demanded that Defendant Wells Fargo return that property of Plaintiff Riad and/or Plaintiff Riad

Holding which:

(a)     Defendant Wells Fargo has taken and continues to possess; and/or

(b)     Defendant Wells Fargo has mistakenly delivered to a third party; and/or

(c)     Defendant Wells Fargo has used; and/or

(d)     Defendant Wells Fargo has misused,

without the authorization of Plaintiff Riad and/or Plaintiff Riad Holdings.

10.     Defendant Wells Fargo has repeatedly refused the reasonable demands of Plaintiff Riad and/or Plaintiff Riad Holdings for Defendant Wells Fargo to return its possession of that property of Plaintiff Riad and/or Plaintiff Riad Holding which:

(a)     Defendant Wells Fargo has taken and continues to possess; and/or

(b)     Defendant Wells Fargo has mistakenly delivered to a third party; and/or

(c)     Defendant Wells Fargo has used; and/or

(d)     Defendant Wells Fargo has misused without the authorization of Plaintiff Riad and/or Plaintiff Riad Holdings,

without the authorization of Plaintiff Riad and/or Plaintiff Riad Holdings.

11.     By virtue of its acts or omissions to act and in the alternative to Counts 1 and 2:

(a)     Defendant Wells Fargo has taken and continues to possess; and/or

(b)     Defendant Wells Fargo has mistakenly delivered to a third party; and/or

(c)     Defendant Wells Fargo has used; and/or

(d)     Defendant Wells Fargo has misused,

the property of Plaintiff Riad and/or Plaintiff Riad Holding without the authorization

of Plaintiff Riad and/or Plaintiff Riad Holdings.

12.     By virtue of its acts and/or omissions to act, Defendant Wells Fargo has excluded Plaintiff Riad and/or Riad Holdings from use and enjoyment of such property and benefits thereof.

13.     By virtue of its acts and/or omissions to act, Defendant Wells Fargo's conduct, by and/or through an employee or employees thereof, was outrageous, fraudulent and/or illegal, to wit:

13.1        Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple violations of the federal statute relating to wire fraud, *18 U.S.C. § 1343*, by the conduct set forth in Sections A and B.

13.2        Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple violations of the federal statute relating to mail/wire fraud affecting a financial institution, Financial Institution Reform, Recovery Enforcement Act ("**FIRREA**"), Pub. L. No. 101-73 (1989), by the conduct set forth in Sections A and B.

13.3        Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple violations of criminal statute relating to forgeries by the conduct set forth in Sections B.  Pennsylvania Statutes Title 18, Pa. C.S.A. Crimes and Offenses §4201 et seq. (forgeries), to wit:

            (a)     Defendant Wells Fargo, by and/or through an employee or employees thereof, executed the purported signature in the name of Plaintiff Riad and/or the authorized representative of Plaintiff Riad Holdings on the Second Version of the First Fraudulent Wire Authorization Form and the Third Version of the First Fraudulent Wire Authorization Form;

            (b)     Defendant Wells Fargo, by and/or through an employee or employees thereof, executed the purported signature in the name of

Plaintiff Riad and/or the authorized representative of Plaintiff Riad Holdings on the Second Fraudulent Wire Authorization Form; and

(c)     Defendant Wells Fargo, by and/or through an employee or employees thereof, executed the purported signature in the name of Plaintiff Riad and/or the authorized representative of Plaintiff Riad Holdings on the Second Version of the Fifth Fraudulent Wire Authorization.

13.4     Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple violations of numerous other state and federal statutes including, but not limited to, sections 1031 and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 ("**CFPA**"), *12 US.C. 5531* and *5536(a)(1)(B)*, Unfair Trade Practices and Consumer Protection Law Act, 73 Pa. CS 201-1 et seq. (the "**UTPCPL**"), the Identity Theft and Assumption Deterrence Act, as amended by Public Law 105-318, 11 Stat. 3007 (October 20, 1998), and Pennsylvania Statutes Title 18 Pa. C.S.A. Crimes and Offenses §4120, Identity Theft.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)     Actual damages and/or compensatory damages and/or restitutionary damages in the following amounts:

(i)     $4,600,000.00; and

(ii)     $1,068,735.00; and

(iii)     $5,100.00; and

(iv)     $143,462.00;

(b)     The amount of all fees charged by Defendant Wells Fargo to accounts held

by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings related to the Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized Transfer, the exact amount to be determined at trial;

(c)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings related to the Three Deposits, Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized  Transfer, the exact amount to be determined at trial;

(d)     Punitive Damages;

(e)     All attorney's fees and litigation costs on a full indemnity basis;

(f)      All costs;

(g)     Interest; and

(h)     Such other such relief as this Honorable Court may deem appropriate.

## COUNT 4

## NEGLIGENCE BY DEFENDANT WELLS FARGO UNDER RESPONDEAT SUPERIOR

1.     Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.     Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

3.     Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.     Paragraph 9 of Count 1 is incorporated, mutatis mutandis, by reference as if stated

in full herein.

5.  Paragraphs 4 through 9, 11 through 17 and 19 and 20 of Count 2 are incorporated, mutatis mutandis, by reference as if stated in full herein.

6.  Paragraph 13 of Count 6 is incorporated, mutatis mutandis, by reference as if stated in full herein.

7.  At all times and places herein, Defendant Wells Fargo, by and/or through an employee or employees thereof, held out its ability to offer, offered and/or provided a variety of products and services to its customers, including Plaintiff Riad and/or Plaintiff Riad Holdings which included, but was not limited to, the following products and services:

7.1  The ability to open and close segregated accounts for the benefit of its customers.

7.2  The ability to accept deposits of funds into segregated accounts opened for the benefit of its customers.

7.3  The ability to hold deposited funds in safe custody and under proper administrative control in such segregated accounts opened for the benefit of its customers.

7.4  The ability to pay interest on positive balances of deposited funds and credit such interest to applicable accounts for the benefit of relevant customers.

7.5  The ability to make funds available for withdrawal from deposited funds pursuant to the request of authorized customers.

7.6  The ability to transfer funds between accounts held for the benefit of its customers.

7.7  The ability to issue, guarantee and cash cashier's checks.

7.8  The ability to undertake Wire Transfers.

7.9        The ability to provide statements and/or transaction records and/or such other records related to the amount, nature and movement of such funds and fees and other charges associated with such funds and Defendant Wells Fargo's provision of products and/or services related to such funds, on a regular basis and/or upon reasonable demand by customers.

8.    Defendant Wells Fargo, by and/or through an employee or employees thereof, held out its ability to offer, offered and/or provided a variety of products and services to its customers including, but not limited to, Plaintiff Riad and/or Plaintiff Riad Holdings, in accordance with:

(a)    Policies and/or procedures established by Defendant Wells Fargo from time to time in respect of such products and services and the delivery thereof;

(b)    Customary banking best practices reasonably expected to be followed by a large regulated financial institution in the United States of America; and/or

(c)    Laws applicable to Defendant Wells Fargo from time to time as a large regulated financial institution in the United States of America.

9.    At all times and places herein, Defendant Wells Fargo had employees working at the Branch including, but not limited to, Randolph and Wyatt.

10.    At all times and places herein, every employee of Defendant Wells Fargo that dealt with Plaintiff Riad and/or Plaintiff Riad Holdings or any matter related thereto, directly or indirectly, was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo, including Randolph and Wyatt.

11.    At all times and places herein, Randolph was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo.

11.1        Randolph was an experienced professional bank manager.

11.2        Randolph was employed by Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President.

11.3        As the Branch's Store Manager III and Assistant Vice President, Randolph routinely managed and supervised employees of Defendant Wells Fargo who worked at the Branch including, but not limited to, Wyatt and tellers.

12.   As part of his employment duties and in the ordinary course of his employment with Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President, Randolph:

(a)    Had authority to sign on behalf of Defendant Wells Fargo;

(b)    Had authority to sign as an Initiator's Signature on Wire Transfer Request Forms;

(c)    Had access to and/or the ability to modify information and/or inputs and/or outputs of information into, out of and within the information management systems (and consequent records thereof) of Defendant Wells Fargo; and/or

(d)    Had the authority to undertake and/or guide and/or authorize the undertaking of transactions on behalf of Defendant Wells Fargo including, but not limited to, the deposit, withdrawal and transfer of funds, issuing of cashier's checks and/or sending of Wire Transfers.

