## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH RIAD** | | |
| **AND RIAD HOLDINGS, INC.,** | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| **v.** | : | **NO. 19-4292** |
| | : | |
| **WELLS FARGO BANK, N.A,** | : | |
| | : | |
| *Defendant.* | : | |

## <u>MEMORANDUM</u>

Plaintiffs Joseph Riad ("Riad") and Riad Holdings, Inc. ("Riad Holdings") filed a Complaint in this Court on September 18, 2019 against Wells Fargo Bank, N.A. ("Wells Fargo") asserting claims for breach of contract, unjust enrichment, conversion, negligence, negligent hiring/supervision, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law relating to alleged unauthorized wire transfers, improperly handled cashier's checks and deposits, and unauthorized account openings and activity. *See generally* ECF No. 1. Defendant moves for summary judgment as to all of Plaintiffs' claims. *See generally* ECF No. 50.

## I.  Background

Although Plaintiffs plead six causes of action, both parties agree that the claims center around three "general categories" of facts: (1) unauthorized wire transfer claims, (2) cashier's check and deposit claims, and (3) unauthorized

1

account claims.  ECF No. 52 at 4; ECF No. 50 at 7-12.  Plaintiffs contend that each
category of fact states a claim under each of Counts 1 through 6.  ECF No. 52 at 4.

     1.  <u>Unauthorized Wire Transfer Claims</u>

Plaintiffs maintain that, between November 23, 2010 and January 18, 2011,
a number of unauthorized wire transfers were executed through a Wells Fargo
account in the name of Riad Holdings, account number ending in 1413.  ECF No.
52-1 at 31, 33.  Riad testified that he discovered the purportedly unauthorized wire
transfers when he "saw it on the screen" in the office of Wells Fargo branch
manager Triandos Randolph.  ECF No. 51 at 2; 51-1 at 37 ("Q: And how did you
find out that all of this money had been wired overseas? A: Well, the money was
taken out of my account. Q: How did you find that out? A: I saw it on the
screen…I went to Tri[andos]'s office, and he pulled my account up and I saw.").
Riad testified that he would visit Wells Fargo in person and obtain his account
balances by viewing them on the screen of a Wells Fargo employee's computer "at
least twice a week" during this time period.  ECF No. 51 at 2; 51-1 at 38 ("Q: . . .
So how often did you go to the branch and have your balance – for the purpose of
having your balance displayed to you on a screen? A: At least twice a week.").
ECF No. 52 at 36.

On January 28, 2011, Riad wrote the following letter to Defendant:

> My name is Joseph Riad and I am writing you this letter
> because I have spoken to my branch manager Triandos

> Randolph and he has given me this address to write to for
> follow up on the wire transfers that were sent while I was
> traveling overseas. I was told that someone at the branch
> made mistakes during my travel and sent these wires
> transfer out. I have demanded reverse wires and I was told
> that this was done. I was also told that you would re credit
> my account pending the investigation of these mistakes.
> I have been promised that this problem will be resolved
> quickly and yet I am not seeing any results. Please look
> into this matter immediately as this is a huge amount of
> money over a million dollars. Please give me a call back
> or email me at [] to update me on your progress on this
> urgent matter.

ECF No. 51 at ¶¶ 9, 10; ECF No. 51-3.

### 2. Cashier's Check and Deposit Claims

Plaintiffs next maintain that Riad purchased a number of cashier's checks between December 2, 2011 and February 24, 2012 that Riad redeposited but that the money was not properly redeposited back into his account.  ECF No. 51-7; ECF No. 52 at 4, 15.  Riad testified that he "[c]omplained to the bank … in 2012" that the cashier's checks were not "properly treated."  ECF No. 50 at 4, 8; 51-1 at 40 ("Q: Do you recall, sitting here today if you ever complained to anyone that the cashier's checks weren't properly treated? A: Yes. Q: Who? A: I complained to the bank. Q. Who? A. Well, I complained to Ryan Silhan, who was the manager at the time. Q. When? . . . A. 2012.").

Next, Plaintiffs claim that Riad made a $2,500,000 deposit on November 10, 2010 and a $1,100,000 deposit on January 19, 2012 and that neither deposit was

credited to any of Plaintiffs' accounts.  ECF No. 52 at 17-23.  Additionally,

Plaintiffs' expert contends that Riad has a claim related to a debit of $143,525.29

dated February 27, 2012 and associated with an account owned by non-party

Michelle Schepperd, account number ending in 7416.  ECF No. 51 at ¶ 15.

Plaintiffs and Defendant agree that the account ending in 7416 is not owned by

either Plaintiff.  *Id*. at ¶ 16.  Plaintiffs maintain that, on February 27, 2012,

$143,525.29 was "withdrawn from the account" ending in 7764 and "then

deposited without Plaintiffs' or Schepperd's [Riad's ex-wife] knowledge, authority

or consent into an unauthorized account in the sole name of Michelle Schepperd,"

account ending in 7416.  ECF No. 52 at 7; ECF No. 51 at ¶ 15.

     3.  Unauthorized Account Claims

     Finally, Plaintiffs maintain that Defendant opened a number of accounts that

were unauthorized, conducted "unauthorized account activities" in these accounts,

and generated unauthorized "fees and interest associated with such accounts."

ECF No. 52 at 4.

     On March 10, 2020, the Court ordered Plaintiffs to produce an unredacted

spreadsheet identifying each account with Wells Fargo that Plaintiffs had claimed

was opened without Plaintiffs' authorization, including information regarding the

owner of the account, the account type, the problem with the account, the

associated damages, and the Bates numbers of supporting documentation.  ECF

No. 39.   In response to the Court's order, Plaintiffs produced a chart with 30 rows

of accounts, including 36 unique account numbers, to Defendant.  ECF No. 51-11.

The chart purports to list the account numbers of the accounts that Defendant

opened or conducted activity in without authorization, the owner(s) of the account,

documentation to support the existence of and claims against the account, and a list

of alleged issues with the account.  *Id*.  There are several accounts listed in certain

rows, and some accounts are listed multiple times.  *Id*.

In contrast, Defendant provides as an exhibit to its Motion for Summary

Judgment the declaration of Karen Nelson, Operational Risk Consultant at Wells

Fargo, which states that Nelson has attached a "list of the opening and closing

dates for all deposit accounts owned by Plaintiffs that was compiled from all

account documents that have been located for the subject accounts after reasonable

investigation and subject to Wells Fargo's document retention policies."  ECF No.

51-8 at 3.  Defendant's list of Plaintiffs' accounts includes 19 accounts, with the

earliest opened in 1998 and the latest closed on September 19, 2014.  *Id*.

Plaintiffs state that on January 17, 2012, Plaintiff Riad wrote to the bank's

corporate office as follows:

> I am writing to you because I understand that I have
> multiple accounts that have been opened using the same
> account name that I have and I am finding it confusing to
> keep up with all these accounts and I don't know which
> one has my money in it. I have spoken to my Branch
> manager Triandos Randolph at 200 scarlett rd, new garden

Pa branch and he also opened me a credit line for 50 thousand dollars that I am not using and do not need. I was told that this was done because the bank is giving him a commission to open multiple accounts. I am not happy with this and I cannot keep track of all these accounts. Please close all these accounts and keep my money is the two accounts that I opened for myself. I went into the branch to inquire where my money is and I can see it on the screen at the office of Triandos, yet I cannot get a statement showing me the money in the account. I am told my money is in a different account under my name. I am finding this frustrating and my ATM printouts are not showing me my balances. I have complained several times about this and I need to have a bank statement showing me where my money is. It makes no sense to me for the bank to open multiple accounts under my name. This is confusing and complicated. Please call me back at [] or email me at []. I am tired of calling your customer service line and being put on hold for a long time to hear at the end that there is nothing they can do, and to go to the branch. I go to the branch and they tell me the money is there. I want to be able to get this in a bank statement and see it on my atm receipt.

ECF No. 52-1 at ¶ 34; ECF No. 51-13.

## II.    Procedural History

Plaintiffs filed the instant Complaint on September 18, 2019.  ECF No. 1. Plaintiffs and Defendant are also currently litigating the unauthorized wire transfer and improperly handled cashier's check and deposit claims in the Chester County Court of Common Pleas, pursuant to a Writ of Summons Plaintiffs filed in that Court on September 12, 2016.  ECF No. 50 at 18; ECF No. 8-1.

## III.  Standard of Review

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P. 56(c).  As the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*.  (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted)).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986)) (emphasis added). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id. See also Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 909 (3d Cir. 1984) (instructing that "conflicts of credibility should not be

resolved on a hearing on the motion for summary judgment unless the opponent's

evidence is too incredible to be believed by reasonable minds.").