13.   In the ordinary course of his employment with Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President, Randolph initiated and/or organized and/or managed and/or supervised numerous transactions, either directly or under his care and/or instruction and/or management and/or supervision and/or guidance and/or knowledge, that advanced the business of Defendant Wells Fargo including, but not limited to:

(a)    The opening and closing of customer accounts;

(b)     The acceptance of deposits into such accounts;

(c)    The holding of deposited funds in safe custody and under proper

administrative control of Defendant Wells Fargo;

(d)     The payment of interest on positive balances of deposited funds and credit of such interest to applicable accounts for the benefit of relevant customers;

(e)     The making of funds available for withdrawal from deposited funds pursuant to the request of authorized customers;

(f)     The transfer funds between accounts held for the benefit of its customers;

(g)     The issue, guarantee and cashing of cashier's checks;

(h)     The receipt of instructions, authorization and undertaking of Wire Transfers; and

(i)     The provision of statements and/or transaction records and/or such other records related to the amount and/or nature and/or movement of such funds and/or fees and/or other charges associated with such funds and/or Defendant Wells Fargo's provision of products and/or services related to such funds, on a regular basis and/or upon reasonable demand by authorized customers.

14.     As part of his employment duties and in the ordinary course of his employment with Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President, Randolph knew or should reasonably have known about:

(a)     Policies and/or procedures established by Defendant Wells Fargo from time to time in respect of products and/or services customarily and/or routinely offered and/or executed at the Branch and elsewhere by Defendant Wells Fargo;

(b)     Customary banking best practices reasonably expected to be followed by a large regulated financial institution in the United States of America; and/or

(c)     Laws applicable to Defendant Wells Fargo from time to time as a large

regulated financial institution in the United States of America.

15.   As part of his employment duties and in the ordinary course of his employment with Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President, Randolph owed a duty of care to Plaintiff Riad and/or Plaintiff Riad Holdings to conduct himself and fulfill his employment duties:

    (a)   In a manner expected of a reasonably competent professional bank manager experienced with the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo;

    (b)   To a standard established by the policies and/or procedures of the Defendant Wells Fargo applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo;

    (c)   To a standard of customary banking best practices reasonably known to bank managers or which should have reasonably been known to bank managers applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo; and/or

    (d)   To a standard required by laws applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo as reasonably known to bank managers or which should have reasonably been known to bank managers.

16.   At all times and places herein, Wyatt was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo.

16.1   Wyatt was an experienced employee in her area of employment.

16.2   As part of her employment duties and in the ordinary course of her employment with Defendant Wells Fargo, Wyatt had the authority, among other duties, to:

(a)     Prepare Wire Transfer Request Forms; and/or

(b)     Sign as an Initiator's Signature on Wire Transfer Request Forms; and/or

(c)     Sign as a Verifier's Signature on Wire Transfer Request Forms.

17.    As part of her employment duties and in the ordinary course of her employment with Defendant Wells Fargo, Wyatt knew or should reasonably have known about:

(a)     Policies and/or procedures established by Defendant Wells Fargo from time to time in respect of Wire Transfers;

(b)     Customary banking best practices reasonably expected to be followed by a large regulated financial institution in the United States of America in respect of Wire Transfers; and/or

(c)     Laws applicable to Defendant Wells Fargo from time to time as a large regulated financial institution in the United States of America in respect of Wire Transfers.

18.    As part of her employment duties and in the ordinary course of her employment with Defendant Wells Fargo, Wyatt owed a duty of care to Plaintiff Riad and/or Plaintiff Riad Holdings to conduct herself and fulfill her employment duties:

(a)     In a manner expected of a reasonably competent professional bank employee experienced in the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(b)     To a standard established by the policies and/or procedures of the Defendant Wells Fargo related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(c)     To a standard of customary banking best practices reasonably known to experienced employees or which should have reasonably been known to experienced employees related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo; and/or

(d)     To a standard required by laws applicable to related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo as reasonably known to experienced employees or which should have reasonably been known to experienced employees.

19.     In addition to specific employment duties conducted in the ordinary course of their employment with Defendant Wells Fargo by Randolph and Wyatt, every other employee of Defendant Wells Fargo, as part of their employment duties undertaken in the ordinary course of their employment with Defendant Wells Fargo, owed a duty of care to Plaintiff Riad and/or Plaintiff Riad Holdings to conduct themselves and fulfill their employment duties:

(a)     In a manner expected of a reasonably competent bank employee;

(b)     To a standard established by the policies and/or procedures of the Defendant Wells Fargo in respect of their duties;

(c)     To a standard of customary banking best practices as reasonably known to bank employees or which should have reasonably been known to bank employees in respect of their duties; and/or

(d)     To a standard required by applicable law as reasonably known to bank employees or which should have reasonably been known to bank employees.

20.     The duty of care of employees of Defendant Wells Fargo to Plaintiff Riad and/or Plaintiff Riad Holdings included, but was not limited to, a duty of care in respect of

the Defendant Wells Fargo's provision of the following products and/or services provided to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo in the ordinary course of their employment:

(a)     The opening and closing of accounts;

(b)     The acceptance of deposits into such accounts;

(c)     The holding of deposited funds in safe custody and under proper administrative control of Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings;

(d)     The payment of interest on positive balances of deposited funds and credit of such interest to applicable accounts for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings;

(e)     The charging of only relevant and applicable fees related to dealings in accounts or transactions authorized by Plaintiff Riad and/or Plaintiff Riad Holdings;

(f)     The making of funds available for withdrawal by Plaintiff Riad and/or Plaintiff Raid Holdings from balances of funds deposited by Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo;

(g)     The receipt of instructions, authorization and undertaking of Wire Transfers only in accordance with their duty of care;

(h)     Maintaining bank account records that accurately reflect the balance of funds in accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings;

(i)     Correctly debiting and/or transferring and/or crediting funds deposited into and/or withdrawn out of accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings including, without limitation, funds deposited and/or withdrawn through cashier's checks

and/or Wire Transfers;

(j)     Detecting, preventing and/or remedying acts of fraud and/or other criminal conduct related to any Wire Transfers and/or activities in any accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited to, acts of fraud and/or other criminal conduct committed by an employee or employees of Defendant Wells Fargo;

(k)     The issue and cashing of cashier's checks purchased by Plaintiff Riad and/or Plaintiff Riad Holdings in accordance with the reasonable instructions of Plaintiff Riad and/or Plaintiff Riad Holdings;

(l)     The return, receipt, acceptance for deposit and/or disposition of unused cashier's checks purchased by Plaintiff Riad and/or Plaintiff Riad Holdings in accordance with their instructions; and/or

(m)     The provision of statements and/or transaction records and/or such other records related to the amount and/or nature and/or movement of funds and/or fees and/or other charges and/or interest associated with accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings, on a regular basis and/or upon reasonable demand by Plaintiff Riad and/or Plaintiff Riad Holdings.

21.     By his acts and/or his omissions to act in the discharge of his duties including, but not limited to, his management duties, Randolph breached his duty of reasonable care to Plaintiff Riad and/or Plaintiff Riad Holdings to conduct himself and fulfill his employment duties:

(a)     In a manner expected of a reasonably competent professional bank manager experienced with the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo;

(b) To a standard established by the policies and/or procedures of the Defendant Wells Fargo applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo;

(c) To a standard of customary banking best practices reasonably known to bank managers or which should have reasonably been known to bank managers applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo; and/or

(d) To a standard required by laws applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo as reasonably known to bank managers or which should have reasonably been known to bank managers.

21.1 Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated, mutatis mutandis, by reference as if stated in full herein.

21.2 Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated, mutatis mutandis, by reference as if stated in full herein.

21.3 Paragraph 9 of Count 1 is incorporated, mutatis mutandis, by reference as if stated in full herein.

21.4 Paragraphs 4 through 9, 11 through 17 and 19 and 20 of Count 2 are incorporated, mutatis mutandis, by reference as if stated in full herein.