## IV.  Discussion

Defendant moves for summary judgment, contending that all of Plaintiffs'

claims are barred by the statute of limitations.  *See* ECF No. 50 at 5-14.  "[A]

federal court must apply the substantive laws of its forum state in diversity actions,

and these include state statutes of limitations."  *Lafferty v. St. Riel*, 495 F.3d 72, 76

(3d Cir. 2007), as amended (July 19, 2007), as amended (Nov. 23, 2007) (internal

citations omitted).  Plaintiffs bring claims under Pennsylvania law for breach of

contract, unjust enrichment, conversion, negligence, negligent hiring and

supervision, and violation of Pennsylvania's Unfair Trade Practices and Consumer

Protection Law ("UTPCPL").  ECF No. 1.

Pennsylvania law imposes a two-year statute of limitations on claims for

negligence, negligent hiring, and conversion.  42 Pa. Cons. Stat. Ann. § 5524(2)

(negligence); 42 Pa. Cons. Stat. Ann. § 5524(3) (conversion); *Toy v. Metropolitan*

*Life Ins. Co.*, 863 A.2d 1, 14 (Pa. Super. Ct. 2004) (finding negligent supervision

claim untimely because appellant "failed to raise the claim within the two-year

statute of limitations"); *see also Ormsby v. Luzerne Cty. Dep't of Pub. Welfare*

*Office of Human Servs.*, 149 F. App'x 60, 62 (3d Cir. 2005) ("Claims for negligent

supervision and intentional infliction of emotional distress brought in Pennsylvania are also governed by this two year limitations period.")

Pennsylvania law imposes a four-year statute of limitations on claims for breach of contract and unjust enrichment. 42 Pa. Cons. Stat. § 5525(8) (breach of contract); 42 Pa. Cons. Stat. § 5525(4) (unjust enrichment).

Finally, Pennsylvania law imposes a six year "catch-all" statute of limitations on UTPCPL claims. *Morse v. Fisher Asset Management, LLC*, 206 A.3d 521, 526 (Pa. Super. 2019) ("A UTPCPL claim is subject to the 6-year statute of limitations under 42 Pa.C.S.A. § 5527(6).") (citing *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396, 411 (Pa. Super. 2012)).

"In Pennsylvania, limitations periods are computed from the time the cause of action accrues." *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 831 (2005) (internal citations omitted). "Thus, the relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted." *Id. See also Dubose v. Quinlan*, 643 Pa. 244, 258 (2017) ("Statutes of limitations begin to run when the cause of action accrues, which is usually the time a plaintiff is injured.")

"As a matter of general rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit

9

within the prescribed statutory period." *Pocono Produce*, 503 Pa. at 84 (internal citations omitted). "Thus, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time." *Id*. at 84-85 "Once the prescribed statutory period has expired, the party is barred from bringing suit unless it is established that an exception to the general rule applies which acts to toll the running of the statute." *Id*. at 85.

A. *Unauthorized Wire Transfer Claims*

Plaintiffs' unauthorized wire transfer claims center around a number of allegedly unauthorized wire transfers that Plaintiffs claim were executed through their account ending in 1413 between November 23, 2010 and January 18, 2011. ECF No. 52-1 at 31-33. Defendant contends that any of the six alleged causes of action based on these wire transfers are untimely because the latest transfer took place in January 2011 and Riad was on notice of these allegedly unauthorized wire transfers as of January 28, 2011, when he sent a letter to Defendant disputing them. ECF No. 50 at 7.

10

In the letter to Defendant, Riad claims that the "wire transfers that were sent while [he] was traveling overseas" were mistakenly transferred out and that he had "demanded reverse wires."  ECF No. 51-3.  Riad further states in his letter that this is an "urgent matter" as it involved a "huge amount of money over a million dollars."  *Id*.  Furthermore, Riad testified that he initially discovered the purported unauthorized wire transfers when he saw them on the computer screen of a Wells Fargo branch manager, in that branch manager's office, in early 2011.  ECF No. 51 at ¶ 7.  Therefore, as Riad was aware of these allegedly unauthorized wire transfers as of January 2011, and the Complaint was not filed in this Court until September 18, 2019, Defendant contends that all Plaintiffs' claims related to the wire transfers are untimely.  ECF No. 50 at 7.

Plaintiffs respond that, "[a]dmittedly, Plaintiff Riad testified that he wrote a letter to Wachovia (Defendant Wells Fargo Bank's predecessor bank) on January 28, 2011 complaining that the transfers were unauthorized."  ECF No. 52 at 8.  Yet Plaintiffs contend that, because "on January 31, 2013, Wells Fargo sent a letter to Riad acknowledging that its effort to recredit his account for the unauthorized wire transfers was ongoing," the "breaches of duty alleged in Counts 1 through 6 of Plaintiffs' Complaint did not occur until much than the January 28, 2011 letter." *Id*.  Plaintiffs therefore imply that the statute of limitations only began to run "when Defendant Wells Fargo Bank communicated a refusal to credit Riad's

account to correct the unauthorized transfers." *Id*.  Plaintiffs also contend that the

"breach of Defendant Wells Fargo Bank's contract with Plaintiffs occurred on the

date that it communicated its intent not to reverse the unauthorized wire transfers

as it had repeatedly promised to do."  *Id*. at 51.

Plaintiffs further imply that Wells Fargo's promises to return the wire

transfers tolled the states of limitations under the doctrines of equitable tolling,

equitable estoppel by fraudulent concealment, or the discovery rule because "[u]p

until 2015, Plaintiff Riad had detrimentally relied on the promises and assurances

of Wells Fargo which caused him to 'relax his vigilance' and 'deviate from his

right of inquiry.'"  *Id*. at 59.

Plaintiffs finally contend that there are genuine issues of material fact

concerning the unauthorized wire transfer claims that preclude summary judgment,

including factual disputes as to where the money was wired, whether the funds

were returned to Plaintiffs' Wells Fargo bank account or credited to any account

owned and controlled by Plaintiffs.  ECF No. 52 at 43-51.

This Court finds that all of Plaintiffs' claims based on the unauthorized wire

transfers accrued when Plaintiffs claim they were injured, i.e., when the money

was wired out of Plaintiffs' accounts allegedly without authorization.  *See Pocono*

*Produce*, 503 Pa. at 84 ("[T]he statute of limitations begins to run as soon as the

right to institute and maintain a suit arises; lack of knowledge, mistake or

misunderstanding do not toll the running of the statute of limitations.")
Furthermore, there is no dispute that Riad knew that these wire transfers had
occurred, had identified them as "mistakes," and had already "demanded reverse
wires" from Defendant as of his January 28, 2011 letter.  ECF No. 51 at ¶ 9.

Because the last wire transfer took place on January 18, 2011 and Riad
admits that he was aware of the unauthorized wire transfers, at the latest, on
January 28, 2011, even "view[ing] the record and draw[ing] inferences in a light
most favorable to the non-moving party," the statute of limitations were certainly
running, at the latest, by January 28, 2011.  *In re Ikon Office Sols., Inc.*, 277 F.3d
658, 666 (3d Cir. 2002); *Drelles*, 881 A.2d at 831 ("[T]he relevant statute of
limitations begins to run as soon as the right to institute and maintain a suit arises,
which generally is when the injury was inflicted.").  The date Plaintiffs allege that
Wells Fargo "communicated its intent not to reverse the unauthorized wire
transfers," purportedly four years after the wire transfers occurred, is not the date
Plaintiffs were injured.  ECF No. 52 at 51.

Plaintiffs, however, contend that equitable tolling, equitable estoppel by
fraudulent concealment, or the discovery rule apply to toll the statute of limitations
for the unauthorized wire transfer claims.  ECF No. 52 at 57.  Plaintiffs baldly state
that "Wells Fargo concealed the misappropriation of funds from Plaintiffs'
account(s) through multiple layers of deception, conniving and failure to produce

13

documents in a timely manner despite its requirements to do so pursuant to court procedures in both federal court and state court."  ECF No. 52 at 59.

Plaintiffs further flatly state that Defendant promised Plaintiffs it "would return their funds comprising the six unauthorized debits and/or unauthorized wires," a "promise [which] was ongoing and reasserted by Defendant Wells Fargo Bank on numerous occasions until approximately the end of 2015 at which time Plaintiff Riad first realized that Defendant Wells Fargo Bank did not intend to credit his account as promised by it."  *Id*.  Plaintiffs additionally state that "[u]p until 2015, Plaintiff Riad had detrimentally relied on the promises and assurances of Wells Fargo which caused him to 'relax his vigilance' and 'deviate from his right of inquiry.'"  *Id*.  Lastly, Plaintiffs contend that they "did not have any way of inspecting internal bank records to ascertain what had happened to the funds in question and/or why they had not been credited back to his account."  *Id*.