21.5 Paragraph 13 of Count 3 is incorporated, mutatis mutandis, by reference as if stated in full herein.

22. By her acts and/or her omissions to act in the discharge of her duties, including,

but not limited to, ensuring that Wire Transfer Forms were properly filled out and/or completed and/or signed by relevant persons (including, but not limited to, Plaintiff Riad and/or Plaintiff Riad Holdings), Wyatt breached her duty of reasonable care to Plaintiff Riad and/or Plaintiff Riad Holdings to conduct herself and fulfill her employment duties:

(a)     In a manner expected of a reasonably competent professional bank employee experienced in the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(b)     To a standard established by the policies and/or procedures of the Defendant Wells Fargo related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(c)     To a standard of customary banking best practices reasonably known to experienced employees or which should have reasonably been known to experienced employees related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo; and/or

(d)     To a standard required by laws applicable to related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo as reasonably known to experienced employees which should have reasonably been known to experienced employees.

22.1     Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers contained complete information.

22.2     Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers contained accurate

information.

22.3    Wyatt failed to ensure that Plaintiff Riad and/or Riad Holdings signed one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers (Customer Signature).

22.4    Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers was signed by Plaintiff Riad in the presence of an employee of Defendant Wells Fargo.

22.5    Wyatt failed to ensure that the preparer of one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers signed such form (Preparer's Signature).

22.6    Wyatt failed to ensure that the initiator of one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers signed such form (Initiator's Signature).

22.7    Wyatt failed to ensure that the verifier of one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers signed such form (Verifier's Signature).

22.8    Wyatt failed to ensure that a bank officer with authority to authorize of one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers signed such form (Authorized Signature).

22.9    Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers was dated.

22.10   Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers had an address for the Receiving Bank.

22.11   Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers had an address for the

Beneficiary thereof.

22.12    Wyatt failed to ensure that one (1) or more of the Wire Transfer Request Forms related to the Six Fraudulent Wire Transfers specified whether or not the wire was conducted on an internal or customer initiated basis.

22.13    Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated, mutatis mutandis, by reference as if stated in full herein.

22.14    Sub-Paragraphs 9(c), 9(d) and 9(e) of Count 4 are incorporated, mutatis mutandis, by reference as if stated in full herein.

23.    By their acts and/or their omissions to act in the discharge of their duties, employees of Defendant Wells Fargo breached their duty of reasonable care to Plaintiff Riad and/or Plaintiff Riad Holdings, when dealing with accounts and/or funds and/or instruments related to such accounts and/or derived from such funds associated with Plaintiff Riad and/or Riad Holdings, to conduct themselves and fulfill their employment duties:

(a)    In a manner expected of a reasonably competent bank employee;

(b)    To a standard established by the policies and/or procedures of Defendant Wells Fargo in respect of their duties;

(c)    To a standard of customary banking best practices as reasonably known to bank employees or which should have reasonably been known to bank employees in respect of their duties; and/or

(d)    To a standard required by applicable law as reasonably known to bank employees or which should have reasonably been known to bank employees.

23.1    Section A (Facts Relevant to Certain Cashier's Checks Purchased by

Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated, mutatis mutandis, by reference as if stated in full herein.

23.2    Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated, mutatis mutandis, by reference as if stated in full herein.

23.3    Paragraph 9 of Count 1 is incorporated, mutatis mutandis, by reference as if stated in full herein.

23.4    Paragraphs 4 through 9, 11 through 17 and 19 and 20 of Count 2 are incorporated, mutatis mutandis, by reference as if stated in full herein.

23.5    Paragraph 13 of Count 3 is incorporated, mutatis mutandis, by reference as if stated in full herein.

24.    The negligent conduct of Randolph and/or Wyatt and/or other employees of Defendant Wells Fargo in dealing with Plaintiff Riad and/or Riad Holdings, while acting within the scope of their employment duties and in the ordinary course of their employment with Defendant Wells Fargo, was a direct and proximate cause of harm to Plaintiff Riad and/or Plaintiff Riad including, but not limited to, the loss of the benefit of their funds and other losses, damages and prejudice related thereto.

25.    As the employer of:

(a)    Randolph; and/or

(b)    Wyatt; and/or

(c)    The other employees who dealt with accounts and/or funds and/or instruments related to such accounts and/or derived from such funds associated with Plaintiff Riad and/or Riad Holdings,

at all relevant times and places herein, Defendant Wells Fargo is responsible for all of the negligent acts and/or omissions to act committed by Randolph and/or Wyatt and/or such other employees within the scope of their employment with Defendant Wells Fargo.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)    Actual damages and/or compensatory damages and/or restitutionary damages in the following amounts:

        (i)    $4,600,000.00; and

        (ii)    $1,068,735.00; and

        (iii)    $5,100.00; and

        (iv)    $143,462.00;

(b)    The amount of all fees charged by Defendant Wells Fargo to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings related to the Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized Transfer, the exact amount to be determined at trial;

(c)    The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings related to the Three Deposits, Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized  Transfer, the exact amount to be determined at trial;

(d)    Punitive Damages;

(e)    All attorney's fees and litigation costs on a full indemnity basis;

(f)    All costs;

(g)     Interest; and

(h)     Such other such relief as this Honorable Court may deem appropriate.

## COUNT 5

## NEGLIGENT HIRING/SUPERVISION

1.      Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.      Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

3.      Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.      Paragraph 9 of Count 1 is incorporated, mutatis mutandis, by reference as if stated in full herein.

5.      Paragraphs 4 through 9, 11 through 17 and 19 and 20 of Count 2 are incorporated, mutatis mutandis, by reference as if stated in full herein.

6.      Paragraph 13 of Count 3 is incorporated, mutatis mutandis, by reference as if stated in full herein.

7.      Paragraphs 6 through 25 of Count 4 are incorporated, mutatis mutandis, by reference as if stated in full herein.

8.      At all times and places herein:

8.1          Randolph:

      (a)    Was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo;

      (b)    Randolph was employed by Defendant Wells Fargo as the Branch's Store Manager III and Assistant Vice President; and

      (c)    Acted within the scope of his employment with Defendant Wells Fargo.

8.2    Wyatt:

      (a)    Was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo; and

      (b)    Acted within the scope of her employment with Defendant Wells Fargo.

8.3    Every other employee of Defendant Wells Fargo who dealt with accounts and/or funds and/or instruments related to such accounts and/or derived from such funds associated with Plaintiff Riad and/or Riad Holdings:

      (a)    Was employed by, and was an agent, servant and/or employee of Defendant Wells Fargo; and

      (b)    Acted within the scope of their employment with Defendant Wells Fargo.

9.    Defendant Wells Fargo is responsible for:

      (a)    The negligent acts performed by Randolph within the scope of his employment with Defendant Wells Fargo; and

      (b)    The negligent acts performed by Wyatt within the scope of her employment with Defendant Wells Fargo; and

      (c)    The negligent acts performed by such other employees of Defendant Wells

Fargo who dealt with accounts and/or funds and/or instruments related to such accounts and/or derived from such funds associated with Plaintiff Riad and/or Riad Holdings.

10.   Defendant Wells Fargo had a duty to train Randolph and/or provide Randolph with an adequate awareness of and/or access to policies and/or procedures and/or controls to ensure that he was able to undertake his employment duties as the Branch's Store Manager III and Assistant Vice President in respect of the supervision and/or management of Wyatt in her execution of the Six Fraudulent Wire Transfers and/or provision of Wire Transfer services on behalf of Defendant Wells Fargo to ensure that the same was conducted:

(a)   In a manner expected of a reasonably competent professional bank employee experienced in the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(b)   To a standard established by the policies and/or procedures of the Defendant Wells Fargo related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(c)   To a standard of customary banking best practices reasonably known to experienced employees or which should have reasonably been known to experienced employees related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo; and/or

(d)   To a standard required by laws applicable to related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo as reasonably known to experienced employees or which should have reasonably been known to experienced employees.

11. Defendant Wells Fargo had a duty to train Wyatt to ensure that she was able to undertake her employment duties with Defendant Wells Fargo:

(a) In a manner expected of a reasonably competent professional bank employee experienced in the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(b) To a standard established by the policies and/or procedures of the Defendant Wells Fargo related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo;

(c) To a standard of customary banking best practices reasonably known to experienced employees or which should have reasonably been known to experienced employees related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo; and/or

(d) To a standard required by laws applicable to related to the preparation and/or authorization and/or processing of Wire Transfers customarily and routinely offered and/or processed by Defendant Wells Fargo as reasonably known to experienced employees or which should have reasonably been known to experienced employees.