The statute of limitations may be tolled by doctrines such as equitable tolling, equitable estoppel by fraudulent concealment, and the discovery rule.  *See Dubose*, 643 Pa. at 262; *Fine v. Checcio*, 582 Pa. 253, 271 (2005); *Pocono Produce*, 503 Pa. at 85 (1983).  "The discovery rule is distinct from the issue of whether a party is equitably estopped from invoking the statute of limitations." *Gustine Uniontown Assocs., Ltd. ex rel. Gustine Uniontown, Inc. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 836 n.2 (2006) (citing *Fine*, 582 Pa. 253).  "[T]he

former doctrine involves a plaintiff's lack of knowledge and the latter doctrine

pertains to a defendant's conduct after the cause of action arose." *Id.*

    1. <u>Equitable Tolling and Equitable Estoppel by Fraudulent Concealment</u>

Plaintiffs contend that "[t]he doctrines of equitable estoppel and equitable

tolling mandate that '[w]here, through fraud or concealment, the Defendant causes

the Plaintiff to relax his vigilance or deviate from his right of inquiry, the

Defendant is estopped from invoking the bar of the statute of limitations.'" ECF

No. 52 at 31 (quoting *Commc'ns Network Int'l, Ltd. v. Mullineaux*, 187 A.3d 951,

961 (2018), reargument denied (July 17, 2018), appeal denied, 203 A.3d 214 (Pa.

2019)).

Equitable tolling is a doctrine that "pauses the running of, or 'tolls,' a statute

of limitations when a litigant has pursued his rights diligently but some

extraordinary circumstance prevents him from bringing a timely action." *Dubose*,

643 Pa. at 262 (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014)).

"[A]ttorney error, miscalculation, inadequate research, or other mistakes have not

been found to rise to the 'extraordinary' circumstances required for equitable

tolling." *Fahy v. Horn*, 240 F.3d 239, 244 (3d Cir. 2001).

By contrast, the doctrine of equitable estoppel by fraudulent concealment

"provides that the defendant may not invoke the statute of limitations, if through

fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from

his right of inquiry into the facts." *Fine*, 582 Pa. at 271.  "The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception." *Id*.  "The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." *Id*.  Furthermore, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id*. at 272.

Plaintiffs fail to meet their burden to show that their claims were tolled by either equitable tolling or equitable estoppel by fraudulent concealment.  First, Plaintiffs do not provide any evidence to show that they were in any "extraordinary way [] prevented from asserting [their] rights." *Merritt*, 326 F.3d at 168. Plaintiffs' vague claims that Defendant "concealed the misappropriation of funds . . . through multiple layers of deception, conniving and failure to produce documents in a timely manner" are insufficient for the Court to invoke the extraordinary remedy of equitable tolling.  ECF No. 52 at 59.

Additionally, Plaintiffs' alleged reliance on a Wells Fargo bank employee's "ongoing" promise that Wells Fargo would "return" the money that had been transferred out of Plaintiffs' account is insufficient to establish the extraordinary circumstances required for equitable tolling.  *See Fahy*, 240 F.3d at 244 ("[A]ttorney error, miscalculation, inadequate research, or other mistakes have not

16

been found to rise to the 'extraordinary' circumstances required for equitable tolling.").

For these same reasons, Plaintiffs fail to meet their burden to show that Defendant used "fraud or concealment" to "cause[] the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine*, 582 Pa. at 271. Plaintiffs do not present "clear, precise, and convincing evidence" showing that Defendant acted in any way that would prevent Plaintiffs from further investigating their claims. *Id*.

Furthermore, even if the statute of limitations had been "tolled by virtue of fraudulent concealment," the statute of limitations "begins to run when the injured party knows or reasonably should know of his injury and its cause." *Id*. at 272.  As Plaintiffs admit that Riad knew of the wire transfers, had already identified them as "mistakes," and had "demanded reverse wire transfers" as of Riad's January 28, 2011 letter to Defendant, if the statute of limitations were ever tolled, they would have begun to run on January 28, 2011.  ECF No. 51-3.

Therefore, Plaintiffs are not entitled to either equitable tolling or equitable estoppel by fraudulent concealment for the unauthorized wire transfer claims.

### 2.  The Discovery Rule

The discovery rule "[a]rises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause."  *Pocono Produce*,

503 Pa. at 85.  "[U]nder the rule, even if a plaintiff suffers an injury, the statute of limitations does not begin to run until 'the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'"  *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (quoting *Debiec v. Cabot Corp.,* 352 F.3d 117, 129 (3d Cir. 2003)).  "For the statute of limitations to run, a plaintiff need not know the 'exact nature' of his injury, as long as it objectively appears that the plaintiff 'is reasonably charged with the knowledge that he has an injury caused by another.'"  *Mest*, 449 F.3d at 510-511 (quoting *Ackler v. Raymark Indus., Inc.*, 551 A.2d 291, 293 (1988)).

The discovery rule's purpose is to "[e]xclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury." *Fine*, 582 Pa. at 266-267.  The discovery rule questions what a plaintiff might have known "by the use of the means of information within his reach, with the vigilance the law requires of him." *Id.* at 267.  When "[r]easonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law." *Id.* at 268.

The discovery rule does not apply to delay the start of the statute of limitations for the unauthorized wire transfer claims.  Riad admittedly knew of the allegedly unauthorized wire transfers as of January 28, 2011 and therefore already knew "that he ha[d] been injured, and . . . that his injury ha[d] been caused by another party's conduct.'"  *Mest*, 449 F.3d at 510 (quoting *Debiec,* 352 F.3d at 129).  In the January 28, 2011 letter, Riad admits that he believed Wells Fargo was responsible for the allegedly unauthorized wire transfers, stating, "someone at the branch made mistakes during my travel and sent the wires out."  ECF No. 51-3.  Even if Plaintiffs had provided evidence to show a genuine issue as to whether Wells Fargo "concealed" the "appropriated funds," which they did not, it is undisputed that Riad knew of his alleged injury, i.e. that the allegedly unauthorized wire transfers were sent from his account, as of January 28, 2011.

Additionally, even if Defendant's promise to return the wire transfers had caused Riad to "relax his vigilance" and "deviate from his right of inquiry," there is no question that Plaintiff knew, or reasonably should have known, that he was injured and that his injury was caused by another party as of his January 28, 2011 letter.  Plaintiffs have not provided any evidence to show that they were unable, despite the exercise of diligence, to know of the alleged injury or its cause. *See Pocono Produce*, 503 Pa. at 85.  Therefore, the discovery rule does not apply to Plaintiffs' unauthorized wire transfer claims.

19

Finally, Plaintiffs' contention that there exists a genuine issue of material fact precluding summary judgment does not succeed because Plaintiffs fail to identify any issue of material fact relating to the statute of limitations. Instead, Plaintiffs dispute the substance of their claim, contending that there is a genuine issue as to where the money was wired and whether the funds were returned to Plaintiffs' account. ECF No. 52 at 43-51. As "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," the Court finds that there is no genuine issue of material fact precluding summary judgment on statute of limitations as to the unauthorized account claims. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

As the statute of limitations for negligence, negligent hiring, and conversion is two years, the statute of limitations for breach of contract and unjust enrichment is four years, the statute of limitations for UTPCPL claims is six years, and as the statute of limitations had begun to run, at the latest, by January 28, 2011, and because Plaintiffs did not file the instant lawsuit until September 18, 2019, all claims related to the unauthorized wire transfers are untimely. *See* cases cited *supra* pp. 8-9. Defendant is entitled to judgment as a matter of law on Counts 1-6 relating to the unauthorized wire transfer claims. Therefore, the Court grants

summary judgment as to Counts 1-6 relating to the unauthorized wire transfer claims in favor of Defendant.

### B. *Cashier's Check and Deposit Claims*

#### 1. Cashier's Check Claims

Plaintiffs maintain that they purchased a number of cashier's checks between December 2011 and February 2012, that Riad returned those cashier's checks to his accounts, but that Wells Fargo never deposited the money from those cashier's checks back to Plaintiffs' accounts.  ECF No. 1 at ¶¶ 28.1-28.4, 33.3-33.4, 39, 41; ECF No. 52-1 at ¶¶ 52, 56, 77; ECF No. 52 at 4.  Riad testified that he complained to Ryan Silhan, a Wells Fargo manager, in 2012 "that the cashier's checks weren't properly treated."  ECF No. 51-1 at 39-40.

Defendant contends that, as Riad admitted he complained to Wells Fargo in 2012 about the cashier's checks not being re-deposited, these claims are untimely. ECF No. 51 at 8.  Defendant further contends that it was impossible for Riad to not have been aware of these purported claims as of February 2012 because the bank records show that after purchasing the first cashier's on December 2, 2011, the money from that first cashier's check needed to be re-deposited into Riad's account so that he could purchase the second cashier's check, and so on until the last cashier's check was deposited into another account of Riad's at PNC on February 27, 2012.  *Id*. at 8-9.