12. Defendant Wells Fargo had a duty to train Randolph and/or provide Randolph with an adequate awareness of and/or access to policies and/or procedures and/or controls to ensure that he was able to undertake his employment duties as the Branch's Store Manager III and Assistant Vice President in respect of the supervision and/or management of employees and/or undertaking of transactions on behalf of Defendant Wells Fargo for Plaintiff Riad and/or Plaintiff Riad Holdings:

(a) In a manner expected of a reasonably competent professional bank manager experienced with the range of products and/or services

customarily and routinely offered and/or delivered by Defendant Wells Fargo;

(b)   To a standard established by the policies and/or procedures of the Defendant Wells Fargo applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo;

(c)   To a standard of customary banking best practices reasonably known to bank managers or which should have reasonably been known to bank managers applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo; and/or

(d)   To a standard required by laws applicable to the range of products and/or services customarily and routinely offered and/or delivered by Defendant Wells Fargo as reasonably known to bank managers or which should have reasonably been known to bank managers.

Without limiting the generality of every other paragraph herein, Paragraphs 11 through 14 of Count 4 are incorporated, mutatis mutandis, by reference as if stated in full herein.

13.   Defendant Wells Fargo had a duty to train other employees of Defendant Wells Fargo who dealt with Plaintiff Riad and/or Plaintiff Riad Holdings and/or accounts and/or instruments held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo to ensure that they were able to undertake their employment duties with Defendant Wells Fargo:

(a)   In a manner expected of a reasonably competent bank employee;

(b)   To a standard established by the policies and/or procedures of the Defendant Wells Fargo in respect of their duties;

(c)   To a standard of customary banking best practices as reasonably known to bank employees or which should have reasonably been known to bank

employees in respect of their duties; and/or

(d)     To a standard required by applicable law as reasonably known to bank employees or which should have reasonably been known to bank employees.

14.     Defendant Wells Fargo failed to provide any and/or adequate training and/or awareness of and/or access to policies and/or procedures and/or controls and/or supervision of Wyatt, Randolph and other employees who dealt with Plaintiff Riad and/or Plaintiff Riad Holdings and/or accounts and/or instruments held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo to the required standard of care reasonably expected of a large regulated financial institution in the United States of America.

14.1     Defendant Wells Fargo failed to provide any and/or adequate training and/or awareness of and/or access to policies and/or procedures and/or controls and/or supervision of Wyatt to enable Wyatt to discharge of her employment duties to organize Wire Transfers and/or provide Wire Transfer services to require standards of care.

14.2     Defendant Wells Fargo failed to provide any and/or adequate training and/or awareness of and/or access to policies and/or procedures and/or controls and/or supervision of Randolph to enable Randolph to discharge of his employment duties to:

(a)     Undertake various transactions;

(b)     Supervise and/or manage the organization and/or undertaking of various transactions;

(c)     Manage and/or supervise employees of Defendant Wells Fargo at the Branch in their conduct of various activities and transactions;

(d)     Supervise and/or manage the organization and/or undertaking of Wire Transfers;

(e)      Supervise employees of Defendant Wells Fargo in the organization and/or undertaking of Wire Transfers;

(f)      Supervise and/or manage the organization and/or disposition and/or deposit of and/or other dealing in cashier's checks; and/or

(g)      Supervise employees of Defendant Wells Fargo in the organization and/or disposition and/or deposit of and/or other dealing in cashier's checks,

to require standards of care.

14.3      Defendant Wells Fargo failed to provide any and/or adequate training and/or awareness of and/or access to policies and/or procedures and/or controls and/or supervision of such other employees of Defendant Wells Fargo who dealt with Plaintiff Riad and/or Plaintiff Riad Holdings and/or accounts and/or instruments held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo to enable such employees to:

(a)      Undertake various transactions; and

(b)      Manage the organization and/or undertaking of various transactions,

to require standards of care.

15.      The negligence of Defendant Wells Fargo in failing to provide any and/or adequate training and/or supervision for:

(a)      Randolph;

(b)      Wyatt; and/or

(c)      Such other employees of Defendant Wells Fargo who dealt with Plaintiff Riad and/or Plaintiff Riad Holdings and/or accounts and/or instruments held for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings with Defendant Wells Fargo,

is a direct and proximate cause of damages caused to Plaintiff Riad and/or Plaintiff Riad Holdings.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)     Actual damages and/or compensatory damages and/or restitutionary damages in the following amounts:

      (i)     $4,600,000.00; and

      (ii)     $1,068,735.00; and

      (iii)     $5,100.00; and

      (iv)     $143,462.00;

(b)     The amount of all fees charged by Defendant Wells Fargo to accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings related to the Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized Transfer, the exact amount to be determined at trial;

(c)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings related to the Three Deposits, Four Cashier's Checks, Residual Balance and Unauthorized Withdrawal of the Unauthorized  Transfer, the exact amount to be determined at trial;

(d)     Punitive Damages;

(e)     All attorney's fees and litigation costs on a full indemnity basis;

(f)     All costs;

(g)     Interest; and

(h)     Such other such relief as this Honorable Court may deem appropriate.

## COUNT 6

## CONSUMER FRAUD BY DEFENDANT WELLS FARGO

1.      Plaintiff Riad and Plaintiff Riad Holdings incorporate each and all of the above paragraphs by reference as if stated in full herein.

2.      Section A (Facts Relevant to Certain Cashier's Checks Purchased by Plaintiff Riad and/or Plaintiff Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein including.

3.      Section B (Facts Relevant to Certain Unauthorized Wire Transfers from Plaintiff Riad and/or Plaintiff Riad Holdings Accounts with Defendant Wells Fargo) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

4.      Section C (Facts Relevant to Consumer Fraud by Defendant Wells Fargo in relation to Plaintiff Riad and/or Riad Holdings) of the Background Facts found in this Complaint is incorporated by reference as if stated in full herein.

5.      Paragraph 13 of Count 3 is incorporated, mutatis mutandis, by reference as if stated in full herein.

6.      At all times and places herein, Plaintiff Riad and/or Riad Holdings and/or Schepperd were customers of Defendant Wells Fargo.

7.      The Unfair Trade Practices and Consumer Protection Law Act, 73 Pa. CS 201-1 et seq. (the "**UTPCPL**") defines "unfair methods of competition" and "unfair or deceptive acts or practices to include, inter alia, "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" and makes the same unlawful.

8.      As affirmed in the above paragraphs as incorporated by reference herein,

Defendant Wells Fargo engaged in fraudulent and/or deceptive conduct in its acts and/or omissions to act in respect of its dealings with Plaintiff Riad and/or Plaintiff Riad in respect of accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings.

8.1     The Defendant Wells Fargo's opening and/or closing and/or transacting in the Fraudulent Churn Accounts and every other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings without their knowledge, consent and authority and Defendant Wells Fargo's unwillingness and/or inability to provide complete records of such accounts, the amount of funds held in such accounts, the fees and charges debited from such accounts and the interest credited to such accounts, if any, caused Plaintiff Riad and/or Plaintiff Riad Holdings to become confused about the nature and/or variety of the Defendant's Products and Services allocated to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo (without the consent, knowledge and authority of Plaintiff Riad and/or Plaintiff Riad Holdings), the nature and amount of funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings, the nature and/or amount of fees and/or other charges charged by Defendant Wells Fargo in respect of such accounts and the nature and/or amounts of interest paid, if any, by Defendant Wells Fargo in respect of such accounts, to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

8.2     The Defendant Wells Fargo's opening and/or closing and/or transacting in the Fraudulent Churn Accounts and every other account held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings without their knowledge, consent and authority and Defendant Wells Fargo's unwillingness or inability to provide complete records of such accounts, the amount of funds held in such accounts, the fees and charges debited from such accounts and the interest credited to such accounts, if any, caused Plaintiff Riad and/or Plaintiff Riad Holdings to misunderstand

the nature and/or variety of the Defendant's Products and Services allocated to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo (without the consent, knowledge and authority of Plaintiff Riad and/or Plaintiff Riad Holdings), the nature and amount of funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings, the nature and/or amount of fees and/or other charges charged by Defendant Wells Fargo in respect of such accounts and the nature and/or amounts of interest paid, if any, by Defendant Wells Fargo in respect of such accounts, to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.      In addition to and/or alternative to Paragraph 8 herein, Defendant Wells Fargo, engaged in fraudulent and/or deceptive conduct in its acts and/or omissions to act in respect of its dealings with Plaintiff Riad and/or Plaintiff Riad in respect to the Riad Schepperd Account and/or such other accounts held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Plaintiff Riad Holdings.