Plaintiffs contend that they "only learned that Defendant Wells Fargo had breached its duty to return their funds and properly credit their accounts [with the cashier's check money] when the bank closed those accounts in late 2014 and failed to send Plaintiff Riad the full balance of the funds held for the benefit of Plaintiffs (between late 2014 and early 2015)."  ECF No. 52 at 34.  Plaintiffs contend, "Riad had no way of inspecting internal bank records to ascertain what happened to the funds in question, and/or why they had not been credited back to his account."  *Id*. at 43.

Plaintiffs further imply that the principles of equitable tolling, equitable estoppel by fraudulent concealment, and the discovery rule apply to toll the statute of limitations because "[u]p until 2015, Plaintiff Riad detrimentally relied on the explicit representations of Wells Fargo relating to his account balances as shown to him on the bank's computer screen by Randolph," which caused "Riad to relax his vigilance and deviate from his right of inquiry."  *Id*. at 42.  Finally, Plaintiffs claim there is a "[d]ispute of [m]aterial [f]acts that [p]recludes the [e]ntry of [s]ummary [j]udgment," relating to where the money from the cashier's checks went after Plaintiffs re-deposited them, since Plaintiffs claim the money was not deposited to any account owned by Riad.  *Id*. at 33-43.

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record

22

and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Plaintiff Riad testified that he knew and complained to a Wells Fargo manager in 2012 that the cashier's checks were not properly deposited into Riad's accounts. ECF No. 52-1 at 40. Plaintiffs do not contest this fact, nor have they pointed to any evidence in the record to rebut this fact.

This Court finds that all of Plaintiffs' claims based on the cashier's checks accrued when Plaintiffs claim they were injured, i.e., when Plaintiffs deposited the cashier's checks into their accounts and their accounts were not credited with that money. *See Pocono Produce*, 503 Pa. at 84 ("[T]he statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations.")

As Plaintiffs maintain that the last cashier's check was purchased in February 2012 and Riad admits that he complained to Defendant about the cashier's checks in 2012, even "view[ing] the record and draw[ing] inferences in a light most favorable to the non-moving party," the statute of limitations were certainly running, at the latest, by December 31, 2012. *In re Ikon Office*, 277 F.3d at 666; *Drelles*, 881 A.2d at 831 ("[T]he relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted."). The date Plaintiffs allege that "the bank closed

[Plaintiffs'] accounts in late 2014 and failed to send Plaintiff Riad the full balance of the funds," is not when Plaintiffs were injured nor when Plaintiffs' claims accrued.  ECF No. 52 at 34.

Plaintiffs further fail to show how the principles of equitable tolling, equitable estoppel, or the discovery rule apply to toll the statute of limitations in this case.  To support their contention that theses doctrines apply, Plaintiffs simply state: "[t]he Fourth Cashier's Check Claim traced to February 2012 redeposit was concealed by Wells Fargo until late 2018 or mid-2019 . . . [c]onsequently, up until early 2019, Plaintiffs relied on the statements by Wells Fargo Bank that the funds were lost."  ECF No. 52 at 42-43.  Plaintiffs also claim that "Riad had no way of inspecting internal bank records to ascertain what happened to the funds in question, and/or why they had not been credited back to his account."  *Id*. at 43.

First, Plaintiffs fail to produce or point to any evidence in the record showing that Plaintiffs "pursued [their] rights diligently but some extraordinary circumstance prevent[ed] [them] from bringing a timely action." *Dubose*, 643 Pa. at 262.  Plaintiffs state but have not shown how Wells Fargo "concealed" that the funds were not re-deposited nor shown how Wells Fargo prevented Plaintiffs from investigating their claim by stating the funds were lost.  Furthermore, neither of these excuses is sufficient to rise to the extraordinary circumstances required to establish that the claim should be tolled pursuant to equitable tolling.  *See Fahy*,

240 F.3d at 244 ("[A]ttorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling.")

Additionally, Plaintiffs fail to produce or point to any evidence in the record showing that the doctrine of equitable estoppel by fraudulent concealment applies to toll the statute of limitations for these claims.  Plaintiffs have not met their burden of providing "clear, precise, and convincing evidence" to show that Defendant acted in any way that "cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts."  *Fine*, 582 Pa. at 271-272. Plaintiffs' bald contentions that Defendant concealed that the funds were not re-deposited and that Plaintiffs "detrimentally relied on the explicit representations of Wells Fargo relating to his account balances as shown to him on the bank's computer screen by Randolph," which caused "Riad to relax his vigilance and deviate from his right of inquiry," are insufficient to meet Plaintiffs' burden of proving fraudulent concealment.  *Id*. at 42.

Furthermore, even if Plaintiffs' cashier's check claims were tolled by virtue of fraudulent concealment, the statute of limitations "begins to run when the injured party knows or reasonably should know of his injury and its cause."  *Fine*, 582 Pa. at 272.  Thus, the statute of limitations for Plaintiffs' cashier's check claims would still have begun running in 2012, when Riad complained to

25

Defendant that his cashier's checks were not properly handled.  ECF No. 52-1 at 40.

Riad also testified that he would go to a Wells Fargo branch "at least twice a week" to look at his bank balances with a Wells Fargo employee on that employee's computer screen.  ECF No. 52-1 at 37-38.  During any of those visits, if the cashier's checks, each with a value of over $1 million, had not been re-deposited into his accounts, Riad reasonably should have noticed that his balance was lower than it should have been and that the cashier's checks had not been re-deposited.  Plaintiffs did not need to "inspect[] internal bank records" to recognize that money was missing from their account.  ECF No. 52 at 43.

Additionally, the discovery rule does not apply to delay the start of the statute of limitations for Plaintiffs' cashier's check claims.  Plaintiffs fail to produce or point to any evidence to show that they were unable, "despite the exercise of due diligence, to know of the injury or its cause."  *Pocono Produce*, 503 Pa. at 85.  As previously discussed, Riad testified that he complained to Wells Fargo about these cashier's checks in 2012 and that he checked his account balances twice a week in person.  ECF No. 52-1 at 37-38, 40.  Therefore, Plaintiffs knew or reasonably should have known that the cashier's checks had not been re-deposited by 2012.

26

Finally, Plaintiffs' contention that there exists a genuine issue of material fact precluding summary judgment does not succeed because Plaintiffs fail to identify any issue of material fact relating to the statute of limitations.  Instead, Plaintiffs dispute the substance of their claim, contending that there is a genuine issue as to where the money from the cashier's checks went after Plaintiffs re-deposited them.  ECF No. 52 at 33-43.  As "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," the Court finds that there is no genuine issue of material fact precluding summary judgment on statute of limitations as to the cashier's check claims.  *Ramara*, 814 F.3d at 666 (citing *Acumed*, 561 F.3d at 228).

As the statute of limitations for negligence, negligent hiring, and conversion is two years, the statute of limitations for breach of contract and unjust enrichment is four years, the statute of limitations for UTPCPL claims is six years, and as Plaintiffs' cashier's check claims accrued, at the latest, on December 31, 2012, and because Plaintiffs did not file the instant lawsuit until September 18, 2019, all causes of action based on the cashier's check claims are untimely.  *See* cases cited *supra* pp. 8-9.  Defendant is entitled to judgment as a matter of law on Counts 1-6 relating to the cashier's check claims.  Therefore, the Court grants summary judgment as to Counts 1-6 relating to the cashier's check claims in favor of Defendant.

2. Deposit Claims

Plaintiffs additionally contend that Riad deposited $2.5 million on November 10, 2010 and $1.1 million on January 19, 2012 but that these amounts were never credited to his account. ECF No. 52 at 16. Defendant notes that these claims are based on two slips of paper that Riad contends are original receipts, dated November 10, 2010 and January 19, 2012, which Defendant claims "Riad has had in his possession since they were generated." ECF No. 50 at 9-10. Plaintiffs also maintain that, on February 27, 2012, $143,525.29 was "withdrawn from the account" ending in 7764 and "then deposited without Plaintiffs' or Schepperd's [Riad's ex-wife] knowledge, authority or consent into an unauthorized account in the sole name of Michelle Schepperd," account ending in 7416. ECF No. 52 at 7; ECF No. 51 at ¶ 15.

Defendant contends that Plaintiffs were on notice of these allegedly missing deposits through the account statements, which were sent regularly to Riad via mail. ECF No. 51 at 10 (citing ECF NO. 52-8 at ¶¶ 13-17). As the account statements were sent regularly, Defendant contends that Riad was aware of the first allegedly missing deposit in late 2010 and the second in early 2012. *Id*.

Plaintiffs contend that the deposit claims were timely filed because, although, "[a]dmittedly, the funds comprising the $2.5 million and $1.1 million 'deposits' were received and accepted on November 10, 2010, and January 19,

2012 . . . it was not until after the November 2014 account closures that the bank failed to return the funds." ECF No. 52 at 7. Plaintiffs further contend that "[n]otwithstanding repeated requests by Plaintiff Joseph Riad for copies of his bank statements and records, Plaintiffs did not receive . . . [credit or ] deposit record[s] until the fall of 2016 through the efforts of [Wells Fargo Vice President] George Beshara." ECF No. 52 at 18. Plaintiffs further contend that genuine issues of material fact preclude summary judgment, including that "the bank refuses to concede it received $5 million represented by $2.5 million on November 9 and $2.5 million on November 10," and that Wells Fargo disputes the $1.1 million was ever deposited by Riad into any of his Wells Fargo accounts. *Id*. at 20-25.