9.1     Defendant Wells Fargo took advantage of the knowledge of Schepperd's limited capacity and inability to manage money and/or money-related affairs to prejudice Plaintiff Riad in dealings with funds jointly held by Plaintiff Riad and Schepperd with Defendant Wells Fargo; and/or

9.2     Defendant Wells Fargo should reasonably have known about Schepperd's limited capacity and/or inability to manage money and/or money-related affairs and, notwithstanding the same, conducted bank transactions on behalf of Schepperd and/or involving accounts held jointly by Plaintiff Riad and Schepperd with Defendant Wells Fargo to prejudice Plaintiff Riad.

10.     It was known to Defendant Wells Fargo, by and/or through Randolph and/or an employee or employees of Defendant Wells Fargo at the Branch that Schepperd:

        (a)     Was a former employee of Wachovia;

        (b)     Had suffered from brain tumor;

(c)     Had undergone brain surgery in connection with the brain tumor; and

(d)     Due to her illness and subsequent effects therefrom, had limited neuropsychological capacity to conduct her own affairs.

11.     Medical records and reports which confirmed Schepperd's limited neuropsychological capacity and her inability to manage money formed part of her employment records with Defendant Wells Fargo.

11.1     The following excerpts form part of the medical records and reports provided to Defendant Wells Fargo in connection with the craniotomy and brain tumor:

PREOPERATIVE DIAGNOSIS: Left hypothalamic brain tumor

POSTOPERATIVE DIAGNOSIS: Left hypothalamic brain tumor

"A pearly white tumor was noted to be herniating up from the floor of the lateral ventricle."

(Operative Note, University of Pennsylvania, Department of Neurology).

11.2     The following excerpts form part of the medical records and reports provided to Defendant Wells Fargo:

[Ms. Schepperd is] "a lovely woman who underwent resection of a pilocytic astrocytoma in the region of the thalamus. . . [She] has remained at home caring for her infant daughter."

(Neurology Report, pg. 1).

"Based on the neuropsychological findings I continue to be very concerned about [Ms. Schepperd's] return to work in a position where she must handle large sums of money. I do not believe that at this time she can be expected to perform

her previous duties reliably and independently.  Since it has been more than a year since her surgery and the onset of the cognitive problems, it is unlikely that there will be much further spontaneous recovery of neurological function." (Neurology Report, pg. 3)

12. In addition to and/or alternative to Paragraphs 8 and/or 9 through 11 herein, Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple instances of identity theft under Pennsylvania Statutes Title 18 Pa. C.S.A. Crimes and Offenses §4120, Identity Theft, by possessing and/or using the identifying information of Plaintiff Riad and/or Plaintiff Riad Holdings without the consent of Plaintiff Riad and/or Plaintiff Riad to further unlawful purposes including, but not limited to, the opening and/or closing and/or transacting in the Fraudulent Churn Accounts and every other account opened and/or closed and/or transacted in on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings without their knowledge, consent and authority and:

(a) Misallocating funds and/or failing to return funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings to the financial benefit of Defendant Wells Fargo and/or other third parties and to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings;

(b) Generating fees for the financial benefit of Defendant Wells Fargo through the opening and/or closing and/or transacting in such accounts to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

(c) Depriving Plaintiff Riad and/or Plaintiff Riad Holdings of the benefit of interest otherwise due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo absent the opening and/or closing and/or transacting in such accounts which created a financial benefit of Defendant Wells Fargo.

13. In addition to and/or alternative to Paragraphs 8 and/or 9 through 11 and/or 12

herein, Defendant Wells Fargo, by and/or through an employee or employees thereof, committed multiple instances of identity theft under the Identity Theft and Assumption Deterrence Act, as amended by Public Law 105-318, 11 Stat. 3007 (October 20, 1998), by knowingly transferring and/or using the identifying information of Plaintiff Riad and/or Plaintiff Riad Holdings without the consent of Plaintiff Riad and/or Plaintiff Riad with the intent to commit, aid or abet activities that violate federal law and/or constitute a felony under state law including, but not limited to, the opening and/or closing and/or transacting in the Fraudulent Churn Accounts and every other account opened and/or closed and/or transacted in on behalf of Plaintiff Riad and/or Plaintiff Riad Holdings without their knowledge, consent and authority and:

(a)   Misallocating funds and/or failing to return funds held by Defendant Wells Fargo for the benefit of Plaintiff Riad and/or Riad Holdings to the financial benefit of Defendant Wells Fargo and/or other third parties and to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings;

(b)   Generating fees for the financial benefit of Defendant Wells Fargo through the opening and/or closing and/or transacting in such accounts to the prejudice and loss of Plaintiff Riad and/or Plaintiff Riad Holdings; and/or

(c)   Depriving Plaintiff Riad and/or Plaintiff Riad Holdings of the benefit of interest otherwise due and payable to Plaintiff Riad and/or Plaintiff Riad Holdings by Defendant Wells Fargo absent the opening and/or closing and/or transacting in such accounts which created a financial benefit of Defendant Wells Fargo.

14.   Despite Defendant Wells Fargo's well documented public record of:

(a)   Its illegal abuse of its customers;

(b)   Its unlawful conduct;

(c)   Its fraudulent and deceptive practices against its customers including, but

not limited to, the use of consumer information without their consent or knowledge; and

(d)     Its payment of substantial fines and penalties,

as evidenced in Section C of the Background Facts of this Complaint, Defendant Wells Fargo was not deterred in engaging in similar fraud, deceptive practices and use of the identifying information of Plaintiff Riad and/or Plaintiff Riad without their consent, knowledge or authority.

15.   Defendant Wells Fargo has repeatedly and deliberately frustrated and/or demonstrated an inability and/or unwillingness to remedy its unlawful, deceptive and fraudulent practices in relation to Plaintiff Riad and/or Plaintiff Riad Holdings.

16.   In *Schwartz v. Rockey et al.*, No. 2036 WDA 2004, slip op. at 14-15, 897 A.2d 528 (Pa.Super.2006), the Supreme Court of Pennsylvania lowered the standard for plaintiffs to win treble damages in a private action under the UTPCPL apart from any determination of punitive damages.

16.1     The Supreme Court found that treble damages should be awarded more generously than punitive damages.

16.2     The Supreme Court found that an award of treble damages under a consumer protection statute is both punitive and remedial and should not be bound by the stricter punitive considerations.

16.3     The Supreme Court found that a prayer for relief that seeks contract-based remedies does not foreclose subsequent amendments for relief that include equitable remedies as a plaintiff may not know the extent of damages at the time that the complaint is filed (as the case in the matter at hand).

17.   Given the above, Defendant Wells Fargo's egregious conduct in relation to Plaintiff Riad and/or Plaintiff Riad Holdings including, but not limited, to, Defendant Wells Fargo's conduct in connection with the Schepperd Riad Account, the forged signatures on the Second Version of the First Wire Authorization Form, Third

Version of the First Wire Authorization Form, the Second Wire Authorization Form and the Second Version of the Fifth Wire Authorization Form, and its willful withholding of account records, in the context of its broader record of similar violations with other customers, reasonably and justifiably warrants an award of treble damages in accordance with the rationale for the award of treble damages as permitted by applicable law and confirmed by judicial precedent.