This Court finds that all of Plaintiffs' claims based on the deposit claims accrued when Plaintiffs claim they were injured, i.e., when Plaintiffs deposited the funds into their accounts and their accounts were not credited with that money. *See Pocono Produce*, 503 Pa. at 84 ("[T]he statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations.") Similarly, Plaintiffs' claim as to the $143,525.29 missing from Riad's account ending in 7746 accrued on February 27, 2012 when that money was allegedly withdrawn from Riad's account and deposited into an account he did not own, without authorization. *Id*.

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley*, 455 F.3d at 201.  As Plaintiffs maintain that the deposits took place in November 2010 and January 2012 and that the funds were withdrawn from Riad's 7746 account in February 2012, even "view[ing] the record and draw[ing] inferences in a light most favorable to the non-moving party," the statute of limitations on these claims were certainly running, at the latest, by February 27, 2012.  *In re Ikon Office*, 277 F.3d at 666; *Drelles*, 881 A.2d at 831 ("[T]he relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted.").  Plaintiffs' contention that the claims accrued after the "November 2014 account closures [when] the bank failed to return the funds" is without merit as Plaintiffs' alleged injury was inflicted when they did not receive their deposited funds in November 2010 and January 2012 and when their funds were withdrawn without authorization in February 2012.  ECF No. 52 at 7.

Finally, Plaintiffs do not specifically address how equitable tolling, equitable estoppel, or the discovery rule would toll the statute of limitations as to these deposit claims but claim baldly, "the doctrines of equitable estoppel and equitable tolling keep these claims alive." *Id*.

First, Plaintiffs fail to produce or point to any evidence in the record showing that Plaintiffs "pursued [their] rights diligently but some extraordinary circumstance prevent[ed] [them] from bringing a timely action." *Dubose*, 643 Pa. at 262.  Plaintiffs vaguely state that their "ability to demonstrate what is now clear was hindered by Wells Fargo's deliberate and systematic failure to produce its record for its customer, Joseph Riad, both before and after the commencement of litigation," without providing any specific details or pointing to any evidence in the record. ECF No. 52 at 18.  Plaintiffs fail to show the extraordinary circumstances required to establish that their claim should be tolled pursuant to equitable tolling. *See Fahy*, 240 F.3d at 244 ("[A]ttorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the 'extraordinary' circumstances required for equitable tolling.")

Additionally, Plaintiffs fail to produce or point to any evidence in the record to show that the doctrine of equitable estoppel by fraudulent concealment applies to toll the statute of limitations for these claims.  Plaintiffs have not met their burden of providing "clear, precise, and convincing evidence" to show that Defendant acted in any way that "cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine*, 582 Pa. at 271-272.

Furthermore, even if Plaintiffs' cashier's check claims were tolled by virtue of fraudulent concealment, the statute of limitations "begins to run when the

injured party knows or reasonably should know of his injury and its cause." *Fine*, 582 Pa. at 272.  Riad testified that he would go to a Wells Fargo branch "at least twice a week" to look at his bank account balances with a Wells Fargo employee on that employee's computer screen.  ECF No. 52-1 at 37-38.  During any of those visits, if the deposits, worth $1.1 million and $2.5 million, had not been credited to his accounts, Riad reasonably should have noticed that his balance was lower than it should have been and that the deposits had not been credited.  For the same reason, Riad reasonably should have noticed that $143,525.29 had been withdrawn without authorization from his account.

Moreover, the discovery rule does not apply to Plaintiffs' deposit claims. Plaintiffs fail to produce or point to any evidence in the record to show that they were unable, "despite the exercise of due diligence, to know of the injury or its cause." *Pocono Produce*, 503 Pa. at 85.  Plaintiffs do not present any evidence to rebut that they knew of their alleged injury in 2010 and 2012 when the deposits were made and the funds were transferred.  ECF No. 52 at 7.  Plaintiffs' claim that "it was not until after the November 2014 account closures that the bank failed to return the funds" is irrelevant, since the funds allegedly were missing as of 2010 and 2012.  ECF No. 52 at 7.

Finally, Plaintiffs fail to identify any genuine issue of material fact relating to the statute of limitations for the deposit claims.  As "the non-movant may not

32

rest on speculation and conjecture in opposing a motion for summary judgment," the Court finds that there is no genuine issue of material fact precluding summary judgment on statute of limitations as to the deposit claims. *Ramara*, 814 F.3d at 666 (citing *Acumed*, 561 F.3d at 228).

As the statute of limitations for negligence, negligent hiring, and conversion is two years, the statute of limitations for breach of contract and unjust enrichment is four years, the statute of limitations for UTPCPL claims is six years, and as the latest of Plaintiffs' deposit claims accrued on February 27, 2012, and because Plaintiffs did not file the instant lawsuit until September 18, 2019, all causes of action based on the deposit claims are untimely. *See* cases cited *supra* pp. 8-9. Defendant is entitled to judgment as a matter of law on Counts 1-6 relating to the deposit claims. Therefore, the Court grants summary judgment as to Counts 1-6 relating to the deposit claims in favor of Defendant.

### C. *Unauthorized Account Opening Claims*

Finally, Plaintiffs have alleged a claim based on a number of unauthorized accounts that Plaintiffs allege Wells Fargo opened under Riad's name without Riad's permission. Plaintiffs contend that these claims are related to "unauthorized accounts, unauthorized account activities and fees and interest associated with such accounts, [as] set forth in Counts 1 through 6 of the Complaint." ECF No. 52 at 4. Riad contends that he sent a letter to Defendant on January 17, 2012 complaining

that he was alerted to "multiple accounts that have been opened using the same account name that I have," which Riad was "told that this was done because the bank is giving [Wells Fargo branch manager Triandos Randolph] a commission to open multiple accounts."  ECF No. 51-13.  Riad contends that he further stated in his letter, "I am not happy with this and I cannot keep track of all these accounts," and demanded that Defendant "[p]lease close all these accounts and keep my money in the two accounts that I opened for myself."  *Id*.

Defendant contends that, based on this January 17, 2012 letter, Riad was aware of all allegedly unauthorized accounts that had been opened on or before January 17, 2012, and, therefore, all claims based on those pre-January 17, 2012 unauthorized accounts are untimely.  ECF No. 51 at 11.  As to any allegedly unauthorized accounts opened after that date, Defendant maintains, "it was the policy of Wachovia Bank and Wells Fargo to mail a monthly statement to the address associated with the account unless the customer agreed to accept statements electronically."  *Id*. at 12.   Defendant contends that "there is no evidence in the record which defeats the presumption that Wells Fargo mailed the statements to the address of record for each account."  *Id*.  Therefore, Defendant contends that "Riad was presumptively on notice of all transactions involving his accounts dated after January 17, 2012 per application of the mailbox rule."  *Id*. at 12-13.

Plaintiffs contend that "there is a substantial body of evidence of record that shows (a) Defendant Wells Fargo Bank opened accounts without Plaintiff Joseph Riad and Plaintiff Riad Holdings knowledge, authority and consent; (b) opened accounts without [Michelle] Schepperd's [Riad's ex-wife] knowledge, authority and consent and funneled funds belonging to Plaintiff Joseph Riad and/or Plaintiff Riad Holdings through such accounts, (c) Defendant Wells Fargo transacted in, through and amongst said accounts in relation to the conduct addressed in other sections of this response brief and in relation to multiple other unauthorized activities."  ECF No. 51 at 8-9.

Plaintiffs state that, "[a]dmittedly Plaintiff Joseph Riad was aware in 2012 that there were several accounts opened in addition to the 2 accounts he had opened back in the 1990s," however, Plaintiffs state Riad "was not aware of all of the accounts, and he was not aware of the fraudulent activities transpiring in the accounts."  *Id*. at 9.  Plaintiffs further state that there are "material facts in dispute on these issues that preclude summary judgment."  *Id*.  Plaintiffs do not further address the unauthorized account opening claims.

1.  List of Unauthorized Accounts

On March 10, 2020, the Court ordered Plaintiffs to produce an unredacted spreadsheet identifying each account that Plaintiffs claimed was opened without Plaintiffs' authorization, including information regarding the owner of the account,

the account type, the problem with the account, the associated damages, and Bates numbers of supporting documentation.  ECF No. 39.   Plaintiffs produced a chart with 30 rows of accounts, including 36 unique account numbers, to Defendant, but Plaintiff Riad was unable to describe the contents of the chart at his deposition. ECF No. 52 at 10 citing (ECF No. 52-12 at 45:3-7) (stating his attorney "put together this chart that is very, very confusing, as far as I'm concerned looking at it . . . I find it to be very confusing myself.").  The chart purports to list the account numbers of either unauthorized accounts or those in which unauthorized activity took place, the owner of the account, documentation to support the existence of and claims concerning the account, and a list of alleged issues with the account. ECF No. 51-11.  There are several accounts listed in certain rows, and some accounts are listed multiple times.  *Id*.