**WHEREFORE,** Plaintiff Riad and Plaintiff Riad Holdings respectfully request entry of judgment in favor of Plaintiff Riad and Plaintiff Riad Holdings against Defendant Wells Fargo Bank, N.A. for damages in the amount of:

(a)     The amount of all funds that Defendant Wells Fargo transferred into and/or out of the Fraudulent Churn Accounts including, but not limited to:

   (j)     $4,600,000.00; and

   (ii)    $1,068,735.00; and

   (iii)   $5,100.00; and

   (iv)    $143,462.00; and

   (iv)    Such other funds in every other account opened and/or closed and/or transacted in by Defendant Wells Fargo without the consent, knowledge or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd that it has failed to return to Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd, the exact amount to be determined at trial;

(b)     The amount of all fees and other charges that Defendant Wells Fargo debited Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd in relation to every transaction and other activity related to the Fraudulent Churn Accounts and every other account opened and/or closed and/or transacted in by Defendant Wells Fargo without the consent, knowledge or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd,

the exact amount to be determined at trial;

(c)     The amount of all interest that Defendant Wells Fargo failed to pay Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd as a result of the transfer of funds to facilitate the opening and/or closing and/or transacting in the Fraudulent Churn Accounts and every other account opened and/or closed and/or transacted in by Defendant Wells Fargo without the consent, knowledge or authority of Plaintiff Riad and/or Plaintiff Riad Holdings and/or Schepperd, the exact amount to be determined at trial;

(d)     Treble the amount of damages;

(e)     All attorney's fees and litigation costs on a full indemnity basis;

(f)     All costs;

(g)     Interest; and

(h)     Such other such relief as this Honorable Court may deem appropriate.

Respectfully submitted,

Mickala Lorraine Rector, Esquire
(Attorney ID No. 315082)
Rector Law
509 Schoolhouse Road
Kennett Square, PA 19348
484.748.1423
mickala.rector@gmail.com
*Attorney for Plaintiffs*
*Joseph Riad and*
*Riad Holdings, Inc.*

Dated: __ September 2019

**APPENDICES**

**APPENDICES COMMENCE ON FOLLOWING PAGE**

**APPENDIX 1. First Version of the First Fraudulent Wire Transfer Request Form**

A b K
214 278-6000

# WACHOVIA

For Use by CMG Field Personnel Only (Not for Financial Center use)

## Wire Transfer of Funds Request

Preparer's Signature

Authorized Signature

061506

*Leesa Wyatt*

Initiator's Signature

Callback NO
Required
(Yes or No)

Customer Accepting Call Back/Phone Number

Verifier's Signature

**Account Status**

**NSF Only**

Sufficient (Audio Checked)

Not Sufficient (NSF)

**SUFFICIENT**

NSF Source of Funds

Credit Approver Name (Please Print)

Credit Approver Signature

Date          Time of Call

---

### Wire Transfer of Funds

Wachovia, a div of WellsFargoBankNA

| | Current Date | Control Number |
|---|---|---|
| | 11/23/10 | 400415 |

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|
| INTERNATIONAL | NON-REPETITIVE | | N | | |

| Caller | Financial Center or Department | Request Type (Phone or Walk in) |
|---|---|---|
| | 0802888 | WALK-IN |

| Description 2 (GL) | Execution Date | Domestic Transfer Amount |
|---|---|---|
| | 11/23/10 | $ |

| Type Currency | Value Date | Foreign Amount | Exchange Rate |
|---|---|---|---|
| US DOLLAR | 11/23/10 | | 1.0000000000 |

Contract Number / Provided By

| U.S. Dollar Amount | | Foreign Currency Transfer Amount |
|---|---|---|
| $ 53,000.00 | = | 53,000.00 |

---

**Originator**

| Name | Check One ☐ Internal   ☐ Customer Initiated | Org | Account Number |
|---|---|---|---|
| RIAD HOLDINGS | | 75 | [Redacted]1413 |

Address
509 SCHOOLHOUSE RD KENNETT SQUARE PA

City/State/Zip/Country
193480000

| ID 22655607 | ID Source PA | ID Type DL | Expiration Date 120430 |
|---|---|---|---|

---

**Receiving Bank**

| Name | R/T Number |
|---|---|
| CORIS BANK INTERNATIONAL | |

Address

City/State/Zip/Country
OUAGADOUGOU BURKINA FASO

Advice NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

---

**Beneficiary Payment Information**

| Name | Org | Account Number |
|---|---|---|
| TAPSOBA EMMANUEL | | [Redacted] |

Address

City/State/Zip/Country
BURKINA FASO

Other Payment Information
SWIFT CODE CORIBFBF CORRESPONDANT BANK IS SOCIETE GENERAL DU BANQU
E PARIS

CHARGE

---

**Fee Method**
(Waive/Charge)

### Customer Contract

All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request.  My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement.*

X _____          X _____11/23/10_____

Customer Signature                              Date

---

562283 (Rev 04) Page 1 of 2          **COPY 1 - FINANCIAL CENTER   COPY 2 - CUSTOMER**

**APPENDIX 2. Second Version of the First Fraudulent Wire Transfer Request Form**

ABA# 026004226  Phone # 212 2786000

# WACHOVIA

## Wire Transfer of Funds Request

*Leesa Wyatt*

061506

Callback Required (Yes or No)  NO

Initiator's Signature

Customer Accepting Call Back/Phone Number

Verifier's Signature

| For Use by CMG Field Personnel Only (Not for Financial Center use) | |
|---|---|
| Preparer's Signature | Authorized Signature |
| **Account Status** | **NSF Only** |
| **Sufficient** (Audio Checked) Not Sufficient (NSF) **SUFFICIENT** | NSF Source of Funds |
| | Credit Approver Name (Please Print) |
| | Credit Approver Signature |
| | Date                Time of Call |

### Wire Transfer of Funds
Wachovia, a div of WellsFargoBankNA

| | | Current Date 11/23/10 | Control Number 400415 |
|---|---|---|---|

| Domestic or International **INTERNATIONAL** | Non-Repetitive or Repetitive **NON-REPETITIVE** | Line Number | Amt Verify Cd **N** | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|

| Caller | Financial Center or Department 0802888 | Request Type (Phone or Walk in) **WALK-IN** |
|---|---|---|

| Description 2 (GL) | Execution Date 11/23/10 | Domestic Transfer Amount $ |
|---|---|---|

| Type Currency **US DOLLAR** | Value Date 11/23/10 | Foreign Amount | Exchange Rate 1.0000000000 |
|---|---|---|---|

Contract Number / Provided By

| U.S. Dollar Amount **$ 53,000.00** | = | Foreign Currency Transfer Amount 53,000.00 |
|---|---|---|

**Originator**

| Name RIAD HOLDINGS | Check One ☐ Internal ☒ Customer Initiated | Org 75 | Account Number [Redacted]1413 |
|---|---|---|---|

Address
509 SCHOOLHOUSE RD KENNETT SQUARE PA

City/State/Zip/Country
193480000

ID 22655607        ID Source PA    ID Type DL        Expiration Date 120430

**Receiving Bank**

Name
CORIS BANK INTERNATIONAL        *Debit Card 4828703778827*    R/T Number

Address

City/State/Zip/Country
OUAGADOUGOU BURKINA FASO

Advice NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

**Beneficiary Payment Information**

| Name TAPSOBA EMMANUEL | Org | Account Number [Redacted] |
|---|---|---|

Address

City/State/Zip/Country
BURKINA FASO

Other Payment Information
SWIFT CODE CORIBFBF CORRESPONDANT BANK IS SOCIETE GENERAL DU BANQU
E PARIS

CHARGE

**Fee Method (Waive/Charge)**

**Customer Contract**
All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request.  My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement*.

X _____        X  11-23-2010
Customer Signature                Date

562283 (Rev 04)  Page 1 of 2        COPY 1 - FINANCIAL CENTER   COPY 2 - CUSTOMER

**APPENDIX 3. Third Version of the First Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

Preparer's Signature    061506

Initiator's Signature *Leesa Wyatt*

Callback Required (Yes or No) **NO**

Customer Accepting Call Back/Phone Number

Verifier's Signature

**Account Status**

Sufficient (Audio Checked)
Not Sufficient (NSF)
**SUFFICIENT**

Authorized Signature

**NSF Only**

NSF Source of Funds

Credit Approver Name (Please Print)

Credit Approver Signature

Date      Time of Call

---

**Wire Transfer of Funds**
Wachovia, a div of WellsFargoBankNA

Current Date **11/23/10**

Control Number **400415**

Domestic or International **INTERNATIONAL**

Non-Repetitive or Repetitive **NON-REPETITIVE**

Line Number

Amt Verify Cd **N**

Verify I.D.