In contrast, Defendant provides the declaration of Karen Nelson, Operational Risk Consultant with Wells Fargo, wherein Nelson states that attached to her declaration is a "list of the opening and closing dates for all deposit accounts owned by Plaintiffs that was compiled from all account documents that have been located for the subject accounts after reasonable investigation and subject to Wells Fargo's document retention policies."  ECF No. 51-8 at 3.  Of the 19 accounts on Defendant's list, 12 were opened prior to the January 17, 2012 letter.  ECF No. 51-9.  All seven of the accounts opened after January 17, 2012 were closed on or

before September 19, 2014. *Id.* There are 17 accounts in Plaintiffs' chart that are not on Defendant's list. *Compare* ECF No. 51-9 *with* ECF No. 51-11.

In an effort to challenge Defendant's list of accounts, Plaintiffs baldly state that the "document was not generated by the bank's central computer system" and that "Defendant Wells Fargo Bank cannot establish this is an accurate list of the accounts." ECF No. 64 at 7. Plaintiffs further note that "the blatant errors in the document typed by the bank's counsel establish that the document[] is inaccurate and incomplete for the following reasons: i) The document fails to include the second account beginning with '169'; and ii) the document inaccurately represents the closing date of the Riad Schepperd Account as January 9, 2012 (the last statement period is 1/10/12 – 1/31/2012)." *Id.* Plaintiffs note that they have attached "a Sworn Certification by Plaintiffs' Counsel that she has the checkbook for the second '169' account in her physical possession and will make it available to the Court for physical inspection." *Id.* at 8. Plaintiffs do not provide any evidence substantiating their claim that Defendant's list inaccurately represents the closing date of the "Riad Schepperd Account." *Id.* Plaintiffs do not point to any other inaccuracies in the list. *Id.*

Plaintiffs' contention that Defendant's list contains errors and therefore is inaccurate is unsupported by evidence.

37

First, Plaintiffs' counsel's certification states that she has "the original checkbook for bank account ending in ***0115 and beginning with '169' in [her] physical possession" and provides a detailed description of the checkbook, a promise to provide the checkbook to the Court for inspection, and a photo of a check in the checkbook.  ECF No. 64-1 at 73-76.  However, Plaintiffs' counsel's certification states simply that she is in possession of a Wells Fargo branded checkbook with a bank account number starting with 169.  *Id*.  There is nothing on the check image indicating that the account belonged to Plaintiffs nor does Plaintiffs' counsel state in her certification that the checkbook or account actually belonged to Plaintiffs.  *Id*.

Second, Defendant's list shows the "Riad Schepperd Account," ending in 7764, as closing on January 17, 2012 and not January 9, 2012, as represented by Plaintiffs.  ECF No. 51-9.  In any case, Plaintiffs do not point to any evidence to show when the Riad Schepperd account *was* closed, even though Plaintiffs claim there exists a bank statement for the period January 10, 2012 to January 31, 2012.  ECF No. 64 at 7.  Plaintiffs do not cite to that bank statement nor do they explain how a bank statement from January 10, 2012 to January 31, 2012 proves the account was closed on any one day.

Plaintiffs do not point to any other purported errors in Defendant's list nor do they provide any additional evidence to show that Defendant's list is inaccurate.

38

"In attempting to defeat summary judgment, '[s]peculation and conclusory allegations do not satisfy [the nonmoving party's] duty.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999)) (alteration in original). "There is a genuine dispute of material fact if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party." *Ramara*, 814 F.3d at 666 (citing *Anderson*, 477 U.S. at 248). "But a mere 'scintilla of evidence' in the nonmovant's favor does not create a genuine issue of fact, and the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Id*. (citing *Acumed*, 561 F.3d at 228) (internal citations omitted).

Defendant supports its list of accounts with a declaration from one of its operational risk consultants and her statement, under penalty of perjury, that the list was "compiled from all account documents that have been located for the subject accounts after reasonable investigation and subject to Wells Fargo's document retention policies." ECF No. 51-8. Plaintiffs, on the other hand, have not provided nor pointed to more than a scintilla of evidence to show that there is a genuine issue as to the accuracy of Defendant's list of accounts.

Furthermore, even though Plaintiffs have not argued that the Court should consider their chart in lieu of Defendant's list, Plaintiffs do not provide enough evidence to show a genuine issue of fact as to either the existence of or claims

39

concerning the 17 accounts that are on Plaintiffs' chart that are not in Defendant's list.  *Compare* ECF No. 51-9 *with* ECF No. 51-11.  Of those 17 accounts, Plaintiffs' chart indicates that three accounts are not owned by Plaintiffs, three accounts are indistinguishable from accounts that *are* on Defendant's list, six accounts have no supporting documentation listed, and five account have insufficient supporting documentation listed.  ECF No. 51-9.

As to the three accounts that are not owned by Plaintiffs, Plaintiffs' chart indicates that they are owned by Plaintiff Riad's ex-wife.  ECF No. 51-11. Plaintiffs do not provide any evidence nor lay a foundation to show how Plaintiffs could maintain a claim for unauthorized account opening and activity against Defendant for accounts that Plaintiffs do not own.

As to the three accounts that are indistinguishable from accounts that *are* on Defendant's list, Plaintiffs fail to show how these accounts are distinct from the other accounts listed in the same row.  Plaintiffs similarly fail to provide any evidence or lay a foundation to support a claim for unauthorized account opening and activity in these accounts.

For each of the six accounts without any supporting documentation noted, Plaintiffs write, simply, "Line item in produced statement and/or Schepperd provided prior [to] her dep. Plaintiffs require the bank statements in a compiled and/or searchable format in order to find the line-item. Kindly provide same and

Plaintiffs will update." ECF No. 51-11. Fact discovery closed in this matter on April 16, 2020, ECF No. 28, and Plaintiffs have not produced nor pointed to any evidence in the record in their 91-page response brief, in their sur-reply brief, nor in any other capacity to support a claim for unauthorized account opening and activity in these accounts.

Lastly, there are five accounts on Plaintiffs' chart with insufficient documentation to support a claim for unauthorized account opening and activity. One account identifies "Riad Deposition Exhibit 32" and another account identifies "Riad Deposition Exhibit 36" as supporting documentation. ECF No. 51-11. In Riad's November 19, 2019 deposition transcript, Exhibit 32 is listed as "Photocopy of Wells Fargo Advisors, LLC New Account Application, 20 pages." ECF No. 53 at 118. Similarly, Exhibit 36 is described as "Photocopy of First Union Securities, Inc. Statement, page 3 of 8." *Id*. Plaintiffs have not pointed to these documents in their exhibits nor laid a foundation to show how these documents would support a claim for unauthorized account opening and activity in these accounts. Plaintiffs have also not produced any other evidence or documentation in their 91-page response brief, in their sur-reply brief, nor in any other capacity to support a claim for unauthorized account opening and activity in these accounts.

Next, one account identifies "Riad and Riad Holdings 000369" as supporting documentation. ECF No. 51-11. The Riad and Riad Holdings 000369 document is

a "cash in debit teller" receipt for an account ending in 0092 at Wachovia Bank. ECF No. 64-1 at 53.  This document does not have any identifying information linking it or the associated account to Plaintiffs.  *Id*.  Plaintiffs do not provide any additional documentation or lay a foundation to show how this document supports a claim for unauthorized account opening and activity in this account.

Subsequently, one account refers to "Account Number identified on Riad and Riad Holdings 000368" as supporting documentation.  ECF No. 51-11.  The Riad and Riad Holdings 000368 document is a "credit memo" from a Wachovia account ending in 1413. ECF No. 64-1 at 55.  On that credit memo, written by hand, is "with debit from . . . . 0594."  *Id*.  Plaintiffs have not pointed to any evidence showing that this 0594 account exists in Plaintiffs' name, nor have Plaintiffs laid the foundation for how this handwritten message supports a claim for unauthorized account opening and activity in this account.

Lastly, the account beginning with "169" and ending with "0115" refers to "Riad and Riad Holdings 001592; and/or Riad and RH Checkbook 000001" as supporting documentation.  ECF No. 51-11.  As previously discussed, Plaintiffs' attorney's certification that she has a "starter" checkbook in her possession for a Wells Fargo account with this account number does not provide any evidence that the account was in Plaintiffs' name.  ECF No. 64-1 at 73-76.  The other document Plaintiffs reference is a "Transaction Record" slip from Wells Fargo bank, wherein

"169" is handwritten on the line for "Account Number."  ECF No. 64-1 at 39.