Type (Fed, Book, Other)

Caller

Financial Center or Department **0802888**

Request Type (Phone or Walk in) **WALK-IN**

Description 2 (GL)

Execution Date **11/23/10**

Domestic Transfer Amount **$**

Exchange Rate **1.0000000000**

Type Currency **US DOLLAR**

Value Date **11/23/10**

Foreign Amount

Contract Number / Provided By

Foreign Currency Transfer Amount **= 53,000.00**

U.S. Dollar Amount **$ 53,000.00**

Check One ☒ Internal ☒ Customer Initiated

Org **75**

Account Number **████████701413**

**Originator**

Name **RIAD HOLDINGS**

Address **509 SCHOOLHOUSE RD KENNETT SQUARE PA**

City/State/Zip/Country **193480000**

ID **22655607**   ID Source **PA**   ID Type **DL**

R/T Number

Expiration Date **120430**

**Receiving Bank**

Name **CORIS BANK INTERNATIONAL**

Address

City/State/Zip/Country **OUAGADOUGOU BURKINA FASO**

Advice **NONE**
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

Org   Account Number

**Beneficiary Payment Information**

Name **TAPSOBA EMMANUEL**

Address

City/State/Zip/Country **BURKINA FASO**

Other Payment Information
**SWIFT CODE CORISBFBF CORRESPONDANT BANK IS SOCIETE GENERAL DU BANQU**
**E PARIS**

CHARGE

Fee Method (Waive/Charge)

**Customer Contract**

All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request. My signature below evidences that I have received a complete copy of this Request, and that I have received the Deposit Agreement.

X _____      X __11-23-20__
Customer Signature      Date

**APPENDIX 4. Second Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

For Use by CMG Field Personnel Only (Not for Financial Center use)

Preparer's Signature
486749

Authorized Signature

Callback Required (Yes or No) **NO**

Initiator's Signature

**Account Status**

Sufficient (Audio Checked)
Not Sufficient (NSF)
**SUFFICIENT**

**NSF Only**

NSF Source of Funds

Credit Approver Name (Please Print)

Customer Accepting Call Back/Phone Number

Verifier's Signature *Leesa Wyatt*

Credit Approver Signature

Date

Time of Call

---

**Wire Transfer of Funds**
Wachovia, a div of WellsFargoBankNA

| | |
|---|---|
| Current Date | 11/30/10 |
| Control Number | 400091 |

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book. Other) |
|---|---|---|---|---|---|
| DOMESTIC | NON-REPETITIVE | | N | | FED |

| Caller | Financial Center or Department | Request Type (Phone or Walk in) |
|---|---|---|
| | 0802888 | WALK-IN |

| Description 2 (GL) | Execution Date | Domestic Transfer Amount |
|---|---|---|
| | 11/30/10 | $ 53,000.00 |

| Type Currency | Value Date | Foreign Amount | Exchange Rate |
|---|---|---|---|

Contract Number / Provided By

U.S. Dollar Amount $ = Foreign Currency Transfer Amount

### Originator
Check One ☐ Internal ☑ Customer Initiated   Org 75   Account Number [Redacted]1413
Name RIAD HOLDINGS
Address 509 SCHOOLHOUSE RD KENNETT SQUARE PA
City/State/Zip/Country 19348000     *wach DBC 6010 - 9/12 EXP*
ID 2265607   ID Source PA   ID Type DL   Expiration Date 120430

### Receiving Bank
Name SOCIETE GENERALE   R/T Number 026004226
Address
City/State/Zip/Country NEW YORK NY
Advice NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

### Beneficiary Payment Information
Name DIPAMA ISSAKA   Org   Account Number [Redacted]
Address
City/State/Zip/Country
Other Payment Information
FOR FURTHER CREDIT TO BANQUE COMMERCIAL DU BURKINA SWIFT
CODE BNCFBFBF
CHARGE

### Fee Method (Waive/Charge)

**Customer Contract**
All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request. My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement*.

X _Riad_   Customer Signature     X 11/30/10   Date

562283 (Rev 04) Page 1 of 2     **COPY 1 - FINANCIAL CENTER   COPY 2 - CUSTOMER**

**APPENDIX 5. Third Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

| For Use by CMG Field Personnel Only (Not for Financial Center use) |
|---|

Preparer's Signature

*Leesa Wyatt*
061506

Authorized Signature

**Callback NO Required** (Yes or No)

Initiator's Signature

| **Account Status** | **NSF Only** |
|---|---|
| Sufficient (Audio Checked) | NSF Source of Funds |
| Not Sufficient (NSF) | |
| SUFFICIENT | Credit Approver Name (Please Print) |

Customer Accepting Call Back/Phone Number

Credit Approver Signature

Verifier's Signature

Date          Time of Call

---

### Wire Transfer of Funds
Wachovia, a div of WellsFargoBankNA

| | Current Date | Control Number |
|---|---|---|
| | 12/09/10 | 400043 |

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|
| DOMESTIC | NON-REPETITIVE | | N | | FED |

| Caller | Financial Center or Department | Request Type (Phone or Walk in) |
|---|---|---|
| | 0802888 | WALK-IN |

| Description 2 (GL) | Execution Date | Domestic Transfer Amount |
|---|---|---|
| | 12/09/10 | $ 21,000.00 |

| Type Currency | Value Date | Foreign Amount | Exchange Rate |
|---|---|---|---|

Contract Number / Provided By

| U.S. Dollar Amount | | Foreign Currency Transfer Amount |
|---|---|---|
| $ | = | |

**Originator**

| Name | Check One ☐ Internal ☒ Customer Initiated | Org | Account Number |
|---|---|---|---|
| RIAD HOLDINGS | | 75 | [Redacted]1413 |

Address
509 SCHOOLHOUSE RD KENNETT SQUARE PA

City/State/Zip/Country
19348000

| ID 2265607 | ID Source PA | ID Type LD | Expiration Date 120430 |
|---|---|---|---|

**Receiving Bank**

| Name | R/T Number |
|---|---|
| SOCIETE GENERALE | 026004226 |

Address

City/State/Zip/Country
NEW YORK NY

**Advice** NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

**Beneficiary Payment Information**

| Name | Org | Account Number |
|---|---|---|
| DIPAMA ISSAKA | | [Redacted] |

Address

City/State/Zip/Country

Other Payment Information
FOR F
URTHER CREDIT TO BANQUE COMMERCIAL DU BURKINA SWIFT CODE BNCFBFBF

CHARGE

**Fee Method** (Waive/Charge)

**Customer Contract**
All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request.  My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement*.

X _____     X  12/9/10
Customer Signature                              Date

**APPENDIX 6. First Version of the Fifth Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

| | |
|---|---|
| Preparer's Signature | Authorized Signature |
| 486749 | |

**Account Status** — **NSF Only**

Sufficient (Audio Checked)
Not Sufficient (NSF)
**SUFFICIENT**

Callback Required (Yes or No) **NO**

Initiator's Signature

Customer Accepting Call Back/Phone Number

Verifier's Signature

NSF Source of Funds

Credit Approver Name (Please Print)

Credit Approver Signature

Date          Time of Call

---

### Wire Transfer of Funds
Wachovia, a div of WellsFargoBankNA

| | |
|---|---|
| Current Date 12/20/10 | Control Number 400140 |

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|
| INTERNATIONAL | NON-REPETITIVE | | N | | |

| Caller | Financial Center or Department 0802888 | Request Type (Phone or Walk In) WALK-IN |
|---|---|---|

| Description 2 (GL) | Execution Date 12/20/10 | Domestic Transfer Amount $ |
|---|---|---|

| Type Currency US DOLLAR | Value Date 12/20/10 | Foreign Amount | Exchange Rate 1.0000000000 |
|---|---|---|---|

Contract Number / Provided By

| U.S. Dollar Amount $ 670,000.00 | = | Foreign Currency Transfer Amount 670,000.00 |
|---|---|---|

---

**Originator**

| Name RIAD HOLDINGS | Check One ☐ Internal   ☐ Customer Initiated | Org 75 | Account Number ~~xxxxxxxx~~1413 |
|---|---|---|---|