Again, neither Riad nor Riad Holdings is mentioned on that slip.  *Id.*  Plaintiffs

have not pointed to any evidence showing that this account exists in Plaintiffs'

name, nor have Plaintiffs laid the foundation to support a claim for unauthorized

account opening and activity in this account.[1]

For the foregoing reasons, Plaintiffs do not support their claim that

Defendant opened or conducted activity without authorization in any of the 17

accounts that are on Plaintiffs' chart but not in Defendant's list.  Additionally,

Plaintiffs fail to provide more than a scintilla of evidence that Defendant's list of

accounts is inaccurate or that Plaintiffs' chart of accounts is accurate.  Therefore,

Plaintiffs' attempt to "rest on speculation and conjecture" in claiming that

Defendant's list of accounts is inaccurate, without providing any additional

evidence, fails.  *See Ramara*, 814 F.3d at 666.  This Court finds that Plaintiffs have

not shown that there is a genuine issue that Defendant's list of accounts, with

opening and closing dates, is complete and accurate.

---

[1] The Court previously held that the deposit claim related to this account was barred by the statute of limitations.  *See supra* p. 33; *see* ECF No. 52 at 21-22.

2.  <u>Allegedly Unauthorized Accounts Opened Prior to January 17, 2012</u>

There are twelve accounts[2] on Defendant's list of nineteen accounts that were opened prior to January 17, 2012, when Riad sent a letter to Wells Fargo demonstrating his knowledge of the existence of allegedly unauthorized accounts. ECF No. 50-9.

First, all twelve of these accounts that were opened prior to January 17, 2012 were also closed on or before this date.  ECF No. 51-9.  Therefore, all account activity, fraudulent or otherwise, in those accounts ended, at the latest, by January 17, 2012.  *Id.*  "Statutes of limitations begin to run when the cause of action accrues, which is usually the time a plaintiff is injured."  *Dubose*, 643 Pa. at 258. Therefore, even if Defendant opened these accounts without Plaintiffs' authorization or conducted unauthorized activity in these accounts, Plaintiffs were injured, at the latest, when each account was closed.  As all of these accounts were closed on or before January 17, 2012, the Court finds that the cause of action for the unauthorized account claims as to these twelve accounts accrued, at the latest, on this date.  Even "view[ing] the record and draw[ing] inferences in a light most favorable to the non-moving party," the statute of limitations were certainly running for the unauthorized account claims as to these twelve accounts, at the

_____

[2] These are Plaintiffs' accounts ending in 7764, 1668, 5274, 7756, 1426, 1439, 1413, 1743, 5309, 5354, 5341, and 5312.

latest, by January 17, 2012.  *In re Ikon Office*, 277 F.3d at 666; *Drelles*, 881 A.2d at 831 ("[T]he relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted.").

Furthermore, Plaintiffs admit that "Riad was aware in 2012 that there were several accounts opened in addition to the 2 accounts he had opened back in the 1990s."  ECF No. 52 at 9.  As both parties agree that Plaintiffs had knowledge of the existence of these accounts as of January 17, 2012, the Court finds that Plaintiffs were also on notice of the unauthorized account claims for these twelve accounts as of January 17, 2012.

Plaintiffs contend that even though Riad knew of some of the accounts as of 2012, Riad was "not aware of ***all of the accounts***, and he was not aware of the fraudulent activities transpiring in the accounts."  ECF No. 52 at 9.  However, "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Pocono Produce*, 503 Pa. at 84–85 (internal citations omitted).  As Riad demonstrated his knowledge that accounts were opened allegedly without his authorization on January 17, 2012, he was required to use all reasonable diligence to be properly informed of the activity in those accounts as of that date.

45

Finally, Plaintiffs fail to identify any genuine issue of material fact relating to the statute of limitations for any of the unauthorized account claims for accounts opened before January 17, 2012. As "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," the Court finds that there is no genuine issue of material fact precluding summary judgment on statute of limitations as to the unauthorized account claims for these twelve accounts. *Ramara*, 814 F.3d at 666 (citing *Acumed*, 561 F.3d at 228).

As the statute of limitations for negligence, negligent hiring, and conversion is two years, the statute of limitations for breach of contract and unjust enrichment is four years, the statute of limitations for UTPCPL claims is six years, and as these claims accrued, at the latest, on January 17, 2012, and because Plaintiffs did not file the instant lawsuit until September 18, 2019, all unauthorized account claims related to the twelve accounts opened before January 17, 2012 are untimely. *See* cases cited *supra* pp. 8-9. Defendant is entitled to judgment as a matter of law on Counts 1-6 relating to the unauthorized account claims for the twelve accounts opened prior to January 17, 2012. Therefore, the Court grants summary judgment as to Counts 1-6 relating to the unauthorized account claims for the twelve accounts opened prior to January 17, 2012 in favor of Defendant.

3.  <u>Allegedly Unauthorized Accounts Opened After January 17, 2012</u>

Furthermore, each of Plaintiffs' seven accounts[3] that were opened after January 17, 2012 were closed between September 15 and September 19, 2014. ECF No. 51-9.  This means that there was no activity, fraudulent or otherwise, occurring in these accounts after September 19, 2014.  "Statutes of limitations begin to run when the cause of action accrues, which is usually the time a plaintiff is injured." *Dubose*, 643 Pa. at 258.  Therefore, even if Defendant opened these accounts or conducted activity in these accounts without authorization, Plaintiffs were injured, at the latest, when each account was closed and all activity in the accounts stopped.  As all of these accounts were closed on or before September 19, 2014, the Court finds that the cause of action for claims concerning these seven accounts accrued, at the latest, on this date.[4]

_____

[3] These include Plaintiffs' accounts ending in 3314, 0908, 9053, 2947, 4562, 7014, and 4670. ECF No. 51-9.

[4] Plaintiffs have not presented any evidence or argument that equitable tolling, equitable estoppel, or the discovery rule apply to toll the statute of limitations as to the unauthorized account claims.  The burden is on Plaintiffs to establish that equitable tolling, equitable estoppel by fraudulent concealment, or the discovery rule apply to toll the statute of limitations.  *See Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755 (2016) ("[A] litigant is entitled to equitable tolling of a statute of limitations *only if the litigant establishes* two elements.") (emphasis added); *Fine*, 582 Pa. at 271 ("The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence."); *Wilson v. El-Daief*, 600 Pa. 161, 175, 964 A.2d 354, 362 (2009) ("The party relying on the discovery rule bears the burden of proof.").  Plaintiffs do not present or point to *any* evidence or argument that the statute of limitations for the unauthorized account claims should be tolled by equitable tolling, equitable estoppel, or the discovery rule. Therefore, this Court finds that equitable tolling, equitable estoppel and the discovery rule do not apply to toll the statute of limitations for the unauthorized account claims.

Therefore, even "view[ing] the record and draw[ing] inferences in a light most favorable to the non-moving party," the statute of limitations were certainly running for the unauthorized account claims as to these seven accounts, at the latest, by September 19, 2014. *In re Ikon Office*, 277 F.3d at 666; *Drelles*, 881 A.2d at 831 ("[T]he relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted.").

As the statute of limitations for these seven accounts started to run, at the latest, five years prior to the filing of the Complaint, Plaintiffs' claims for negligence, negligent hiring and conversion, which each have a two year statute of limitations, are untimely. *See supra* p. 8.  Similarly, Plaintiffs' claims for breach of contract and unjust enrichment, which each have a statute of limitations of 4 years, are untimely. *See supra* pp 8-9.  Plaintiffs also fail to identify any genuine issue of material fact relating to the statute of limitations for negligence, negligent hiring, conversion, breach of contract, and unjust enrichment for any of the unauthorized account claims for accounts opened after January 17, 2012.  As "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment," the Court finds that there is no genuine issue of material fact precluding summary judgment on statute of limitations as to the unauthorized

account claims for these seven accounts. *Ramara*, 814 F.3d at 666 (citing *Acumed*, 561 F.3d at 228).

Defendant is entitled to judgment as a matter of law on Counts 1-5 relating to the unauthorized account claims for the seven accounts opened after January 17, 2012. Therefore, the Court grants summary judgment as to Counts 1-5 relating to the unauthorized account claims for the seven accounts opened after January 17, 2012 in favor of Defendant.

However, Plaintiffs' claim that Defendant's unauthorized account openings and activity violated the UTPCPL, Count 6, has a statute of limitations of six years. *See supra* p. 9. As Plaintiffs filed the Complaint five years after the latest possible date that the cause of action for these seven accounts could have accrued, Plaintiffs' claim for unauthorized account opening and activity in violation of the UTPCPL for any activity between September 18, 2013 and the date the account was closed, **as to these seven accounts only**, is not time barred.[5]

---

[5] Defendants contend that, because it was the "policy of Wachovia Bank and Wells Fargo to mail a monthly statement to the address associated with" each of its customer's accounts, "Riad was presumptively on notice of all transactions involving his accounts dated after January 17, 2012 per application of the mailbox rule." ECF No. 50 at 12-13. However, Defendant does not address when any allegedly unauthorized activity in the seven accounts occurred. Therefore, even if Plaintiffs were on notice of all transactions in their accounts per application of the mailbox rule, if any of the allegedly unauthorized activity occurred between September 18, 2013 and September 2014, when the accounts were closed, Plaintiffs' UTPCPL claims as to this activity would still be timely.