Address
509 SCHOOLHOUSE RD KENNETT SQUARE PA

City/State/Zip/Country
193480000

| ID 2265607 | ID Source PA | ID Type DL | Expiration Date 120430 |
|---|---|---|---|

---

**Receiving Bank**

Name
ECO BANK                                R/T Number

Address
01 BP 145 OUAGADOUGOU 01

City/State/Zip/Country
BURKINA FASO

**Advice** NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

---

**Beneficiary Payment Information**

| Name JOSEPH RIAD | Org | Account Number ~~xxxxx~~ |
|---|---|---|

Address

City/State/Zip/Country
BURKINA FASO

Other Payment Information
SWIFT CODE: ECOCBFBF

CHARGE

---

**Fee Method**
(Waive/Charge)

**Customer Contract**
All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request. My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement.*

X _____      X _____
Customer Signature                            Date

**APPENDIX 7. Second Version of the Fifth Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

| For Use by CMG Field Personnel Only (Not for Financial Center use) | |
|---|---|
| Preparer's Signature 486749 | Authorized Signature |

Callback NO
Required
(Yes or No)

Initiator's Signature

Customer Accepting Call Back/Phone Number

Verifier's Signature

| Account Status | NSF Only |
|---|---|
| Sufficient (Audio Checked) | NSF Source of Funds |
| Not Sufficient (NSF) SUFFICIENT | |
| | Credit Approver Name (Please Print) |
| | Credit Approver Signature |
| | Date                 Time of Call |

### Wire Transfer of Funds
Wachovia, a div of WellsFargoBankNA

| | Current Date 12/20/10 | Control Number 400140 |
|---|---|---|

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|
| INTERNATIONAL | NON-REPETITIVE | | N | | |

| Caller | | |
|---|---|---|
| | Financial Center or Department 0802888 | Request Type (Phone or Walk in) WALK-IN |

| Description 2 (GL) | Execution Date 12/20/10 | Domestic Transfer Amount $ |
|---|---|---|

| Type Currency US DOLLAR | Value Date 12/20/10 | Foreign Amount | Exchange Rate 1.0000000000 |
|---|---|---|---|

Contract Number / Provided By

| U.S. Dollar Amount $ 670,000.00 | = | Foreign Currency Transfer Amount 670,000.00 |
|---|---|---|

**Originator**

| Name RIAD HOLDINGS | Check One ☐ Internal ☑ Customer Initiated | Org 75 | Account Number [Redacted]1413 |
|---|---|---|---|

Address 509 SCHOOLHOUSE RD KENNETT SQUARE PA

City/State/Zip/Country 193480000

ID 2265607      ID Source PA      ID Type DL      Expiration Date 120430

**Receiving Bank**

Name ECO BANK          DSC 6012 EXP 9/12 R/T Number

Address 01 BP 145 OUAGADOUGOU 01

City/State/Zip/Country BURKINA FASO

Advice NONE
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

**Beneficiary Payment Information**

Name JOSEPH RIAD          Org          Account Number [Redacted]

Address

City/State/Zip/Country BURKINA FASO

Other Payment Information SWIFT CODE: ECOCBFBF

CHARGE

| Fee Method (Waive/Charge) | **Customer Contract** |
|---|---|
| | All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request. My signature below evidences that I have received a complete copy of this Request, and that I have received the Deposit Agreement. |
| | X _____                    X _____ |
| | Customer Signature                    Date |

562283 (Rev 04) Page 1 of 2          **COPY 1 - FINANCIAL CENTER  COPY 2 - CUSTOMER**

**APPENDIX 8. Sixth Fraudulent Wire Transfer Request Form**

# WACHOVIA

## Wire Transfer of Funds Request

**For Use by CMG Field Personnel Only (Not for Financial Center use)**

Preparer's Signature                                         Authorized Signature

486749

Callback **NO**
Required
(Yes or No)

Initiator's Signature

Customer Accepting Call Back/Phone Number

Verifier's Signature

| Account Status | NSF Only |
|---|---|
| **Sufficient** (Audio Checked) | |
| **Not Sufficient (NSF)** | NSF Source of Funds |
| SUFFICIENT | |
| | Credit Approver Name (Please Print) |
| | Credit Approver Signature |
| | Date          Time of Call |

---

**Wire Transfer of Funds**
Wachovia, a div of WellsFargoBankNA

Current Date **01/18/11**          Control Number **400185**

| Domestic or International | Non-Repetitive or Repetitive | Line Number | Amt Verify Cd | Verify I.D. | Type (Fed, Book, Other) |
|---|---|---|---|---|---|
| INTERNATIONAL | NON-REPETITIVE | | N | | |

Caller                          Financial Center or Department **0802888**          Request Type (Phone or Walk in) **WALK-IN**

Description 2 (GL)          Execution Date **01/18/11**          Domestic Transfer Amount **$**

| Type Currency | Value Date | Foreign Amount | Exchange Rate |
|---|---|---|---|
| US DOLLAR | 01/18/11 | | 1.0000000000 |

Contract Number / Provided By

U.S. Dollar Amount **$ 271,635.00**          =          Foreign Currency Transfer Amount **271,635.00**

**Originator**

| Name | Check One ☐ Internal   ☐ Customer Initiated | Org | Account Number |
|---|---|---|---|
| RIAD HOLDINGS | | 75 | [Redacted]1413 |

Address
509 SCHOOLHOUSE RD KENNETT SQUARE PA
City/State/Zip/Country
193480000

ID          ID Source **PA**   ID Type **DL**          Expiration Date

**Receiving Bank**

Name
ECO BANK          R/T Number
Address
633, RUE ILBOUDO
City/State/Zip/Country
OUGADOUGOU BURKINA FASO

**Advice NONE**
(No Phone Advice Required, Credit and Phone Advice, Notify and Pay, Pay Upon Proper I.D.)

**Beneficiary Payment Information**

Name
OBS IMPORTS/EXPORTS          Org          Account Number [Redacted]
Address

City/State/Zip/Country
BURKINA FASO
Other Payment Information
SWIFT CODE: ECOCBFBF

CHARGE

| Fee Method (Waive/Charge) | **Customer Contract** |
|---|---|
| | All of the above information is complete and correct and provided to Wachovia Bank, a division of Wells Fargo Bank, N.A. or to Wachovia Bank of Delaware, a division of Wells Fargo Bank, N.A. (each, the "Bank") for it to implement a wire transfer of funds from my account. The Bank's acceptance and execution of my wire transfer transaction is subject to the Terms and Conditions contained in this Wire Transfer of Funds Request.   My signature below evidences that I have received a complete copy of this Request, and that I have received the *Deposit Agreement*. |

X _____          X _____
Customer Signature                    Date

562283 (Rev 04) Page 1 of 2          **COPY 1 - FINANCIAL CENTER   COPY 2 - CUSTOMER**

**APPENDIX 9. Table 1.1, The Fraudulent Churn Accounts, Redacted Account Numbers**

| | **Redacted Account Number** |
|---|---|
| Account #1 | ****1413 |
| Account #2 | ****7764 |
| Account #3 | ****7416 |
| Account #4 | ****7756 |
| Account #5 | ****0908 |
| Account #6 | ****3314 |
| Account #7 | ****1668 |
| Account #8 | ****3199 |
| Account #9 | ****1426 |
| Account #10 | ****1439 |
| Account #11 | ****2947 |
| Account #12 | ****0594 |
| Account #13 | ****4562 |
| Account #14 | ****7014 |
| Account #15 | ****5312 |
| Account #16 | ****5309 |
| Account #17 | ****1743 |
| Account #18 | ****5354 |
| Account #19 | ****5341 |
| Account #20 | ****5274 |
| Account #21 | ****8092 |
| Account #22 | ****7819 |
| Account #23 | ****5000 |
| Account #24 | ****1030 |
| Account #25 | ****1990 |
| Account #26 | ****5632 |

| | **Redacted Account Number** |
|---|---|
| Account #27 | ****5402 |
| Account #28 | ****3620 |
| Account #29 | ****4670 |
| Account #30 | ****8884 |
| Account #31 | ****7815 |
| Account #32 | ****5175 |
| Account #33 | ****2435 |
| Account #34 | ****8345 |