While there is no evidence on the record to support Plaintiffs' claims that Defendant opened or conducted activity in these seven accounts without authorization during this time, Defendant does not specifically address the unauthorized account claims with respect to these seven accounts in its Motion for Summary Judgment.  "The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).  As Defendant has not pointed to any portion of the record to establish either that Plaintiffs' claims that Defendant opened or conducted activity in these seven accounts without authorization are untimely or that there is an absence of a genuine issue of fact, Defendant has not met its burden for summary judgment on these claims for these seven accounts.

However, to maintain this claim at trial, Plaintiffs will still need to establish both that Defendant opened or conducted activity in these seven counts without authorization in violation of the UTPCPL and that these claims are timely.  The UTPCPL states, "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or person, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars

($100), whichever is greater."  73 P.S. §201-9.2.  Plaintiffs will need to establish that Defendant opened or conducted activity in these seven accounts without authorization in violation of the UTPCPL and that Plaintiffs suffered an ascertainable loss, aside from attorney's fees, specifically as to these seven accounts.  *Grimes v. Enter. Leasing Co. of Philadelphia, LLC*, 629 Pa. 457, 465 (2014) ("[M]ere acquisition of counsel would not suffice to satisfy the 'ascertainable loss' requirement.")

As the Court granted summary judgment as to Counts 1-5 in their entirety and Count 6 with respect to the unauthorized wire claims, the cashier's check and deposit claims, and the unauthorized account claims as to the twelve accounts opened before January 17, 2012 in favor of Defendant,  no evidence on any of these claims will be introduced at trial.  The only evidence that will be presented at trial will be related to Defendant opening or conducting activity without authorization in the seven accounts opened after January 17, 2012 to establish that this claim is timely, to establish a violation of the UTPCPL, and to establish that Plaintiffs suffered an ascertainable loss.

D. *State Law Claims Tolling*

Lastly, Defendant contends that the relevant statutes of limitations are not tolled by Plaintiffs' filing of a Writ of Summons in the Chester County Court of Common Pleas ("Chester County Action") on September 12, 2016, even if many

of the claims in the Chester County Action overlap with this federal action.  ECF

No. 50 at 5-6 (citing *Ammlung v. City of Chester*, 494 F.2d 811, 816 (3d Cir. 1974)

("The running of a Pennsylvania statute of limitations against a federal cause of

action is not tolled under Pennsylvania concepts of tolling by the commencement

of a similar suit in state court.") (citations omitted)).

Plaintiffs respond that the statutes of limitations *were* tolled when they filed

a Writ of Summons in the Chester County Action because the Chester County

Action is currently pending.  ECF No. 52 at 85.  Plaintiffs rely on *Holmes v.*

*Strawbridge & Clothier, Inc.*, where the court decided to exercise supplemental

jurisdiction over the plaintiffs' untimely state law claims because those claims had

been timely filed in state court and were currently pending in state court.  ECF No.

52 at 85-86 (citing *Holmes v. Strawbridge & Clothier, Inc.*, No. CIV. A. 94-1999,

1994 WL 649156 at *2 (E.D. Pa. Nov. 16, 1994)).  Plaintiffs claim that "just like in

*Holmes*, the state cases are 'concurrently pending' before the State Court and the

tolling of the statute of limitations does not expand Plaintiffs' rights by

concurrently litigating this Federal Action."  *Id.*  Plaintiffs further contend that

Defendant cites to cases that "either involve federal causes of action that are

parallel causes of action to state causes of action pending before a state court or

cases that were not pending either at the time the federal action was commenced or

at the time the court considered the statute of limitations issue."  ECF No. 52 at 86.

Plaintiffs' contention that the statutes of limitations are tolled because the Chester County Action, where Plaintiffs are litigating many of the same claims, is currently ongoing is unsupported by the law.  "Pennsylvania and federal law distinguish between actions commenced in state court and federal court for the purpose of tolling."  *Bush v. City of Pittsburgh*, No. 19-1009, 2020 WL 3097677, at *2 (3d Cir. June 11, 2020).  Courts have consistently held that "[t]he tolling of a claim by virtue of its initiation in state court does not transfer to claims subsequently brought in federal court." *Id*. (citing *Ammlung*, 494 F.2d at 816); *see also Falsetti v. United Mine Workers of Am.,* 355 F.2d 658, 662 (3d Cir. 1966) (rejecting contention that commencement of prior state court action served to toll the limitations period for subsequently filed federal action); *Royal-Globe Ins. Cos. v. Hauck Mfg. Co*., 335 A.2d 460, 462 (1975) ("An action in state court does not toll the running of the statute of limitations against subsequent action in federal court."); *McCreary v. Redevelopment Auth. of the City of Erie*, 427 F. App'x 211, 215 (3d Cir. 2011) (refusing to toll the statute of limitations on plaintiff's claims for the time "in which [plaintiff] pursued relief against the [defendant] in state court"); *Davis v. Malitzki*, No. CIV. A. 09-0739, 2009 WL 3467770 (E.D. Pa. Oct. 27, 2009) (finding that a state writ of summons does not toll the statute of limitations under Pennsylvania law when the state court case is filed as a separate claim in federal court and not removed to federal court).

In contrast, the court in *Holmes* was deciding whether to exercise supplemental jurisdiction over the plaintiff's related state law claims, when plaintiff had timely filed federal law claims, which were pending before the court, and the state law claims were timely filed in state court. *Holmes v. Strawbridge & Clothier, Inc.*, 1994 WL 649156 at *1 (E.D. Pa. Nov. 16, 1994). Instead of forcing the plaintiff to "litigate identical facts in two different courts," the court considered "efficiency, judicial economy, convenience, and fairness to the litigants" in determining to exercise supplemental jurisdiction over the plaintiff's claims. *Id*. at *3.

*Holmes* is inapplicable to this case. Here, this Court has diversity jurisdiction, not supplemental jurisdiction, over Plaintiffs' claims, all of which are based on alleged violations of state law. Furthermore, Plaintiffs are already years into litigating the related claims in state court. Whereas the court in *Holmes* sought to further judicial economy by allowing the plaintiff to litigate both his federal and state law claims in the same forum, here Plaintiffs sought to litigate their state law claims in *both* state court and federal court and now seek to use their state court filing date to also toll the statues of limitations in this federal court. *Holmes* does not support Plaintiffs' contention that their federal claims should be tolled because their state law claims are currently pending. Therefore, given the inapplicability of *Holmes* and the ample case law holding that the filing of a Writ of Summons in

state court does not toll the statute of limitations in a similar suit in federal court, Plaintiffs claims are not entitled to tolling based on the Chester County Action.

## V.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part, denied in part.  The Court grants summary judgment as to Counts 1-5 in favor of Defendant.  The Court grants summary judgment as to Count 6 with respect to the unauthorized wire claims, the cashier's check and deposit claims, and the unauthorized account claims as to the twelve accounts opened before January 17, 2012 in favor of Defendant.  **The Court denies summary judgment as to Count 6 with respect to Plaintiffs' claims that Defendant opened or conducted activity in Plaintiffs' accounts ending in 3314, 0908, 9053, 2947, 4562, 7014, and 4670 without authorization in violation of the UTPCPL.**

As stated previously, to maintain this claim at trial, Plaintiffs will need to establish that these claims are timely, that Defendant opened or conducted activity in these seven accounts without authorization in violation of the UTPCPL, and that Plaintiffs suffered an ascertainable loss, aside from attorney's fees, specifically as to these seven accounts.  *See Grimes*, 629 Pa. at 465 ("[M]ere acquisition of counsel would not suffice to satisfy the 'ascertainable loss' requirement.")

As the Court granted summary judgment as to Counts 1-5 in their entirety and Count 6 with respect to the unauthorized wire claims, the cashier's check and

deposit claims, and the unauthorized account claims as to the twelve accounts opened before January 17, 2012 in favor of Defendant,  no evidence on any of these claims will be introduced at trial.  The only evidence that will be presented at trial will be related to Defendant opening or conducting activity without authorization in the seven accounts opened after January 17, 2012 to establish that this claim is timely, to establish a violation of the UTPCPL, and to establish that Plaintiffs suffered an ascertainable loss.

An appropriate order will follow.

BY THE COURT:

**DATED:** <u>August 6, 2020____</u>       <u>/s/ Chad F. Kenney_____</u>
                                           **CHAD F. KENNEY, J.**